# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

OLACHI MEZU-NDUBUISI, an Individual )
                                )
                     Plaintiff, )  Case No.: 24-cv-6387-EAW
vs. )
                                  )
UNIVERSITY OF ROCHESTER, )  COMPLAINT
                                  )
GOLISANO CHILDREN'S HOSPITAL, )  DEMAND FOR JURY TRIAL
UNIVERSITY OF Rochester Medical Center )
                                  )
DR. MICHAEL APOSTOLAKOS, in his )
personal capacity and as Chief Medical Officer )
of University of Rochester. )
                                  )
DR. JILL HALTERMANN, in her personal )
Capacity and as Chair of the Department of )
Pediatrics, University of Rochester. )
                                  )
DR. CARL D'ANGIO, in his personal capacity )
and as Chair of the Division of Neonatology, )
Department of Pediatrics, University of )
Rochester. )
                                  )
                     Defendants. )
                                  )

*UNITED STATES DISTRICT COURT / FILED JUN 2 0 2024 / MARY C. LOEWENGUTH, CLERK / WESTERN DISTRICT OF NY*

## INTRODUCTION

Plaintiff, Dr. Olachi Mezu-Ndubuisi, hereinafter, ("Plaintiff" or "Dr. Mezu-Ndubuisi") pro se files

this complaint against University of Rochester, ("UR"), and Golisano Children's Hospital (GCH),

University of Rochester Medical Center, and Dr. Michael Apostolakos, Dr. Jill Haltermann, Dr.

Carl D'Angio, or collectively, "Defendants" to recover damages and for declaratory relief for

violations of Title VII of the Civil Rights Act of 1964, based upon discrimination, retaliation,

harassment, hostile work environment; denial of procedural due process and breach of contract,

1

New York Executive Law §296, discriminatory retaliation (hereinafter "NYSHRL") predicated on plaintiff's opposition to and complaints of defendant's unlawful and discriminatory clinical and employment practices and policies.

## PARTIES

1.     Dr. Olachi Mezu-Ndubuisi is and at all relevant times a resident of the City of Rochester, in the State of New York.

2.     Defendant, University of Rochester (UR) is and at all relevant times a private research university and does business as University of Rochester in Rochester, New York.

3.     Defendant, University of Rochester employs more than 501 people, and at no time relevant to this complaint did it ever employ fewer than 15 persons.

4.   Defendant, Golisano Children's Hospital (GCH) is a hospital primarily affiliated with University of Rochester.

5.   Defendant, GCH, University of Rochester Medical Center employs more than 501 people, and at no time relevant to this complaint did it ever employ fewer than 15 persons.

6.   Defendant, Dr. Michael Apostolakos, is and at all relevant times, the Chief Medical Officer of University of Rochester

7.     Defendant, Dr. Jill Halterman, is and at all relevant times, the Chair of the Department of Pediatrics, University of Rochester.

8.     Defendant, Dr. Carl D'Angio, is and at all relevant times, the Chair of the Division of Neonatology, Department of Pediatrics, University of Rochester.

9.     At all relevant times, UR and Golisano Children's Hospital (collectively known as "UR") employed Dr. Mezu-Ndubuisi.

10.     At all relevant times, University of Rochester has been a joint employer with Golisano Children's Hospital where both defendants controlled the terms and conditions of Dr. Mezu-Ndubuisi's employment.

11.     All acts and failures to act alleged herein were duly performed by and attributable to all Defendants, each acting as a successor, agent, alter ego, employee, indirect employer, joint employer, integrated enterprise, or under the direction and control of the others, except as specifically alleged otherwise. Said acts and failures to act were within the scope of such agency and/or employment, and each Defendant participated in, approved, and/or ratified the unlawful acts and omissions by the other Defendants complained of herein. Whenever and wherever reference is made in this Complaint to any act by a Defendant or Defendants, such allegations and reference shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and/or severally.

12. All acts and failures to act alleged herein were duly performed by and attributable to the plaintiff's supervisors, managers, and colleagues referenced in this complaint who carried out such acts in their official capacities as employers, and as agents, and assigns of the Defendants.

13.     Plaintiff is ignorant of the true names and capacities of each defendant sued as DOES 1 through 17, inclusively, and therefore Plaintiff sues said defendants by fictitious names. Plaintiff reserves the right to amend the complaint to name each DOE defendant individually or corporately as it becomes known. Plaintiff alleges that each DOE defendant was in some manner responsible for the acts and omissions alleged herein and Plaintiff will amend the complaint to allege such responsibility when the same shall have been ascertained by Plaintiff.

**JURISDICTION AND VENUE**

14.     This court has personal jurisdiction over the parties. The plaintiff is a citizen of the state of

New York and works for the defendants in the State of New York. Defendants do business in the

State of New York and their conduct in the State of New York underlies all of the claims in this

suit. The court has subject matter jurisdiction because this action raises a federal question for which

district courts have original jurisdiction. 28 U.S.C. § 1331. Plaintiff requests this court exercise

supplemental jurisdiction over her NYSHRL claims pursuant to 28 U.S.C. Code § 1367.

15.     Venue is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which

the events giving rise to the claims occurred.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

16.     All conditions precedent to filing claims under Title VII have been performed or have

occurred. Dr. Mezu-Ndubuisi filed a single timely charge of discrimination with the U.S. Equal

Employment Opportunity Commission ("EEOC") on December 20, 2023, with the Rochester

EEOC against the University of Rochester. On April 3, 2024, the EEOC issued a notice of the

right to sue. **(Exhibit A).** This suit is being brought within 90 days from the plaintiff's receipt of

the notice of the right to sue.

**FACTS COMMON TO ALL CAUSES**

**Overview of Dr. Mezu-Ndubuisi's Relevant Academic Background**

17.     Dr. Mezu-Ndubuisi is an Associate Professor with tenure at University of Rochester,

hired on July 1, 2022, and the only Black faculty and neonatologist in the Division of

Neonatology of Nigerian national origin, and the only black tenured faculty in the Department of

Pediatrics at University of Rochester. Dr. Mezu-Ndubuisi was hired as a clinician-scientist to

4

conduct laboratory, clinical, global health and translational research, including bench to bedside applications of research knowledge, as well as care for newborns and critically ill premature infants in the neonatal intensive care unit (NICU). Despite having full tenure, which is unprecedented for the institution, the Plaintiff has faced a pattern of discrimination, false reports, and retaliation from the department leadership and colleagues.

18.     Dr. Mezu-Ndubuisi has published over 25 peer-reviewed research papers, 4 book chapters, and recently in December 2023, a medical textbook titled, Fluids, Oxygen, Calories, Inflammation/Infection (FOCI) – a physiology-based guide to neonatal care. Dr. Mezu-Ndubuisi was awarded over $1.2 million in research funding from the National Eye Institute (NEI) of the National Institute of Health (NIH) funding for her laboratory research on retinopathy of prematurity (ROP), studying the effect of oxidative stress on the organs (brain, retina, lungs, kidneys) of premature babies and to develop novel treatments which can be translated clinically and applied to improve outcomes in premature infants. **(Exhibit B).**

19.     Dr. Mezu-Ndubuisi was awarded a three-year professorship  from 2021 to 2024 by the McPherson Eye Research Institute Retina Research Foundation for her dedicated and pioneering contributions to clinical, laboratory, global health research and advancing the field of retina research.

20.     At University of Rochester, Dr. Mezu-Ndubuisi has established a research laboratory staffed by two full-time technical associates and 10 graduate and undergraduate students. In addition, she is currently mentoring three global health students (two from University of Rochester and one from SUNY College of Optometry), a medical student and an ophthalmology resident in various research projects. Dr. Mezu-Ndubuisi has mentored over 50 trainees and helped inspire their academic careers.

21.    At UR, Dr. Mezu-Ndubuisi is well-respected and valued for her clinical expertise, compassionate care of babies and their families, meticulous medical record documentation, professionalism, clear and respectful communication, cheerful demeanor, and collaborative and kind attitudes to all staff and colleagues.

22.    At UR, Dr. Mezu-Ndubuisi has excellent working relationships with colleagues and the medical team, and received unsolicited emails of praise and support from other physicians who sought the Plaintiff's expertise in managing complex cases. Dr. Mezu-Ndubuisi was well-respected and valued by her colleagues and trainees for her clinical expertise, excellent teaching, meticulous medical record documentation, professionalism, clear and respectful communication.

23.    Dr. Mezu-Ndubuisi's colleagues in the Division of Neonatology and the Departments of Ophthalmology frequently sought her clinical opinion regarding complex medical cases, particularly those of lung disease, ventilatory care, poor nutritional growth, and retinopathy of prematurity.

**Overview of Dr. Mezu-Ndubuisi's Complaint of Racial Discrimination And Retaliation Against University of Rochester**

## A. PRE-EXISITING TOXIC AND UNHEALTHY WORK ENVIRONMENT IN THE GCH NICU

24.    A biased and unhealthy work environment in the Golisano Children's Hospital NICU was existing prior to Dr. Mezu-Ndubuisi's hire. On the July 1, 2022, during the first day of hire meeting with Dr. Mezu-Ndubuisi, her direct supervisor, Dr. Carl D'Angio disclosed to her and a new Assistant Professor in a welcome meeting that the GCH NICU staff had been struggling

for years with a toxic and unhealthy work environment, unkind behaviors, excessive malicious rumors amongst staff at all levels and micro-aggressions at all levels, from nursing staff to trainees and physicians, and they were working on curtailing it. Dr. Mezu-Ndubuisi told him that acknowledging it's existence was the first step towards eradicating it.

25.   From the first time Dr. Mezu-Ndubuisi began work at University of Rochester she was subject to extreme microaggressions and rumors about her clinical care by some NICU staff, and NICU Leadership refused to investigate these false reports, and instead encouraged these behaviors.

26.   University of Rochester and NICU Leadership while recognizing that an unhealthy work environment exists in the NICU have neglected to institute implicit bias training, cultural sensitivity training, and training against racial discrimination all for its NICU staff, leading to an unhealthy, toxic work environment for Dr. Mezu-Ndubuisi and minority employees (fellow and resident physicians and staff).

27.   An August 14, 2023 email from the Healthy Work Environment (HWE) committee established around the time of Dr. Mezu-Ndubuisi's hire in the NICU confirms that there is a toxic, unhealthy work environment in the NICU, and a culture of rumors and false reports that has remained unfettered pre-dating Dr. Mezu-Ndubuisi's first clinical week assignment in the NICU in 2023. Christina San Filipo from the HWE Leadership states that, *"We acknowledge together these difficult truths: The unit's architecture represents a physical and symbolic challenge- walls separate people with too little communication and collaboration. **Gossip is a major problem: professional criticism, judgment, idle rumors, and pettiness.** Each discipline faces specific challenges to feeling the work environment helps them perform to their best abilities."* **(Exhibit H)**

7

**B.   NICU LEADERHSIP IGNORED IMPLICIT BIAS TRAINING FOR YEARS DESPITE AN UNHEALTHY NICU WORK ENVIRONMENT**

28.   There was no Diversity, Equity, Inclusion (DEI) and Implicit Bias Training specifically done for NICU staff and trainees prior to or during Dr. Mezu-Ndubuisi's time working in the NICU.

29.   In a September 26, 2023 email from the Neonatology Fellowship Director, Dr. Rita Dadiz, stated that Dr. D'Angio had mentioned Dr. Mezu-Ndubuisi's DEI interest. Dr. Mezu-Ndubuisi had offered before hire and during her annual evaluation on July 14, 2023  to be involved in developing DEI training in the department, but Dr. D'Angio ignored these requests and never discussed it with her. This email from Dr. Dadiz came days after Dr. D'Angio brought the first staff complaint against Dr. Mezu by email on September 18, 2023 that falsely claimed that she was not following consensus practice and that an investigation into her clinical care would be opened, despite not asking her side of events, refusing to disclose specific complaints, and ignoring her account of the events of the September 11, 2023 night in question (baby F Twin A - Exhibit C).   Dr. Mezu-Ndubuisi raised concerns of lack of fairness and equity in the investigations. Therefore, she viewed this sudden and vague invitation to participate in DEI initiatives to be conveniently timely and a distraction from the ongoing discrimination she was facing in the NICU. Dr. Dadiz in her email stated, *"Carl recently mentioned that you were involved with DEI work in your former institution.  He didn't go into details, but I am interested in hearing about it.  I am emailing to see whether you would be interested in helping to develop a DEI curriculum for the fellows.  I have been thinking about doing this for a number of years, but I have been busy addressing/working on other fellow-related issues/initiatives.  Nationally,*

*there is a group of neonatologists and fellows who completed a needs assessment and is just starting to envision what a national curriculum might look like. However, I am thinking that it will be another couple of years before this happens. If you are interested, we can start by meeting to brainstorm."*

30.    As of March 1, 2024, the Division of Neonatology still did not have any formal DEI and Implicit Bias Training of its faculty members and nursing staff, despite these concerns of racism raised by Dr. Mezu-Ndubuisi, formally since December 8, 2023. Dr. Carl D'Angio, the Division Chief of Neonatology wrote to all neonatology clinical faculty stating that " *Dear NICU Faculty, Rita Dadiz has arranged for the Office of Equity and Inclusion to provide faculty and fellows with a series of workshops over the next several months on ways to recognize and diminish bias in our interactions with colleagues, trainees and families. This training is crucial to our faculty role as leaders in the NICU.*" The topics listed in the scheduled sessions from February through September 2024 of Implicit Bias, Microaggressions, and Allyship in this training related only to Gender diverse people, and not on racial discrimination. This training was also not mandatory for fellows or faculty.

31.    While it is a good first step to train fellows in Implicit Bias and Microaggressions geared towards gender bias, there was no mention of racial bias training or a planned training specific for the neonatology faculty, NICU nursing and other staff. This casual approach to DEI training undermines the commitment of University of Rochester to maintain equity and a safe space for racial minorities in the workplace, particularly clinical environment.

## C. INVOLUNTARY ASSIGNMENT OF A CLINICAL MENTOR TO DR. MEZU-NDUBUISI

32.     Since Dr. Mezu-Ndubuisi's hire, Dr. Carl D'Angio, Chair of the Division of Neonatology in the Department of Pediatrics of University of Rochester, has assigned several clinical mentors to Dr. Mezu-Ndubuisi in succession, without seeking her input or giving her a reason why a clinical mentor was needed, and without seeking her input in this choice of a mentor. No other Associate Professor has been forced to have a clinical mentor.

33.     On July 1, 2022, on Dr. Mezu-Ndubuisi's first day of hire, Dr. Carl D'Angio communicated to her in an in-person meeting that she would be assigned a clinical mentor. No reason was offered to Dr. Mezu-Ndubuisi and she was not given a choice in selecting a clinical mentor. Dr. D'Angio never stated to Dr. Mezu-Ndubuisi the reason why she was being asked to have a clinical mentor. He alluded that it would help her acclimatize to a new institution if she ever had questions, and that clearly she is a qualified and experienced neonatologist and does not need a mentor in the actual sense of it. However, the intensity and persistence of his actions assigning a mentor to her rather than allowing her develop natural relationships with a mutually agreed upon mentor of her choice, belied the underlying intention that the clinical mentor was to monitor Dr. Mezu-Ndubuisi, control her practice and restrict her autonomy of clinical judgement as a physician, without justification.

34.     Defendants' NICU Leadership showed bias and disparate treatment in mandating a clinical mentor to Dr. Mezu-Ndubuisi upon hire, when other new neonatologists in prior years were not mandatorily assigned a clinical mentor upon hire. Dr. Joe Bliss, a new faculty with considerable experience was hired in September 2023. He was not assigned a clinical mentor on the first day or month of his hire as was done to Dr. Mezu-Ndubuisi.

35.     When Dr. Mezu-Ndubuisi complained that mentors of lower academic ranks were being assigned to her, University to Rochester, in a cover up,  then assigned  Dr. Myers as a clinical

mentor to Dr. Bliss after her official complaints of discrimination. There is no evidence that these two have a mentoring relationship, and the timing of this assignment is questionable. This assignment likely occurred after Dr. Mezu-Ndubuisi notified the University on December 8, 2023 of her belief that insistence on a clinical mentor was to monitor her, and that other non-black faculty were not treated this way.

36.     In addition , the new faculty hired between 2019 and 2021 as Assistant Professors prior to Dr. Mezu-Ndubuisi's hire in July 1, 2022  were not assigned clinical mentors from the first day of hire, without their input, or even months after hire. Acceptable evidence would be an email evidence of this involuntary assignment as was done to Dr. Mezu-Ndubuisi.

37.     Therefore, Dr. Mezu-Ndubuisi, is of the belief that assignment of a clinical mentor was a practice initiated when she was hired in July 1, 2022, as the only Black faculty in neonatology, constituting discriminatory and disparate treatment.

38.     The UR Leadership's presented a re-entry plan on May 23, 2024 and a remediation plan on June 4th, 2024 that includes excessive monitoring of Dr. Mezu-Ndubuisi's clinical activities by an assigned mentor, without justification, including daily and weekly reporting to a mentor, and weekly reporting to the Division Chief and Department Chair, giving them the authority to terminate her mentoring or clinical activities at will. All without justification or due process.

## D. NICU LEADERSHIP'S UNDUE MONITORING AND OVERSCRUTINY OF DR. MEZU-NDUBUISI'S CLINICAL ACTIVITIES

39. Dr. Mezu-Ndubuisi has 75 % protected research time and her allocation of clinical time in weeks is equivalent to those of other clinician-scientist neonatologists in the division like Dr. Andrew Dylag, Dr. Laurie Steiner, and  Dr. Kristin Schieble, and this does not affect their

clinical performance or erode the confidence in their abilities as a clinician. That Dr. Mezu-Ndubuisi is being treated differently is a prime example of the racial discrimination and bias in the Division of Neonatology. That the NICU leadership does not recognize that their lack of diversity in leadership, faculty and trainee representation, and NICU nursing staff including nurse practitioners and leadership is concerning and contributing to an unhealthy and toxic work environment for the minority trainees (NICU fellow and pediatric residents) and Dr. Mezu-Ndubuisi.

40. Dr. D'Angio has infact instituted unfair monitoring and over-scrutiny of Dr. Mezu-Ndubuisi since hire. He monitors her attendance at meetings by suggesting that she participate in person in the division fellow conference and perinatal conference. No other neonatologist's attendance is monitored in this matter or given these in person attendance directives. These meetings have an attendance of 14 to 24 out of over 60 clinical staff, with over 80% attending by zoom. Dr. Mezu-Ndubuisi's attendance is on par with all other faculty, particularly other clinician-scientist neonatologists.

41. In the re-entry plan presented to Dr. Mezu-Ndubuisi by Dr. D'Angio on June 4, 2023, it states that she is mandated to attend all lectures in person, or in zoom with camera on. Most attending neonatologists attend lectures in person when they are on clinical service and present in the NICU, otherwise majority attend via zoom. Only about 40-60% of neonatologists are present during weekly meetings. For the December 13, 2023 Fellow Conference, out of the 22 people that attended, only 6 attended in person, and the rest were on zoom, with only 4 attending with their cameras on.  For the January 31, 2023 Perinatal conference with both Obstetrics and Neonatal staff, 23 people attended, with 7 present in person; and out of the 16 on zoom, only 3 had their cameras on. Clearly, conference attendance should be encouraged for all staff, and in

12

person attendance emphasized for all staff, and not just Dr. Mezu-Ndubuisi. This is disparate treatment.

## A. DR. MEZU-NDUBUISI DRAWS NICU LEADERSHIP'S ATTENTION TO UNSAFE MEDICAL PRACTICES IN THE GCH NICU

42. Dr. Mezu-Ndubuisi, in her first few months of clinical work, noted unsafe clinical practices at University of Rochester GCH NICU, including aggressive ventilator practices, use of excessive nutritional fluids leading to fluid overload and worsening lung disease, restrictive transfusion protocols leading to severe anemia in premature babies with increased morbidity particularly to the gut and brain, staff over-reliance on protocols and guidelines ignoring the real-time clinical needs and condition of infants, lack of mandatory hand-washing culture for NICU staff leading to unusually high rates of infection and sepsis, unsanitary NICU infection practices, and excess use of high levels of oxygen in premature babies, leading to increased morbidity and mortality in the GCH NICU for premature infants, higher than other NICUs in the country.

43. Dr. Mezu-Ndubuisi brought these patient safety concerns to NICU Leadership in a collaborative manner, seeking to work together with her colleagues to review existing literature/protocols to guide the team in considering modifications where needed. NICU Leadership resented that Dr. Mezu-Ndubuisi raised these concerns, while expressing their support of her initiatives.

44. Dr. Mezu-Ndubuisi offered to give several educational lectures to review the existing evidence and best practices regarding oxygen saturation goals, fluid management, retinopathy of prematurity. She delivered these lectures to the entire between March and

May 2023 to meetings attended by clinical and research faculty and staff from the Departments of Pediatrics, Ophthalmology and other Departments at UR. Her lectures were very well-received, and none of her colleagues voiced any concerns during these discussions.

45. NICU Leadership began badgering Dr. Mezu-Ndubuisi to hand over her protocols and initiatives around oxygen saturation goals and fluid management without inviting her to be part of the discussion to effect the change. Dr. Mezu-Ndubuisi was concerned about wrong application of her perspectives.

46. NICU leadership sought to discredit Dr. Mezu-Ndubuisi by escalating rumors and false reports without investigating them, and Dr. D'Angio recommending in November 2023 to University Medical Staff Leadership that Dr. Mezu-Ndubuisi should undergo mandated Physician Communication Coaching, Forced Clinical Mentoring, and monitoring of her clinical practice, without any just cause. No email, document, or report was presented to Dr. Mezu-Ndubuisi stating what she had done wrong that warranted these penalties, rather rumors from staff and false reports that have remained uninvestigated, despite repeated requests from Dr. Mezu-Ndubuisi to know what she is accused of.

**B. SOME STAFF MAKE FALSE REPORTS AGAINST DR. MEZU-NDUBUISI'S ADVOCACY FOR SAFE CARE OF PATIENTS**

47. Defendants' NICU Leadership accepts rumors and personal biased opinions of staff regarding Dr. Mezu-Ndubuisi's clinical care of patients without properly investigating them. Defendants stop the investigations when there is evidence that these staff were untruthful about their complaints against Dr. Mezu-Ndubuisi *(Case C- DNR Case baby C),*

14

or that harm was caused by these staff to the patient while under their care *(Case A – baby F Twin A)*. Patients under Dr. Mezu-Ndubuisi's care have improved clinically.

48. Early in her first weeks as attending on service Dr. Mezu-Ndubuisi became the victim of the unhealthy, rumor-rife environment in the NICU. She was subjected to false patient safety reporting and inaccurate rumors when staff that she had never seen or spoken to claimed to have heard first-hand statements that she would cancel a "Do not resuscitate" (DNR) order on baby C, **Case C.** On Friday, March 10, 2023, she presented for her first overnight call following her time on service. Dr. Mezu-Ndubuisi received sign-out from the two daytime attendings and the fellows. After signing out, she went to her call room, and within 45 minutes the NICU fellow called Dr. Mezu-Ndubuisi to receive a phone call from Dr. D'Angio. Dr. D'Angio proceeded to accuse Dr. Mezu-Ndubuisi of having concerns about the DNR order of baby C- Case C, and asked if she had questions. Dr. Mezu-Ndubuisi said that she did not have any questions or concerns about it. After the phone call, Dr. Mezu-Ndubuisi investigated and emailed Dr. D'Angio to inform him that she had not spoken to any staff since sign-out and had gone straight to her call room, prior to his call. He stated that he would investigate the rumor and emailed a day later saying "...*I did a little digging, and found that, like many rumors, it disappeared like a mist when I tried to grasp it. No one whom I could find actually had firsthand knowledge of any conversation. I'm in contact with leaders of all staff and provider levels about the need for respectful communication. I'm sorry that you experienced this. I'd be happy to speak with you more about it either by phone or in person.*" Dr. D'Angio never discussed this incident further with Dr. Mezu-Ndubuisi, apparently stopping the investigation. *Case C – baby C*. See

emails regarding this case. (**Exhibit F**). Defendants' NICU leadership refused to investigate this early incident leading to continued false rumors about Dr. Mezu-Ndubuisi by some NICU staff.

49. Some specific staff, particularly those making these complaints, are consistently rude, threatening and unprofessional towards Dr. Mezu-Ndubuisi during the course of her clinical work, and this has continued undeterred because Defendants' NICU leadership appears to be protecting those making false complaints.

50. Some staff at the NICU made false reports about the plaintiff's advocacy for the safe care of patients. The false reports are usually made several weeks and months after the alleged act. Defendants have not shared any of the complaints with the plaintiff except on two occasions saying that staff feel she does things "different from what they are used to" *(September 11, 2023 – Case A, baby F Twin A)* and "do not feel heard" *(October 7, 2023 – Case B, baby F Twin  B).* Dr. Mezu-Ndubuisi emailed NICU Leadership to give her account of events, and in both cases, NICU Leadership concluded that they agreed with Dr. Mezu-Ndubuisi's clinical management and would encourage staff to bring their concerns in real time. See email documents regarding Case A (**Exhibit C**) and Case B (**Exhibit D**).

51. The false complaints against Dr. Mezu-Ndubuisi in Case A and Case B were made due to differences in clinical opinion during care of a premature infant where staff sought to escalate ventilatory care on babies while Dr. Mezu-Ndubuisi was advocating for weaning the babies' ventilator settings since they had clear signs of having clinically improved.

52. In the case A of **baby F twin A** on September 11, 2023, Dr. Mezu-Ndubuisi had been called to the bedside because the baby was deteriorating because of higher oxygen needs and an abnormally high $CO_2$ on blood gas, and staff wanted to move the baby from the

conventional vent to the more aggressive JET ventilator. After examining the baby and reviewing the labs, Dr. Mezu-Ndubuisi determined that he was clinically improved and showed the staff this evidence which they agreed with. She spent time teaching the staff at the bedside, and explained that the baby's lungs were over-expanded on the chest x-ray which would decreased venous return contributing to the signs of abnormal blood gas, higher oxygen needs, ad lower blood pressure. The baby was pink, active, and well-perfused and an umbilical line was still being placed, indicating that the blood gas may have been inaccurate. With consensus from staff expressing agreement and understanding, the infant was weaned on the ventilator, and did well during Dr. Mezu-Ndubuisi's shift. The blood gas within an hour was normal and the oxygen needs improved. After Dr. Mezu-Ndubuisi's shift ended, the next staff changed the baby to the JET ventilator, without justifying a reason in the medical records.

53. Dr. D'Angio never disclosed what the specific complaint against her was and notified her that he was opening an investigation into her clinical care of **baby F**. He never disclosed the results of this investigation, but mandated in a November 2023 zoom meeting, with the agenda of clinical mentor discussion, that she should undergo communication coaching as a result of the complaints he has never disclosed against her. Dr. D'Angio ignored Dr. Mezu-Ndubuisi explanation of events.

54. In the case B of **baby F twin B** on October 7, 2023, when Dr. D'Angio was out of town, Dr. Colby Richardson and Dr. Julie Riccio approached Dr. Mezu-Ndubuisi stating that staff were feeling "not heard" because her practice was different from what they were used to. Dr. Mezu-Ndubuisi encouraged Drs. Richardson and Riccio to be specific about the concern because vague complaints were not helpful. They indicated that it was concerning **baby F.**

**B – Case B**, and that staff were concerned that Dr. Mezu-Ndubuisi abruptly switched the ventilators for the baby from JET to conventional without reason, and it was not what they were used to.

55. Dr. Mezu-Ndubuisi proceeded to explain to Drs. Richardson and Riccio that this was untrue. She clarified to them that she did not abruptly switch ventilators, and that the baby had self-extubated while under nursing care, and Dr. Mezu-Ndubuisi was called to the bedside. She informed them that the infant had been improving significantly all week, and the clinical consensus plan by the medical team was to wean from the JET high frequency ventilator to Draeger conventional ventilator in the next day. The baby looked clinically well, tolerating hand-bagging, with minimal inflatory pressures after self-extubating. The respiratory therapist, Dr. Mezu-Ndubuisi, the resident physician assigned to the baby and the bedside nurse agreed collaboratively to place the baby on the conventional vent which was already in the room as part of the JET. The baby tolerated this switch and had good blood gases and x-rays showing clinical improvement. Dr. Mezu-Ndubuisi made appropriate documentation in the medical records. Overnight, another attending neonatologist (a new graduate) switched the baby to the JET with higher settings, without any documentation in the chart justifying the switch. Dr. Mezu-Ndubuisi maintained the baby on the JET with lower settings to protect and preserve the lung and did not make any other ventilator switch to avoid stress on the baby. Dr. Richardson and Dr. Riccio agreed with Dr. Mezu-Ndubuisi's management and stated that they would encourage staff to be more open-minded and ask questions or raise concerns in real time so they can be properly clarified regarding babies needing some deviation from consensus practice they were used to.  See emails about case B **(Exhibit D)**

56. In both case A and B, escalating ventilatory care on a patient who is clinically improving could cause harm and is against all standards of medical practice, and has unfortunately led to death and demise of several premature infants in the NICU of University of Rochester, including Case A of baby F twin A under the care of a non-minority neonatologist, who was not investigated. Beyond Case A and Case B, Dr. D'Angio, Dr. Mezu-Ndubuisi's supervisor, or NICU leadership have not sent her any email bringing any other staff complaints to her attention. Till date, they have never disclosed to her in person or in writing what the specific complaints or concerns are about these two cases. Instead, NICU Leadership had agreed with Dr. Mezu-Ndubuisi that the NICU staff bringing the complaints needed to improve communication by raising concerns in real time.

57. Dr. Mezu-Ndubuisi has been retaliated against by NICU Leadership for making patient safety concerns. University of Rochester does not have any policy or consensus-based approach that stipulates that patients improving clinically should have their ventilator settings increased or their clinical care escalated to more powerful and aggressive ventilators. This would cause harm by any standards, and Dr. Mezu-Ndubuisi and all healthcare professionals took an oath to "First do no harm".

## C. NICU LEADERSHIP FALSELY ACCUSED DR. MEZU-NDUBUISI OF CONTINUING TO CHANGE OXYGEN SATURATION GOALS ON INFANTS WHEN SHE HAD BEEN INSTRUCTED NOT TO

58. Defendants' NICU Leadership accused Dr. Mezu-Ndubuisi of changing oxygen saturation parameters in the NICU when she had been instructed not to do so. This is untrue. While Dr. Mezu-Ndubuisi believes that clinical and laboratory evidence support the use of bi-phasic oxygen saturation parameters and explains the evidence for this to the NICU staff

when asked, she has never written an order in any patient's medical record for oxygen saturation parameter change. Dr. Mezu-Ndubuisi told Dr. D'Angio in October 2023 when he made this accusation that the NICU nurses informed her that they were following an over 7-year-old oxygen saturation policy that appeared different from what the Defendants' NICU Leadership believed, but more aligned with the bi-phasic oxygen practice of lower saturation goals in the first month of life and higher saturation goals after one month post-natally. It appears that after this meeting, Defendants' NICU Leadership changed the 2008 policy in November 2023, yet continued in their EEOC position statement of January 2024 to falsely accuse Dr. Mezu-Ndubuisi of changing oxygen saturation parameters. ***See Update to Oxygen Saturation Policy of Nov 2023.  (Exhibit E)***

### D. NON-MINORITY STAFF WHO DO NOT FOLLOW CONSENSUS PRACTICE AND PROTOCOLS IN THE NICU ARE NOT PENALIZED OR RETALIATED AGAINST

59. Some non-minority neonatologists who do not follow the consensus guidelines in the Golisano Children's Hospital (GCH) of University of Rochester, are not penalized and there are no complaints made about them by bedside staff.

60. While the Division of Neonatology may seek to have all faculty follow protocols or consensus guidelines, they do not follow protocols or consensus guidelines. All faculty exhibit autonomy of practice, and if making a clinical decision that deviates from the protocol or consensus guidelines, they are expected to provide their evidence for it prior to implementing. If a physician determines that due to the patient's unique clinical situation that the consensus practice would be harmful, they are not bound to follow the protocol or consensus by ethical standards. They are obligated to document the reason for their clinical

decision and communicate that reason to the staff caring for the infant prior to implementing the clinical decision.

61. **Dr. Mezu-Ndubuisi has been denied this autonomy of practice to make a clinical decision that deviates from a protocol or consensus guideline, in the best interest of patient safety, if she has determined and has shown that following that protocol or guideline would be harmful to the patient,** even after she has shared the evidence supporting her decision and documented this evidence in the medical records. Other non-minority neonatologists who have not explained the rationale for their differing clinical decisions and have not documented this evidence in the medical records are not penalized when they deviate from consensus practice at GCH NICU, and no staff complaints are made against them, and they are not penalized repeatedly for the same action and are not re-assigned from clinical duties, like Dr. Mezu-Ndubuisi was. This is racially discriminatory and disparate treatment because Dr. Mezu-Ndubuisi is the only Black Faculty in Neonatology.

62. A specific example of other neonatologists deviating from set protocols based on their clinical judgement and not facing penalties like Dr. Mezu-Ndubuisi is shown in an email on February 28, 2024 sent by a NICU fellow, Dr. Mashfiq Hasan  sharing slides he had presented during Fellow's conference on the use of Tylenol for treatment of PDA. The fellow's email stated,  *"The plan was to update the current policy, which states ibuprofen is our first line, to match our current practice, where most people use tylenol as a first line for medical management of PDAs. The updated language we agreed on towards the end of the conference was: Acetaminophen as 1st line for PDA management; Dose: 15 mg/kg oral preferred (or IV if necessary); Frequency: every 6 hours; Duration:*

*3 days. If re-examination shows decreased size but not complete closure, can do an additional 4 day course of Tylenol or consider an alternate medication. Additional questions posed which were not addressed (will likely need a separate conference/discussion at some point): 3 days of Tylenol or longer; when to echo premature infants; how to decide if a PDA should be treated; PDA classification criteria; long term neurodevelopmental outcomes, etc."*

63. Another instance that shows that variation in practice is expected and acceptable amongst neonatologists is shown below in varying use of steroids in newborn premature infants. In an August 17, 2023 email from Dr. Colby Richardson, she states, "*In an attempt to standardize our use of systemic steroids in small babies, we have created a guideline for early steroid use (first 72 hours of life) and for evaluation of need for steroids at day of life 14 and 28. **These are guidelines, not a strict policy, so initiation of steroids will still be up to the discretion of the medical team and may vary depending on the specific clinical situation.** It is our hope though that this will provide some overall standardization to care, based on currently available evidence…!*"

64. **These are evidence that it is accepted that all neonatologists have autonomy of practice regardless of protocol or consensus practice, to avoid harm to the patients.** This shows that neonatologists at University of Rochester have varying practice despite the existing consensus or protocol, and this is accepted, and they are not penalized for it. That there remain areas of controversy in deciding to adopt Tylenol use for PDA as a protocol or standardize the current varying use of steroids on infants as a guideline means that it is accepted that these neonatologists that are deviating from the existing protocol, without justifying their reason, will continue to practice differently per their Hippocratic

oath and conscience without fear of penalties, and multiple complaints from staff. Dr. Mezu-Ndubuisi justifies the reason for any clinical decision made with teaching at bedside and documenting in the clinical records, yet she is denied the same autonomy of practice as her colleagues and she is subjected to false reporting of her clinical actions.

65. In this email, Dr. Andy Dylag, the first clinical mentor proposed for Dr. Mezu-Ndubuisi upon hire, of the same academic rank as her, seeks Dr. Mezu-Ndubuisi's guidance regarding conservative fluid management. He insinuates that other faculty practice in the same manner (which varies from the existing feeding protocol of high volume fluid administration). Yet, Dr. Mezu-Ndubuisi has been subjected to complaints regarding conservative fluid management, while the Division of Neonatology has since adopted a more conservative approach to fluid management since observing patient improvement under Dr. Mezu-Ndubuisi's care. Dr. Dylag states, on March 16, 2023 with the **Subject:** *fluid management; "Olachi, I've been told you are much more conservative in managing fluids in early preemies. This fits with what I'm noticing... more fluid = fluid overload = more ventilation. Do you have a set structure you like to start with. I'm giving fellows conference next week and am trying to gain perspectives with others who manage fluids more conservatively. Do you have an upper sodium limit where you respond? I tend not to... just wondering. "*

66. The same conservative fluid management practice practiced by "others" in the NICU is the subject of the FPPE done on only Dr. Mezu-Ndubuisi by UR leadership, and the reason for the biased remediation plan being imposed on Dr. Mezu-Ndubuisi.

67. While the Division of Neonatology seeks to have consensus in practice, they recognize that all faculty will still use their discretion in implementing these consensus guidelines based

23

on the patient's individual real time needs. The autonomy to exercise clinical judgment in determining the safety of following consensus or making a clinical decision to meet the patient's real unique needs has been denied Dr. Mezu-Ndubuisi, as her decisions are scrutinized, over-analyzed, and complaints raised weeks later even after the same staff have agreed to her explanation and rationale given for the clinical decisions.

## E. BIASED HANDLING OF ADVERSE PATIENT OUTCOMES INVOLVING NON-BLACK NEONATOLOGISTS

68. Defendants' NICU Leadership's handling of complaints concerning Dr. Mezu-Ndubuisi has been biased and do not uphold their stated commitment to diversity, equity, and inclusion in the workplace at University of Rochester.

69. Since before Dr. Mezu-Ndubuisi's hire, Defendants' Department of Pediatrics leadership staff have exhibited racially discriminatory behaviors towards her, including unjustified false reports about her research work, in a bid to control the location of her lab, and the use of her laboratory equipment.

70. Complaints against Dr. Mezu-Ndubuisi by some NICU staff are shrouded in secrecy. Defendants have never sent an email or document to Dr. Mezu-Ndubuisi outlining any complaint against her and have never shared the results of any investigations towards these complaints, despite repeated requests from Dr. Mezu-Ndubuisi to know what specifically she is accused of.

71. Defendants have showed bias in their handling of morbidity and mortality ("M & M") cases in the NICU. Dr. Mezu-Ndubuisi is being currently penalized and restricted from clinical work even when all babies under her care have done clinically well. No babies have died

under her care in her team as an attending neonatologist on service. Other babies that have died under the care of other neonatologists are discussed in M & M conference, and these neonatologists do not have complaints against them and the cases of these babies who died under their care are not investigated. These neonatologists under whose care have resulted in demise of patients have not followed standard of care for neonatal care, ignoring clinical signs of infant distress, poor systemic perfusion, and fluid overload and continuing to push excess fluid volumes, as well as escalating aggressive ventilator settings on fragile infants causing deterioration, ignoring critical signs of anemia and poor perfusion on infants and delaying transfusions leading to morbidities, and sometimes these actions by other providers have resulted in death of infants. None of these neonatologists have FPPE ordered, complaints filed, or investigations initiated.

72. <u>Examples of babies who were harmed under the care of non-Black neonatologists and not investigated or penalized.</u> First, in the case of *baby F(Case D) who died on 5/25/23* at 7:57pm from Necrotizing enterocolitis (NEC) totalis, fulminant sepsis and coagulopathy, losing 75% of her bowel during emergent bedside surgery, following an aggressive feeding protocol while on high ventilator settings on the Jet ventilator and following a procedure error on May 25th 2023 where her brachial artery was inadvertently punctured and damaged by the vascular access team ("VAT") during peripherally inserted central catheter ("PICC") line placement causing loss of perfusion to that arm. The neonatologist in charge of this infant was Dr. Colby Richardson, the NICU Director. In the case of *baby F, Twin B who died on September 26, 2023 (Case B)* from cardiorespiratory failure following aggressive ventilator use on the Jet, the neonatologist who cared for him in the first week of life was Dr. Kristin Scheible (Associate Division Chief of Research and Program Development), and

the neonatologist who cared for him the night of his death was Dr. Julie Riccio. In the case of baby *N Twin A* , Case E who died on September 24, 2023 from grade 4 bilaterally IVH after a drop in hematocrit from 15g/dl to 7.8g/dl in 24 hours went unnoticed and untreated because it did not reach the rigid threshold for the transfusion protocol. The attending neonatologist caring for baby N, Case D since birth till his death was Dr. Andrew Dylag. The baby now received several transfusions in a few hours prior to death, even though above the threshold for transfusion of blood per the NICU protocol. No complaints or investigations were filed against Dr. Dylag. These three neonatologists are part of the Defendants' NICU Leadership bringing false and uninvestigated complaints against Dr. Mezu-Ndubuisi through Dr. Carl D'Angio.

73. The FPPE ordered on Dr. Mezu-Ndubuisi, without just cause and biased in nature as it has never been ordered on any neonatologist in the history of URMC, cites Dr. Mezu-Ndubuisi as having a deviation of 18% from standard practice, when there is no other FPPE to compare to. The alleged deviations in practice resulted in babies with improved clinical care and no deaths, and the cited deviations were for conservative fluid management, transfusion for anemia above threshold, and conservative ventilator practices, which are all practices that have been performed by her non-Black neonatology colleagues above, Dr. Richardson (Day), Dr. Schieble, Dr. Riccio, and Dr. Dylag. The difference is that the above named performed the same actions a little too late leading to demise of the babies under their care. There were no complaints filed against them because they are part of NICU Leadership. They are the same NICU Leadership reviewing Dr. Mezu-Ndubuisi for an FPPE after perpetuating false reports to stop her from clinical work, and have now drafted a re-mediation/re-entry plan for her.

74. In the past few months since Dr. Mezu-Ndubuisi has been reassigned from clinical duties, several babies have died due to poor standard of care in the GCH NICU, particularly excessive oxygen use and high infection rates.

75. Defendants' NICU does not have an unbiased and fair peer-review system comprising some physicians outside the division of neonatology and department of pediatrics to review, investigate and determine the validity of the complaints prior to effecting penalties on physicians with staff complaints or rumors. No other neonatologist is penalized based on rumors or uninvestigated and unfounded staff complaints like Dr. Mezu-Ndubuisi, the only Black neonatologist in the NICU.

76. Complaints are being made about the care Dr. Mezu-Ndubuisi provided to babies, even though no baby has died under her care, or suffered any adverse outcome under her care. There are no complaints being raised about babies that suffered adverse outcomes or died under the care of other non-Black neonatologists and providers, as shown above.

77. During a June 4, 2024 meeting with UR Leadership, Dr. Mezu-Ndubuisi was informed by Dr. Apostolakos that even though no baby has suffered an adverse outcome or died under her care, the hospital would like to prevent an adverse outcome from happening, which is the reason for her mandated monitoring with a re-entry plan. Dr. Mezu-Ndubuisi in her June 4, 2024 response to the re-entry plan inquired what the NICU and URMC leadership have done to reduce the still ongoing adverse outcomes in babies under the care of other neonatologists.

78. *Dr*. Mezu-Ndubuisi informed UR Leadership that there was a **high rate of mortality in the URMC NICU, which is very concerning,** and a reflection of the aggressive ventilator care and overt adherence to protocols ignoring patients' real-time clinical needs. She informed

Dr. Apostolakos that recently, in the past week before the June 4, 2024 meeting, there have been several deaths in the NICU, including baby JP on 6/3/24, MS on 6/1/24, MG on 5/31/24. Dr. Mezu-Ndubuisi inquired if complaints were filed or FPPEs initiated on those neonatologists who cared for those babies that died under their care?

79. There is a biased focus on monitoring the plaintiff for providing safe care as shown in the FPPE in order to prevent "future adverse outcome", while ignoring the ongoing adverse outcomes in the NICU due to care provided by other neonatologists that resulted in actual patient deaths.

**F. NICU LEADERSHIP, WITHOUT EVIDENCE OR JUSTIFICATION IMPOSES PENALTIES ON DR. MEZU-NDUBUISI FOLLOWING UNINVESTIGATED FALSE REPORTS AND RUMORS ABOUT HER PATIENT CARE**

80. Dr. Carl D'Angio, Division Chief of Neonatology,  scheduled a zoom meeting on November 21, 2023 under the guise of discussing the issue of a clinical mentor. Dr. D'Angio during a zoom meeting informed Dr. Mezu-Ndubuisi that he believed that several complaints received against her during patient care were caused by a breakdown in communication. Without providing evidence or investigation, Dr. D'Angio then stated that prior instances of disagreements about patient care were due to communication failures from Dr. Mezu-Ndubuisi. He also shared that he was recommending that Dr. Mezu-Ndubuisi complete a Physician Communication Coaching Program, without offering any justification or any evidence to support this recommendation. *Written transcript and detailed notes from this meeting is available upon request.*

81. Dr. Mezu-Ndubuisi disagreed with Dr. D'Angio's recommendation during this zoom meeting reminding him that she had been notified only on two occasions of staff complaints that she does things "differently from what they are used to" *(September 11, 2023 – Case A baby F twin A)* and "do not feel heard" *(October 7, 2023 – Case B, baby F, twin B).* **She** reminded him that in both cases she had emailed him and NICU Leadership to give her account of events. Both cases involved staff wanting to unsafely escalate ventilatory care on a patient that had clinically improved, which would have caused harm. Dr. Mezu-Ndubuisi then asked him what she had done wrong in both cases, and what she should have done different, and how these cases warranted only her needing to do a Physician Communication Coaching Program. He did not provide any explanation. Dr. Mezu-Ndubuisi reminded him that NICU Leadership had agreed that she had cared for the patients within expected clinical standards. Dr. Mezu-Ndubuisi again asked why she was being mandated to participate in a Physician Communication Program, when the complaints raised by staff were regarding specific patient case and he has not indicated to her what she had done wrong in the specific case. He did not answer.

82. Dr. Mezu-Ndubuisi reminded Dr. D'Angio of the pre-existing unhealthy work environment and microaggressions in the NICU before her hire, and that he has ignored that the only Black faculty in Neonatology has been subjected to false patient safety reports, rumors, inaccurate reporting of clinical events, micro-aggressions, rude and unprofessional behaviors since hire. Rather, the Defendants' NICU Leadership penalizes Dr. Mezu-Ndubuisi based on these rumors and refuses to investigate these rumors. and the NICU Leadership had till date has not provided any implicit and racial bias training for staff. Dr.

D'Angio informed Dr. Mezu-Ndubuisi that he agrees with her, but that she should complete the communication training program first and then help educate the staff.

83. Dr. Mezu-Ndubuisi shared with Dr. D'Angio that communication involved two or more people, and mandating just one person to participate in communication training was not effective. She also reminded him that a couple months earlier, she had proactively and voluntarily completed a 6-month-old Leadership and Communication program, which he had approved, in preparation for her clinical and research role at University of Rochester. She added that the course had been helpful and that she did not feel she needed to undergo a repeat training, especially since the miscommunication or poor communication were from the staff bringing complaints behind her back and not from her. Dr. D'Angio stated that he had discussed with the CMO, Dr. Apostolakos, that if she declined to do the communication coaching, that the CMO, Dr. Apostolakos, would like to meet with her to request that she participate. Dr. Mezu-Ndubuisi asked Dr. D'Angio why he would escalate issues to the CMO without ever bringing to her attention that he had concerns about her communication and without any evidence to support this recommendation. She asked him what specific concerns he had with her communication. No answer was provided. He responded "**you have to do this**". No reason was provided to Dr. Mezu-Ndubuisi why she was mandated to a Physician Communication Coaching Program. Defendants' NICU leadership's habitual ineffective communication of reasons for their actions does not foster a collaborative or respectful work environment.

84. Dr. Mezu-Ndubuisi is known as an excellent clinician-scientist whose communication is clear, compassionate, and collaborative as witnessed by both clinical and research staff and trainees of University of Rochester, including her supervisor Dr. D'Angio in his July 14,

2023 annual evaluation and review. Dr. Mezu-Ndubuisi's colleagues, and research staff wrote letters of evaluation commending her outstanding commitment to clinical, research, and teaching activities, her excellent teaching, clear and compassionate communication, and admirable professionalism, as well as being a role model for all. See letters of evaluation/support. **(Exhibit G).** During Dr. Mezu-Ndubuisi's July 14, 2023 annual review meeting with Dr. D'Angio, he commended her for her excellent teaching at the bedside and during night calls to the fellows, residents, and nursing staff, saying they greatly appreciated it. He informed her that NICU staff viewed her as very knowledgeable, kind, and very supportive. Dr. Mezu-Ndubuisi thanked him and asked if there was any feedback or an area she could improve on. He first no, that it was all positive feedback, then he added that there has been mention that Dr. Mezu-Ndubuisi's rounds tend to run long due to the teaching. Dr. Mezu-Ndubuisi agreed and said she has been working on reserving specific teaching on specific infants to avoid rounds running long, and she incorporates literature review where she brings evidence-based journals for specific topics and assigns reading to the team, so that they can share their understanding of the topic the next day to the entire team, so that everyone participates in teaching. Dr. D'Angio told Dr. Mezu-Ndubuisi, "I would advise you not to change anything. Keep teaching as you are. Keep your rounds the same. Excellent teaching is a great reputation to have. You had that reputation in Wisconsin from your recommendations, and you have it here too." He added that Dr. Mezu-Ndubuisi should not change anything, and that she was doing a wonderful job. Dr. Mezu-Ndubuisi thanked him. Dr. D'Angio did not mention any staff complaints or concerns with communication to Dr. Mezu-Ndubuisi at the one-year evaluation of her time as faculty at URMC. **(Exhibit G).** *Written transcript and detailed notes from the meeting is available upon request.*

31

85. Defendants are mandating that she participate in a communication coaching program, even though she had voluntarily taken one upon hire, ignoring that the root cause of the miscommunication in the Division of Neonatology is an unhealthy work environment strife with rumors and disrespectful behaviors amongst staff and racially biased filing of false patient safety reports. One also cannot ignore racially discriminatory behaviors towards Dr. Mezu-Ndubuisi as the only black faculty in neonatology. The Defendants' Division of Neonatology has acknowledged the unhealthy work environment created by rumors and poor communication amongst staff prior to Dr. Mezu-Ndubuisi's hire. See Healthy Work Environment Emails and Clinical Retreat Documents. **(Exhibit H)**

## G. DR. MEZU-NDUBUISI ALERTS UR LEADERSHIP OF RACIAL DISCRIMIANTION AND RETALIAITON AGAINST HER FOR RAISING PATIENT SAFETY CONCERNS

86. Dr. D'Angio wrote a letter following the zoom call to reiterate his mandate to Physician Coaching and clinical mentoring to Dr. Mezu-Ndubuisi, still without providing any evidence for it. Dr. Mezu-Ndubuisi in a response to Dr. D'Angio mandate filed a complaint on December 8, 2023 alerting University of Rochester Leadership of unfair, racially discriminatory treatment of her for raising complaints of patient safety, and her belief that the mandate for a clinical mentor and Physician Communication Coaching were in retaliation for raising these concerns about patient safety. See Dr. Mezu-Ndubuisi's Concerns of Racism _Response_to_Dr_D'Angio_12-8-23 (without related attachments). **(Exhibit I).**

87. Defendants' University Leadership, Dr. Apostolakos and Dr. Baumhauer asked to meet Dr. Mezu-Ndubuisi to inform her that she had to undergo the communication coaching and clinical mentoring. No indication was given to Dr. Mezu-Ndubuisi that her concerns were being investigated and no-one asked for her version of events. Dr. Mezu-Ndubuisi indicated that she was awaiting a response from Dr. D'Angio to her email of December 8, 2023 requesting evidence for his recommendations. She was informed that Dr. D'Angio did not have to respond to her. See emails from UR Leadership, Dr. Apostolakos and Dr. Baumhauer – **(Exhibit J).**

## H.   UR'S EEOC RETALIATION WITH MONITORING AND FALSE REPORTS WITHOUT INVESTIGATIONS, AND STOPPING DR.MEZU-NDUBUISI FROM CLINICAL DUTIES

88. Dr. Mezu-Ndubuisi filed a complaint with EEOC on December 19, 2023, and notified the University of Rochester. The complaint was essentially the December 8th letter with documented evidence supporting Dr. Mezu-Ndubuisi's complaint of racism.

89. Dr. Mezu-Ndubuisi  was the attending physician (neonatologist) scheduled from December 23, 2023 to January 5, 2024 on the gold team that is staffed by the nurse practitioners/advanced practice providers.

90. Prior to beginning service, she received sign-out from the prior attending, Dr. Joe Bliss, on December 21, 2023. They both discussed in detail the clinical care and goals for the babies, and Dr. Bliss solicited Dr. Mezu-Ndubuisi's opinion and recommendations for the three babies on the ventilator (BL, DL, CR), who were critically ill and receiving very high

oxygen levels with severe lung disease and not showing signs of improvement despite best practices. Dr. Mezu-Ndubuisi offered her opinion.

91. Dr Bliss welcomed Dr. Mezu-Ndubuisi's suggestions and expressed agreement with them. Dr. Mezu-Ndubuisi asked if he could institute some of our discussions so that the team does not feel that her plan is different when she starts service. He responded that her plan is consistent with his views and goals as well and is not at all different.

92. Dr. Mezu-Ndubuisi's care provided from December 23rd 2023 to December 27th, 2023 was a continuation of the plan agreed with Dr. Bliss. All babies improved under Dr. Mezu-Ndubuisi's care with reduced oxygen needs.

93. Throughout Dr. Mezu-Ndubuisi's brief time in the NICU on service from December 23 to 27, 2023, her every action, movement, and word during patient care has been over-scrutinized, over-analyzed, and monitored. No other non-Black attending in the NICU is treated in this manner.

94. Similar actions of multiple ventilator changes by other non-Black attendings are not over-scrutinized. These monitoring behaviors by NICU Staff and Leadership appear to be a form of monitoring instituted by NICU leadership in retaliation for Dr. Mezu-Ndubuisi raising concerns of patient safety earlier in the year, and in retaliation for her filing an EEOC Charge.

95. On December 27, 2023, Dr. Carl D'Angio marched Dr. Mezu-Ndubuisi aggressively out of the Defendants' NICU, without her consent, and up to the elevators to the office of the Chair of Pediatrics where she was intimidated, harassed, and attempts made to coerce her to agree to penalties restricting and monitoring her practice in the NICU because they received anonymous patient safety reports against her. Plaintiff asked what these reports were. The

Chair of the Department, Dr. Jill Halterman, responded that she had not seen these reports herself or investigated them, but that she wanted Dr. Mezu-Ndubuisi to agree to restrictions in her clinical practice. Dr. Mezu-Ndubuisi felt afraid and academically lynched, and informed them that she was leaving the meeting. ***Written transcript and detailed notes from the meeting is available upon request.***

96. Dr. Halterman sent an email within minutes reassigning Dr. Mezu-Ndubuisi from clinical duties, and Dr. Mezu-Ndubuisi has not been asked to return to clinical duties till date. No one to date has informed Dr. Mezu-Ndubuisi of what these complaints are that rise to a patient safety concern level. All the 16 to 18 patients under her care during that time had done clinically well. (**Exhibit L).**

97. The patient safety concerns Dr. Mezu-Ndubuisi raised in her email of December 8, 2023 to UR and NICU leadership were ignored, but spurious patient safety concerns raised by unnamed non-black staff against her are immediately unquestionably believed and quickly escalated to the highest level of leadership and punitive actions proposed, especially since she filed the EEOC complaint.

## I.  UR LEADERSHIP UPHOLDS DEPARTMENT OF PEDIATRICS UNJUSTIFIED PENALTIES WITHOUT INVESTIGATION

98. On January 4, 2024, Dr. Halterman, Chair of Pediatrics wrote Dr. Mezu-Ndubuisi an email inviting her to meet with her to review conditions with which she would be allowed to return to clinical duties. Dr. Mezu-Ndubuisi responded reminding her of how she reassigned her from duties aggressively, without cause or evidence presented.

99. Dr. Halterman in a January 4, 2024, for the first time introduces new false accusations regarding Dr. Mezu-Ndubuisi's professionalism and communication as an attending that she had never mentioned during their first Dec 27, 2023 encounter, and presented in this email as wanting to review " what is expected of all attendings in the NICU…" These same false accusations are repeated in the re-entry plan **(Exhibit S)** presented to Dr. Mezu-Ndubuisi on May 23, 2024, and remediation plan **(Exhibit O)** presented on June 12, 2024.

100. Dr. Mezu-Ndubuisi responded recounting in detail the events of the meeting in which Dr. Halterman intimidated and accused her without providing evidence, investigation, or due process as outlined above. Dr. Mezu-Ndubuisi reminded them of the EEOC Complaint she had filed and the December 8 letter raising patient safety concerns. **(Exhibit L)**

101. On February 12, 2024, Dr. Michael Apostolakos, the CMO of the University of Rochester Strong Memorial Hospital wrote to Dr. Mezu-Ndubuisi informing her that he had received a Focused Professional Practice Evaluation (FPPE) from the NICU regarding her clinical care and he would like to meet to review and discuss with unnamed individuals. Dr. Mezu-Ndubuisi reminded Dr. Apostolakos of the ongoing EEOC proceedings that were related, and she did not want to hinder, encouraging UR to accept the EEOC mediation as she had. He did not attach the FPPE, outline allegations against Dr. Mezu-Ndubuisi, or provide any evidence for the FPPE. **(Exhibit K)**

## J. EEOC PROCEEDINGS

102. On February 9, 2024, University of Rochester submitted a 10-page Position statement to EEOC on the Charge of Discrimination that Dr. Mezu-Ndubuisi had filed. UR essentially denied any form of discrimination against Dr. Mezu-Ndubuisi. They denied forcing a

clinical mentor of her, denied seeking to monitor her, and denied mandating her to Physician Communication Coaching. They claim they welcomed her new ideas and initiatives and had invited her to lead incorporation of these ideas in the NICU. They neglected to mention the UR NICU history of unhealthy work environment and that Dr. Mezu-Ndubuisi had been removed from clinical work since December 27, 2024.

103. On March 15, 2024, Dr. Mezu-Ndubuisi responded to the University of Rochester's Position Statement with evidence refuting their claim that they did not seek to monitor her or mandate a clinical mentor, and that they did not discriminate against her. Dr. Mezu-Ndubuisi showed email evidence of UR NICU's unhealthy work environment, change in their oxygen saturation protocol in November 2023 from the original in place since 2008, and evidence of the false reports made against her by UR NICU leadership.

104. Without investigating these concerns or attempting to speak directly to her, EEOC believed University of Rochester and issued a right to sue letter to Dr. Mezu-Ndubuisi dismissing her complaint with a right to sue within 90 days. **(Exhibit A).**

## K. DR. MEZU-NDUBUISI INITIATES RENEWAL OF HER CLINICAL PRIVILEGES AND IS STALLED BY UR MEDICAL STAFF LEADERSHIP.

105. On January 10, 2024, the University of Rochester medical staff office wrote to Dr. Mezu-Ndubuisi informing her that her clinical privileges would need to be renewed, and she should start the process. Dr. Mezu-Ndubuisi completed the online application to renew her privileges. On April 15, 2024, the medical staff office reminded Dr. Mezu-Ndubuisi of outstanding items needed to renew her privileges, and she provided them.

106. On April 15, 2024, Dr. Apostolakos wrote to Dr. Mezu-Ndubuisi asking why she had initiated renewal of clinical privileges, and informed her that a meeting was needed to discuss re-entry due to her current clinical practice. *"It has come to my attention that you have initiated the process for re-credentialling your clinical privileges at Strong Memorial Hospital/Golisano Children's Hospital, but that you are not currently practicing clinical medicine and thus I wanted to touch base to clarify the reason for your request. Current clinical practice will be a significant consideration in evaluating your application for re-credentialing at the Hospital. If you do wish to return to clinical practice, I will need to speak with you in my office for an in-person meeting and a re-entry plan will need to be initiated.* "

107. Dr. Mezu-Ndubuisi responded on April 16, 2024 to Dr. Apostolakos in detail explaining that she was complying with the request to renew her privileges from the medical staff office, and that she did wish to return to clinical practice. She reminded him that he was aware that she was stopped from clinical practice without due cause and summarized the past year's concerns with biased treatment and false reporting of her in the NICU, and lack of due process in penalizing her.

108. Dr. Mezu-Ndubuisi requested that she be allowed to bring a support person of her choosing for an in-person meeting. Dr. Apostolakos agreed that she could bring a support person, as long as it was not legal counsel. Dr. Mezu-Ndubuisi suggested that her support person would be her younger sister, Dr. Ure Mezu-Chukwu, an adult cardiologist-electrophysiologist residing in Ohio. Dr. Apostolakos accepted, and the meeting was set for May 23, 2024.

109. Dr. Mezu-Ndubuisi has fulfilled all the requirements to renew her hospital privileges, as certified by the medical staff office. Dr. Apostolakos and UR Leadership are withholding

renewal of these privileges without just cause, and having never stated what she is accused of, and ignoring evidence she has provided of excellent clinical given in the only two cases concerns had been raised by NICU leadership, and NICU leadership agreed with her patient management.

L. **Dr. MEZU-NDUBUISI IS INVITED TO MEETING TO DISCUSS RETURN TO WORK BY UR LEADERSHIP – FOCUSED PROFESSIONAL PRACTICE EVALUATION PRESENTED**

110. Dr. Apostolakos invited Dr. Mezu-Ndubuisi and her support person, her sister, to a meeting on May 23, 2024. Dr. Baumhauer was present at the meeting.

111. During this meeting, Dr. Apostolakos presented the FPPE to Dr. Mezu-Ndubuisi showing alleged 18% deviation from standard of practice. The FPPE was conducted on 22 NICU babies in the past year, from 22 weeks gestational age at birth to 37 weeks or greater, with majority at 22-28 weeks, that Dr. Mezu-Ndubuisi had cared for since hire. The FPPE reviewed charts to determine if there were concerns regarding Dr. Mezu-Ndubuisi's practice around transfusions, oxygen/respiratory/ventilator management, and fluid/nutrition management.

112. Dr. Mezu-Ndubuisi explained to Dr. Apostolakos that she practices within standards of medical care and that in every clinical situation she and all physicians are expected to use their clinical judgement to determine course of action, while considering any set guidelines and protocols. Babies are not one size fit all and have rapidly changing real time clinical

needs. She explained her rationale for clinical decisions made. She explains that all babies do well under her care, and no baby has died under her care. She explained that she documents meticulously in the medical records, and signs out to the next attending physician and medical team. They agree with her actions and have no concerns raised. However, it appears weeks after she has completed her shift, rumors arise that trigger NICU leadership concerns. No one asks her any questions but this recommendation for communication coaching was made, she was stopped from clinical work, and FPPE initiated.

113. Dr. Apostolakos expressed agreement and understanding of Dr. Mezu-Ndubuisi's rationale for clinical care. He stated that as an adult critical care physician, he understood and agreed with Dr. Mezu-Ndubuisi explanation of physiology. Dr. Apostolakos and Dr. Baumhauer share that they see that Dr. Mezu-Ndubuisi is very knowledgeable and passionate about her work, and has a unique understanding of clinical care that her NICU colleagues could benefit from. Dr. Apostolakos inquired if Dr. Mezu-Ndubuisi was willing to meet with Dr. D'Angio and Dr. Halterman to work out a plan to get Dr. Mezu-Ndubuisi back to clinical practice, and Dr. Mezu-Ndubuisi agreed. Dr. Apostolakos told Dr. Mezu-Ndubuisi that he is very uplifted and motivated by meeting her, and he will ensure that she returns to clinical practice and that things would change in the NICU culture. He shared his theory that the people filing the reports or complaints could not be staff that had heard her explanation or teaching at the bedside. He stated that listening to her explain her clinical rationale, he understands it and sees that she is open-minded and would be willing to consider other views. Dr. Apostolakos offered his perspective that listening to Dr. Mezu-Ndubuisi speak about her care for patients, he does not believe that the complaints came from anyone at the bedside listening to her. It had to come from people who were not present to hear her speak.

Dr. Ure Mezu-Chukwu invited both Dr. Apostolakos and Dr. Baumhauer to watch Dr. Mezu-Ndubuisi at bedside rounds and also watch other neonatologists at rounds to gain more insights and perspectives of NICU interactions.  Dr. Baumhauer had to leave after about an hour to catch a flight out of the country, and the meeting continued with Dr. Apostolakos. He agreed to ensure implicit bias training of NICU staff, and he acknowledged that she was experiencing racial bias and shared some prior encounters of racial bias by well-meaning staff against minority staff in clinical practice that he had witnessed. Dr. Apostolakos stated that he would initiate a change in how the NICU operates. *Written transcript and detailed notes from the meeting is available upon request.*

114. As requested after the meeting, Dr. Mezu-Ndubuisi responded in writing to the FPPE she had been presented with, and emailed Dr. Apostolakos and Dr. Baumhauer. On May 24, 2024, Dr. Mezu-Ndubuisi responded in writing to the FPPE explaining her clinician rationale for all the FFPE cases cited, showing that her actions prevented adverse effects on the infants, and all did clinically well. No infant died under her care, the FPPE noted. The FPPE was conducted by the same NICU leadership bringing false complaints against Dr. Mezu-Ndubuisi. See Response to FPPE. **(Exhibit M) - contains confidential patient information.**

115. Dr. Mezu-Ndubuisi stated that all babies cared for improved clinically and did well under her care, and the FPPE does not reveal any adverse clinical outcomes from the 22 charts reviewed. She asked that "if all infants improved clinically, and none had an adverse outcome from my care, why were concerns raised and reports filed leading to an FPPE? Are the staff not happy that the infants got better? Would they rather have an adverse outcome?

This appears to be disparate treatment of me as the only Black neonatology faculty in the NICU."

116. Dr. Mezu-Ndubuisi stated in her letter that "In all infants I care for, there is no intentional pre-meditated effort to deviate from a guideline, consensus practice, or protocol. I am only exercising my clinical judgement in specific situations to prevent harm or adverse outcome for the infant. This is my responsibility as a physician."

117. **Dr. Mezu-Ndubuisi wrote that "The FPPE states that provider practiced outside generally accepted standards 4 of 22 charts (18%):** The FPPE states that 14 of 22 (64%) of cases reviewed found the practices to fall within generally acceptable standards. The stated deviation of 18% from standard practice after review of 22 charts appears commendable. To the best of my knowledge, this is the first time an FPPE has been conducted on a neonatologist in the University of Rochester, so it is hard to interpret or draw any meaningful conclusions regarding where 18% deviation falls within the practice of other neonatologists at the UR NICU." See Response to FPPE in detail. **(Exhibit M – Confidential patient information)**

## M. UR LEADERSHIP PRESENTS BIASED, DISCRIMATORY AND TARGETED RE-ENTRY PLAN WITHOUT JUSTIFICATION

118. On the follow-up meeting with UR Leadership on June 4, 2024 meeting, Dr. Mezu-Ndubuisi and her sister were shocked to see a change in Dr. Apostolakos demeanor and opinions, different from their last meeting. *Written transcript and detailed notes from the meeting is available upon request.*

119. Dr. Mezu-Ndubuisi was presented with a 5-page re-entry plan that entailed daily, weekly monitoring of her every clinical decision by an assigned clinical mentor, of unspecified duration. The plan also included one-on-one Physician Communication Coaching. No evidence was presented for the re-entry plan and no specific complaint was stated to her warranting such extreme mandates. She was assured that they would modify the re-entry plan, and present to her.

120. Dr. Mezu-Ndubuisi stated during the meeting that the re-entry plan was excessive and would create a toxic work environment for her and disrupt patient care if she had to check with a mentor for every clinical decision. Dr. Mezu-Ndubuisi explained her rationale for clinical decisions made was to provide safe guide guided by real time needs, and she was practicing within standards of care. She always discussed with the medical team who agree before implementation and that she documents meticulously in the charts. The UR leadership stated that clearly Dr. Mezu-Ndubuisi was passionate about clinical care and has a unique understanding of physiology, and it would be helpful during her clinical monitoring to share these views so others could benefit from them.

121. Dr. Mezu-Ndubuisi directly asked Dr. D'Angio what had changed that he was mandating monitoring of her clinical activities. She reminded him that his annual evaluation of her was excellent in July 2023, and she had asked him if there was any feedback she could improve on and he said none, that all evaluation form nursing staff, trainees, and colleagues were outstanding. So what changed? She asked him directly. Dr. Mezu-Chukwu encouraged Dr. D'Angio to answer, and the UR leaders all looked at Dr. D'Angio awaiting his answer. He hesitated and then responded, "What changed was that I received complaints after July". Dr. Mezu-Ndubuisi informed him that he had alerted her attention to one complain - baby

43

F twin A Case and had refused to state what the exact complain was, but she had offered her account of events. He ordered an investigation without reading the medical records or speaking first-hand to the staff bringing the complaints. She asked him what she had done wrong in that case A. Dr. D'Angio did not answer. Dr. Mezu-Ndubuisi informed him again that the only other complaint brought to her attention was baby F twin A - Case B when he was out of the country, and she had been approached by Dr. Richardson and Riccio with a vague complaint of staff not feeling heard, and when she asked for specifics they said the staff complained she switched vents on a baby without reason. This was untrue as the baby self-extubated and the team agreed collaboratively he was doing well and could go on a conventional vent and not back to the JET. She reminded Dr. D'Angio that none of them had investigated this false report, and she had emailed them and included him with the details of the case. She asked him what she had done wrong in this case. He had no response. Dr. Mezu-Ndubuisi informed Dr. D'Angio that he was to blame for unfounded reports because he did not investigate the first DNR false report against her in March 2023, and refused to discuss it saying the rumor disappeared not "thin air", allowing more unfounded rumors to fester. She told him he was responsible for hiring her into an unhealthy environment with pre-existing microaggressions and refusing to acknowledge that she was a victim of these same microaggressions and rumors. Dr. Mezu-Chukwu asked Dr. D'Angio what he had done as a leader in the NICU to curb the toxic work environment, implicit bias, and microaggressions. His response was incoherent, including saying that the NICU was implementing encouraging breast milk initiatives for minority mothers. Dr. Mezu-ndubuisi told Dr. D'Angio that he was picking favorites by protecting those filing false reports against her. **"Who will protect me? Am I not part of the team?"** she asked him. He looked down,

and did not respond. She stated that it was his responsibility to thoroughly investigate complaints brought to him and speak to first-hand witnesses before attempting to escalate or initiate penalties, on not only her but any staff. That is equity. She reminded him that none of the complaints against her were ever investigated. She informed him that he may trust and know the people bringing these complaints as long-term colleagues and friends, but he does not know their intentions or personal biases, including racial biases against her, just for the color of her skin.

122. Dr. Apostolakos mentioned that those bringing complaints need to remain anonymous and do not like to be found, and Dr. Mezu-Ndubuisi could not speak to anyone making any complaints against her. Dr. Mezu-Ndubuisi responded that she didn't want to know who made complaints, but that these complaints are false and not investigated. She pointed out that in Case B the informant was called "bedside staff" when that was not true. The bedside staff were all part of the clinical decision. **(Exhibit D)** She asked again how she would be protected from continued false rumors or how complaints would be investigated, but no answer was given. Dr. Mezu-Ndubuisi stated that she strives to be positive and kind to all at work, no matter what she has experienced or heard said about her. She shared that she constantly reflects each day, how she could act or react differently in any encounter, and come s to work each day with a smile, bright attitude and enthusiasm, and that the nurses always say how glad they are to see her and that she is at UR, giving her hugs each day. She shared that she reminds everyone at rounds that they are all a work family and have the same shared goals for their patients and are all patient advocates, and so when someone has a differing opinion clinically, one should strive to listen, understand and work collaboratively to care for the patient. Dr. Mezu-Ndubuisi shares that she believes that every

staff cares about their patients and tries to do their best in a given situation. She reminds them that everyone has made personal and professional sacrifices to be there, is well-trained for their positions, but have different experiences which can be used collectively and shared to benefit the babies.

123. Dr. Apostolakos asked when they should expect to receive Dr. Mezu-Ndubuisi's acceptance or denial of the re-entry plan. Dr. Mezu-Ndubuisi stated that the document was not acceptable as is, and unjustified. Dr. Apostolakos said that they would make some modifications based on the discussions had. Dr. Mezu-Ndubuisi asked that it be reduced to 1.5 pages at the most, and the extent of monitoring removed, and that if she was going to be observed in the NICU at rounds, her colleagues should also be observed to give the observer a holistic perspective of staff interactions in the NICU and avoid creating a worse hostile and toxic environment for her, as it would be perceived she had done something wrong. She reminded them they have not provided any evidence to her of any wrong-doing clinically and all babies under her care had done well clinically. Dr. Mezu-Chukwu asked Dr Apostolakos to give some time for consideration. Dr. Apostolakos said they would revise the re-entry plan and send across within 1-2 weeks. As the meeting ended, Dr. Mezu-Ndubuisi informed the UR leadership that she knew they were well-meaning and trying their best to do their jobs, but she hopes that their Hippocratic oath as physicians to "First, do no Harm", and their sense of equity, justice, and moral/ethical standards would be prioritized and guide their decisions. They thanked her. All present shook hands in greeting, and the meeting ended.

124. **In an email on June 4, 2024, Dr. Mezu-Ndubuisi responded to the UR Proposed Re-entry Plan, stating, "During our meeting, you first showed me a 5-page re-entry plan that**

will have me undergoing monitoring daily in the NICU by a mentor, including consulting

the mentor with every major decision on a baby's care, change of ventilator mode/settings,

etc. This plan starts with only care of feeder grower sub-acute babies, and will progress me

to more critical babies, then overnight call, and then clinical time at RGH over the course

of a year. I am to consult a mentor daily with my care of babies, check in once a week, and

will be evaluated by the Division Chief and Chair of Pediatrics who at their discretion could

prolong the duration of this plan at will, with no clear end. The plan also includes one-on-

one Physician Communication Coaching. The re-entry plan included that I must be present

at zoom with camera on, even though majority of neonatologists and clinical staff attend

zoom with camera off. I brought to your attention that the re-entry plan requiring that I run

ventilator changes by a mentor would disrupt clinical rounds, delay patient care, and may

upset both parents and staff at rounds. *You assured me that you would modify these sections

of the re-entry plan, and would simply the re-entry plan and send across to me."* (**Exhibit

S**)

125. **Dr. Mezu-Ndubuisi provided her Reflections on the Re-entry Plan stating, "**Although

you deny that the plan is meant to be punitive, <u>it is clearly punitive</u>. I shared that this re-

entry plan was excessive scrutiny of my clinical activities without just cause, <u>and would

create a more hostile and toxic work environment in the NICU for me.</u> **I asked you all,

what I had done wrong to result in this, and what baby was involved and what I should

have done different, and none of you could answer.** I was informed that an FPPE had

showed 15% deviation from alleged standard of care. You informed me that the 15% was

unusually high and warranted a re-entry plan. I reminded you that the FPPE listed all the

alleged deviations,  and that I had provided a response supporting the clinical decisions I

had made. All decisions I made were based on my clinical judgement and were made to prevent harm from happening to the babies. You ignored my explanations or account of events. ***Please, see my response to FPPE attached for your reference.***"

126. Dr. Mezu-Ndubuisi stated her concerns about disparate treatment, "It is concerning to me that I am being treated differently, both with the handling of rumors, alleged complaints and the initiation of an FPPE. The FPPE has never been ordered on a neonatologist in the history of URMC. This shows bias and disparate treatment of me as the only black neonatologist at URMC. You repeatedly informed me that the Office of Equity was handling my concerns of racism separately. However, those concerns of racism and implicit bias are inherently intertwined with the FPPE and alleged complaints against me. So, without waiting for proper investigations, I am being penalized with a re-entry plan and monitoring. I asked you how complaints were handled and how it is determined which were escalated like mine and which were ignored or handled without escalation. You could not provide the answer."

127. **Dr. Mezu-Ndubuisi pointed out the Biased Handling of Adverse Outcomes in the NICU involving other providers, stating,** "Complaints are being made about the care I provided to babies, even though no baby has died under my care, or suffered any adverse outcome under my care. *Are complaints being raised about babies that suffered adverse outcomes or died under the care of other non-Black neonatologists and providers?* You told me that even though no baby has suffered an adverse outcome or died under my care, you would like to prevent an adverse outcome from happening. I would like to inquire what the NICU and URMC leadership have done to reduce the still ongoing adverse outcomes in babies under the care of other neonatologists. **The high rate of mortality in the URMC NICU is very concerning,** and a reflection of the aggressive ventilator care

and overt adherence to protocols ignoring patients' real-time clinical needs. Recently, in the past one week there have been several deaths in the NICU, including baby JP on 6/3/24, MS on 6/1/24, MG on 5/31/24. *Were FPPEs initiated on those neonatologists who cared for those babies that died under their care? Were complaints filed?* There is a biased focus on monitoring me for providing safe care as shown in the FPPE in order to prevent "future adverse outcome", while ignoring the ongoing adverse outcomes in the NICU due to care provided by other neonatologists that resulted in actual patient deaths."

## N. WORSENING UNHEALTHY AND TOXIC WORK ENVIRONEMNT EVEN IN DR. MEZU-NDUBUISI'S ABSENCE FROM CLINICAL WORK

128. On June 6, 2024, Dr. D'Angio sent email communication to the clinical faculty neonatologists with a document with the agenda of the Clinical Retreat and another document titled "homework" with anonymous responses from faculty about what they considered an important area of improvement and discussion.

129. In his June 6, 2024 email, Dr. D'Angio attached anonymized homework assignments and an agenda with the objectives: *"Improving communication and civility respect among faculty and staff and trainees and responding to episodes of incivility".* Anonymized homework responses included *"Challenge: communication/ cohesion among faculty Next step to help address: optimize communication, have team building events; Challenge: various levels of disrespect amongst all levels of providers and nurses within the NICU. Steps to be taken: We have to hold each other accountable for our actions and word choices by making sure to address the issue in real time. I believe it is our hesitation in addressing certain behaviors/actions/words that allow for them to be perpetuated, which*

*may lead to an uncomfortable setting in the work place. And from another responder, "Challenge: Differential treatment of families by race/SES; Curiosity: Short of punishment, how can we engage peers who do not see this as negatively impacting the health of our newborns?* (**Exhibit H**).

130. As of June 6, 2024, Dr. Mezu-Ndubuisi had been away from clinical duties for over 5 months and yet she is being penalized with mandated mentoring and clinical monitoring, and forced communication coaching, while the toxic NICU environment continues to fester.

## O. UR LEADERSHIP THREATENS DR. MEZU-NDUBUISI WITH NON-RENEWAL OF CLINICAL PRIVILEGES UNLESS SHE AGREES TO FALSE REMEDIATION PLAN MANDATING TOXIC, UNJUSTIFIED MONITORING OF CLINCIAL ACTIVITIES

131. On June 12, 2024, the hospital presented Dr. Mezu-Ndubuisi with a re-entry plan.

132. In the morning of June 14, 2024, Dr. Mezu-Ndubuisi responded to Dr. Apostolakos that the re-entry plan was discriminatory and excessive monitoring, without just cause. Dr. Mezu-Ndubuisi stated in this email to the UR hospital leadership that the NICU environment was toxic and the neonatologists are complaining of the same things she was, and yet she was being penalized.

133. Dr. Mezu-Ndubuisi presented the June 6th clinical retreat email from Dr. D'Angio discussing this toxic work environment and poor, disrespectful communication amongst all levels of NICU staff with the agenda and home work citing *"various levels of disrespect amongst all levels of providers and nurses within the NICU"*, all while she has been away from clinical work since December 27, 2023, and yet she was the one being penalized.

134. Dr. Mezu-Ndubuisi stated, "my crime it appears was (1) that I am a new member of the faculty even though an Associate Professor with tenure and diversified experience; (2) that I am a black and non-white neonatologist who dared to point out concerns bedeviling the Department of Pediatrics and the Golisano Children's Hospital NICU of University of Rochester – issues that everyone is now trumpeting."

135. While noting that Dr. Mezu-Ndubuisi has been reassigned from this clinical environment and communication has worsened in her absence, and this remediation plan document makes her a target for this toxic environment. Yet, she is being mandated to Physician Communication Coaching when there has not been a single evidence of her having problematic communication. Communication is a two-way interaction, and needs to be the responsibility of all involved, not one person.

136. Dr. Mezu-Ndubuisi reminded Dr. Apostolakos that "Conspicuously missing from this document is how NICU leadership plan to protect me from racial targeting and from false/biased reporting and rumors as happened with baby F twin A and B, and with the false DNR report on March 10, 2023 where a rumor was started and propagated by someone who did not see or speak to me at all stating that I was going to approach a parent to cancel a baby's DNR. This was never investigated. **What would be the consequences to individuals who bring false reports against me?** How would NICU staff investigate complaints going forward to not only protect the staff but to protect me from false reports and racial targeting?

137. In the afternoon of June 14, 2024, Dr Apostolakos responded with a demand that Dr. Mezu-Ndubuisi sign the document or it would be assumed that she declines the document, and that the University of Rochester would only allow her return to clinical duty if she

accepts the monitoring conditions stating, *"We received your email in response to the re-entry plan that was provided to you on Wednesday, June 12, 2024. That plan offered an outline of the terms and conditions under which the University would support your return to clinical practice. If you would like to return to clinical practice, we request that you affirmatively confirm your acceptance of the terms in the plan by the end of the day on Friday June 21, 2024. If we do not receive such an acceptance by then, we will consider you to have declined."*

138. The re-entry plan is filed with falsehoods, inaccurate statements about Dr. Mezu-Ndubuisi's professionalism, communication, and clinical care of patients with no evidence provided for any of these false statements. No evidence has been provided to Dr. Mezu-Ndubuisi in person or writing since these proceeding began in November 2023. (**Exhibit P**).

139. Agreeing to sign such a document is career suicide. This would make Dr. Mezu-Ndubuisi subject to bullying, harassment, clinical monitoring with no clear end and continued racial discrimination in the GCH NICU. Signing this document would be forcing Dr. Mezu-Ndubuisi to agree to crimes and egregious unprofessional conduct she has not ever committed. Signing this document could threaten the status of Dr. Mezu-Ndubuisi's tenure at University of Rochester, including revocation.

140. Ignoring to sign this document would also be career suicide, yet the more ethical, moral, just, and only truthful option that plaintiff has. The hospital, under the guise of patient safety and in adherence to their set protocols, which are false and unproven allegations, will still deny renewal of Dr. Mezu-Ndubuisi's privileges or terminate it, and they will be mandated to report this action to the National Practitioners Data. A negative reporting to

the national practitioners' data bank will mean that Dr. Mezu-Ndubuisi cannot be granted privileges as a physician anywhere in the country and no insurance company will insure her. Basically, her medical career or ability to practice medicine as a neonatologist would be over.

141. Hence, this legal suit and accompanying preliminary injuction to prevent any negative action on Dr. Mezu-Ndubuisi's hospital privileges and force University of Rochester to produce the charges against her, and evidence for them, and grant her due process of investigating these charges thoroughly. None of this burden of proof has been provided by University of Rochester.

142. No evidence has been provided to Dr. Mezu-Ndubuisi in person or writing since these proceeding began in November 2023. Agreeing to sign such a document would expose Dr. Mezu-Ndubuisi to an even more toxic work environment, force her to agree to egregious unprofessional conduct that she has not ever committed, and threaten the status of Dr. Mezu-Ndubuisi's tenure at University of Rochester, including revocation.

143. The Plaintiff has been targeted and discriminated against for pointing out safety issues in the NICU, such as aggressive ventilator use, high rates of sepsis, chest tube insertions, and unsafe practices.

144. During the time the Plaintiff was removed from service, the department continued to experience more preventable deaths of babies, most of which the Plaintiff had previously tried to help the hospital address. Instead of addressing these safety concerns, the institution chose to target the Plaintiff.

**P.        WORSENING PATIENT SAFETY ENDANGERMENT IN GCH NICU**
**LEADING TO INFECTIOUS DISEASE OUTBREAK .**

145. The GCH NICU has now being plagues in a crisis of Staphylococcal nosocomial
infections due to unsanitary and unhygienic hand-washing practices of the NICU staff
caring for premature infants. Unfortunately, NICU Leadership has repeatedly ignored Dr.
Mezu-Ndubuisi's concerns raised to them of high rate of infections in the NICU,
specifically to the Chief of Neonatology, Dr. D'Angio during one of their meetings in the
NICU and the medical director, Dr. Colby Day, when she and Dr. Mezu-Ndubuisi were on
service together in May 2023. Dr. Mezu-Ndubuisi had raised concerns that (a) She was
concerned that there was a high rate of sepsis in premature babies in the NICU, from
bacteria to fungal, and she believed that this appeared to be higher in comparison to other
NICU's in the nation; (b) Lack of a hand-washing station prior to entry into the NICU
clinical area and patient care area, as this is sterile station wash basin/sink is present in
almost all NICU's in the country, and all NICUs Dr. Mezu-Ndubuisi had worked in. Dr.
Mezu-Ndubuisi's concerns were ignored, and she was retaliated against by Dr. D'Angio
and Dr Day for bringing these concerns to be with escalation of false patient reports
against her.

146. On June 6,  2024, the GCH NICU was forced to acknowledge an outbreak of sepsis from
nosocomial methicillin-resistant staph aureus in the NICU, with several babies affected,
critically ill and receiving treatment from it. This crisis of Staphylococcal nosocomial
infections was due to unsanitary and unhygienic hand-washing practices of the NICU staff
caring for premature infants. GCH NICU is now in panic doubling efforts to contain this
widespread infection, including instituting basic hand-washing practices that should have

been in place for years, and that should have been considered when the concerns were raised by Dr. Mezu-Ndubuisi a year earlier. Infectious Disease Department has been on alert and in meetings with NICU Leadership to control this infection outbreak and  emergency. See emails about infection outbreak. (**Exhibit P).**

147. In her June 6, 2024 email, Dr. Richardson (Day) stated, *" As I'm sure you know, in the NICU we have had 9 cases of Staph Aureus sepsis in the past few months, including two recent patients with very poor outcomes."* She stated that NICU leaders had now engaged the hospital infection prevention leaders and hospital epidemiologist "to formulate a phased plan to prevent additional infections." She stated that Phase 1 required the entire team to:

   1. *Perform <u>3 minute</u> hand hygiene ("scrub") when entering the NICU for the first time each day*

   2. *Wash and glove upon entering rooms and touching surfaces and wash upon exiting rooms*

   3. *Wipe down high touch surfaces including computers, countertops at the start of your shift*

   4. *Avoid rolling unnecessary equipment into rooms if possible. If you do need to bring a computer workstation into a room for a clinical reason, it must be entirely wiped down after exiting the room before proceeding to the next patient.*

   5. *Use cell phone disinfecting machines at beginning of shift*

   6. *Avoid wearing <u>watches and jewelry</u> other than a simple band-type ring during patient care"*

148. The 3-minute scrub in #1 and in removing jewelry #6 had never been practiced in the GCH NICU, while 2-5 are expected of all providers, it was never encouraged by NICU leadership.

149. On June 13, 2024, Dr. Colby Richardson, the Medical Director of the GCH NICU stated that "*We do truly have an infection crisis on our hands in the unit. While the vast majority of people I have talked to in the last 3 hours are absolutely set on getting the infection burden under control, I am already hearing of push back (from nursing in particular) about not being allowed to wear bracelets and other jewelry. This is going to be a culture change in our unit and **I need the faculty to take the lead on this**. Please make this a priority every single time you are in the unit, not only to demonstrate that you are following the recommendations I wrote out in the last email but also to professionally notify people in the moment if you see them not following our guidelines. Not to steal an overused phrase but this needs to be a 'see something, say something' situation.*"

150. On June 14, 2024 an infant baby LS died of septic shock in the GCH NICU, a direct result of these unsafe hand-washing practices.

151. The Plaintiff was pulled from service and restricted from working due to false claims of patient safety concerns.

152. The Plaintiff has an impeccable record, with no patient deaths under her watch, and takes pride in her extensive documentation and patient care.

153.    In contrast, the Plaintiff is aware of multiple routine patient deaths in the NICU, which have never been investigated for the other physicians, and she has brought these to the attention of UR leadership for which she is being penalized with monitoring or face non-renewal of clinical privileges.

**Q. DR. MEZU-NDUBUISI'S CLINICAL OPINION IS SOUGHT FOR COMPLEX CASES IN THE DIVISION OF NEONATOLOGY AND THE DEPARTMENT OF OPHTHALMOLOGY**

154.   It is important to point out here that the ophthalmologists who are the experts in retinopathy of prematurity diagnosis seek and trusted Dr. Mezu-Ndubuisi's expertise and recommendations as both a vision-scientist and neonatologist with laboratory and clinical expertise in ROP, and would frequently encourage and redirect neonatology staff to follow Dr. Mezu-Ndubuisi's recommendations regarding oxygen saturation targets in ROP. Dr. Rajeev Ramachandra, pediatric ophthalmologist/retina specialist, on one occasion on April 11, 2023 in response to NICU staff asking for his recommendations for home oxygen on a baby with ROP, redirected them to my recommendations stating by email, ***"Hi Elizabeth, Igor asked me this question and I sought the expertise of Dr. Mezu-Ndubuisi. Her are thoughts and I feel we should go with her recommendations. We are very fortunate to have a neonatologist with ROP expertise to help guide use with systemic treatment and its effect on the eyes. Thanks, -Rajeev***

155. See emails from pediatric retina specialist/ophthalmologist. Emails of Complex Case Consultations from Colleagues. (**Exhibit Q**)

156. These emails above show that there was wide support for the oxygen saturation guideline changes that Dr. Mezu-Ndubuisi was proposing. While claiming to be supportive, NICU Leadership were also sabotaging her efforts by encouraging complaints from staff, without proper investigation and protecting these staff .

157. Even as Dr. Mezu-Ndubuisi has not been working clinically, she is still being contacted by senior members of the Division of neonatology to provide useful insights to a planned

clinical trial, since she not only was a co-author on the original trial eight years ago, she was the site Principal Investigator for five years on the trial investigating the use of insulin growth factor to prevent ROP, BPD, and IVH in the NICU. Dr. Mezu-Ndubuisi's site for this trial in University of Wisconsin was commended as a model site for clinical trial execution and monitoring earning her the title of ROP star of the month in the clinical trial newsletter in 2016. This is ironic that the same people seeking to monitor Dr. Mezu-Ndubuisi and silently witnessing the unjust, unfair, and biased treatment of her are the same people seeking her knowledge and expertise, and assistance to teach them so they can benefit from her lessons learned. Dr. Mezu-Ndubuisi was reviewing the re-entry plan imposed by UR leadership, and did not feel comfortable participating in these last minute discussions, nor did she trust the intent of these invitations. **(Exhibit Q).**

## FIRST CAUSE OF ACTION

**(Racial Discrimination in Violation of Title VII of the Civil Rights Act of 1964,**

**42 SC 2000e. et seq.)**

158. Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

159. At all times hereto, the Title VII racial discrimination laws were in full force and effect and were binding upon Defendants and each of them.

160. Dr. Mezu-Ndubuisi was at all times relevant herein an employee and applicant covered by U.S.C. 42 § 2000e et seq.

161. Defendants were at all times aware that the Plaintiff is a black African Woman from Nigerian national origin.

162. The Defendants' conduct as alleged at length herein constitutes discrimination based on race in violation of Title VII.

163. The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretext to hide the Defendant's discriminatory animus.

164. Plaintiff suffered significant damages because of Defendants' unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and attorney fees and the costs of bringing this action.

165. Defendants intentionally violated Plaintiff's rights under Title VII with malice or reckless indifference.

166. Plaintiff is entitled to backpay, front pay, compensatory damages, punitive damages, attorney's fees, costs of suit, a declaration that Defendants violated her rights under Title VII.

## SECOND CAUSE OF ACTION
### (Title VII Retaliation)

167. Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

168. The discriminatory and retaliatory actions were undertaken by the defendants acting as agents, supervisors, joint employers, that had the purpose or effect of adversely affecting Dr. Mezu-Ndubuisi's continued employment, ability to work and perform her clinical duties on the same terms as was available to similarly situated employees when they were false rumors made about them about patient safety and the use of their clinical judgment.

169. Defendants' discrimination and retaliation had the effect or purpose of creating an intimidating, hostile, or offensive working environment, and the purpose of unreasonably interfering with Dr. Mezu-Ndubuisi's work performance.

170. The stated reasons for the Defendants' conduct were not the true reasons, but instead were **pretext** to hide the Defendant's retaliatory animus.

171. The actions were taken for the purpose of retaliating against Dr. Mezu-Ndubuisi for complaining about the discriminatory and retaliatory acts towards her; her complaints that she raised about the patient safety issues at the Defendants' NICU.

172. After she filed the EEOC complaint in December 2023, the defendants retaliated against her by removing her from clinical duties.

173. Defendants in bad faith presented falsehoods without any evidence to EEOC denying discrimination and false reports about Dr. Mezu-Ndubuisi's clinical care.

174. Dr. Mezu-Ndubuisi, in good faith, attended two in person meetings with UR Leadership in a bid for peaceful and amicable resolution of the issues in the best interest of patients.

175. Defendants, in bad faith, continued to push forward an FPPE and a re-entry/remediation plan that slanders Dr. Mezu-Ndubuisi and states falsehoods against her professional character and clinical care without any evidence.

176. Dr. Mezu-Ndubuisi faces a threat of irreparable damage to her professional career if she does not sign the mandated re-entry plan and her clinical privileges are not renewed.

177. Defendants are aware that Dr. Mezu-Ndubuisi is a black woman from Nigeria national origin.

178. Defendants have expressed hostility towards Dr. Mezu-Ndubuisi's Igbo ethnic origin as described in the incorporated allegations.

179. These retaliatory actions have created a hostile working environment for the Plaintiff.

180. These retaliatory actions have caused the Plaintiff to suffer emotional, psychological, physical, and financial harm.

### THIRD CAUSE OF ACTION
### (HARASSMENT/HOSTILE AND ABUSIVE WORK ENVIRONMENT)

181. Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

182. The actions listed in all the preceding paragraphs were undertaken by the Defendants acting as agents, supervisors, joint employers to harass Dr. Mezu-Ndubuisi and to create a hostile and abusive work environment.

183. The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretext to hide the Defendants' retaliatory animus.

184. The harassment was unwelcome and sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and created a hostile work environment.

185. Despite having actual and constructive notice of the harassment herein, Defendants failed and refused to take prompt and appropriate action to stop the harassment and the resulting hostile work environment.

186. Defendants did not properly handle the complaints made by the Plaintiff. Defendants failed to properly investigate and respond to complaints, discouraged additional complaints from being made, and failed to implement necessary remedial measures to end the harassment.

187. Defendant retaliated against Dr. Mezu-Ndubuisi for bringing to their attention unsafe medical practices, choosing to bring forward false complaints and FPPE to restrict her clinical practice and monitor her without justification.

188. The unlawful employment practices complained of above were intentional.

189. The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of the Plaintiff.

190. As a result, the Plaintiff suffered significant damages including emotional distress, past and future lost wages and benefits, and attorney fees, costs, and the costs of bringing this action.

## THIRD CAUSE OF ACTION
## (DENIAL OF DUE PROCESS)

191. Defendants refuse to investigate the false rumors and allegations against Dr. Mezu-Ndubuisi.

192. Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

193. Plaintiff was hired in July 2022 with an employment contract as an Associate professor with tenure.

194. Plaintiff has a property interest or right in her position as an Associate professor with tenure with research and clinical duties.

195. Plaintiff was entitled to a notice of the false allegations about patient safety that were leveled against her and the rumors about her use of her physician's discretion in making decisions about patients' treatment and care

196. Plaintiff's tenured position also entitled her to a right to a hearing and to confront the witnesses who leveled false allegations against her before disciplinary actions are meted out to her.

197. Defendants failed to give her notice of the false allegations that were leveled against her. They failed to properly investigate the false complaints despite plaintiff's many requests for an investigation.

198. Defendants, through their agent, Dr. Angio then punished the plaintiff by removing her from clinical duties without notice and a hearing. Dr. Angio approached plaintiff in a threatening manner when he removed her from clinical work which made plaintiff fear for her safety.

199. Defendants were required to provide evidence of the reasons for stopping the plaintiff from clinical work and give advance notice before the stoppage and hold a hearing on the matter. Defendants did not do any of those.

200. As a result, plaintiff is unable to renew her clinical privileges and is at risk of her license being labeled inactive status.

201. As a result, the Plaintiff suffered significant damages including emotional distress, past and future lost wages and benefits, and attorney fees, costs, and the costs of bringing this action.

## FOURTH CAUSE OF ACTION
## (RETALIATORY HARASSMENT AND DISCRIMINATION IN VIOLATION OF NYSHRL)

202. Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

203. NYSHRL prohibits harassment and discrimination against an employee who complains of, or objects to, discrimination and harassment.

204. Plaintiff was engaged in protected activity when she opposed and complained about the defendants' harassment and discriminatory treatment in their handling of false patient safety reports about the plaintiff as opposed to similarly situated non-minority employees, handling of rumors regarding the plaintiff's use of her medical judgment in patients' care; the disparity and failure of the defendants to investigate and discipline similarly situated non-minority practitioners whose patients died under their care; the willingness to investigate and institute disciplinary actions against the plaintiff without notice and a hearing by mandating monitoring, coaching, and  focused evaluations. Dr. Angio engaged in a physically threatening/intimidating behavior towards the plaintiff on December 27, 2023 when he arbitrarily stopped the plaintiff from performing her clinical duties.

205. Defendants were aware that the plaintiff engaged in these protected activities because she lodged her complaints with them and the Rochester EEOC. Additionally, Defendants presented a position statement to the EEOC in response to EEOC's inquiry about the plaintiff's discrimination complaints. Plaintiff was stopped from clinical duties after the EEOC discrimination filing.

206. Defendants' conduct would discourage a reasonable person from making a complaint of discrimination.

207. As a direct, proximate and foreseeable consequence of the above-referenced conduct, plaintiff's career prospects, earning potential, and reputation have been severely harmed. She has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, past and future economic losses, and

other direct consequential damages. Plaintiff has suffered and continues to suffer economic and non-economic damages as a result of defendants' conduct and also seeks punitive damages, attorney fees and costs.

208. Defendants, Dr. Apostolakos, Dr. Baumhauer, Dr. Halterman, and Dr. D'Angio, threatened to deny renewal of Dr. Mezu-Ndubuisi's privileges if she did not accept the document stating that she did actions that violated professionalism, communication, and patient safety, and  would be monitored excessively and terminated at will going forward, which would be a lie, as Dr. Mezu-Ndubuisi has been the model of compassion, professionalism, and respectful communication in the NICU, and the University has not shown any complaint to her or evidence of wrong doing, and has not investigated these allegations. The legal proceeding is the only way for Dr. Mezu-Ndubuisi to prevent adverse action on her medical privileges and medical career.

## FIFTH CAUSE OF ACTION
## (BREACH OF CONTRACT)

209. Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

210. An implied employment contract exists between the plaintiff and the defendants.

211. Defendants' policies and procedures, including, but not limited to those policies and procedures at **Exhibit T**, created the terms and conditions of plaintiffs' contract with the defendants.

212. Plaintiff fulfilled all her obligations under the contract.

213. Defendants did not fulfill their obligations under the contract.

214. Specifically, the defendants failed to fulfill their obligations under their contract with the plaintiff when they did not respond to the plaintiff's complaints and reports of harassment, discrimination, hostile work environment and retaliation.

215. Defendants also violated the terms of their contract with the plaintiff when they failed to follow their code of Ethical Conduct by failing to investigate Dr. Angio's threatening behavior towards the plaintiff.

216. As a direct, proximate and foreseeable consequence of the above-referenced conduct, plaintiff's career prospects, earning potential, and reputation have been severely harmed. She has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, past and future economic losses, and other direct consequential damages. Plaintiff has suffered and continues to suffer economic and non-economic damages as a result of defendants' conduct and also seeks punitive damages, attorney fees and costs.

**Wherefore,** by reason of the foregoing, plaintiff, Dr. Mezu-Ndubuisi hereby respectfully requests that following relief:

a. Damages at an amount to be proven at trial;

b. Attorney's fees and costs of suit;

c. Reinstatement to clinical duties, without restrictions.

d. Renewal of her clinical privileges without restrictions of her clinical practice

d. Implicit bias training for the Defendants' NICU;

e. Defendants to institute a non-biased and just process of handling staff complaints in the NICU, including a multi-disciplinary peer-reviewed system separate from NICU leadership

f. For a money judgment representing compensatory damages including lost wages, earnings, retirement benefits, and other employee benefits, and all other sums of money, together with interest on these amounts; for other special damages; and for general damages for mental pain and anguish and emotional distress and loss of earning capacity;

g. For prejudgment interest on each of the foregoing at the legal rate from the date the obligation became due through the date of judgment in this matter;

h. For injunctive relief barring Defendants' discriminatory employment policies and practices in the future;

i. For any other relief that is just and proper.

Dated: June 18, 2024

Respectfully Submitted

*Olaeln J. Mezu-Ndubuisi*

Dr. Olachi Mezu-Ndubuisi
1021 Pittsford Victor Rd
Pittsford, NY 14534

State of New York
County of Ontario
Subscribed and sworn to (or affirmed) before this
19 day of June, 2024 by Rachael Cook
_____ Personally Known   X Produced Identification
Type of ID Produced Drivers License
*Rachael Cook*
(Signature of Notary)
*Rachael Cook*
(Name of Notary, Typed, Stamped or Printed)

RACHAEL COOK
Notary Public - State of New York
No. 01CO0023338
Qualified in Ontario County
My Commission Expires April 10, 2028

## JURY DEMAND

Plaintiff respectfully requests a jury trial on all issues of law and facts raised by her complaint.

Dated: June 18, 2024

Respectfully Submitted,

*Olachi J. Mezu-Ndubuisi*

Dr. Olachi Mezu-Ndubuisi
1021 Pittsford Victor Rd
Pittsford, NY 14534

**CERTIFICATION**

Under Federal- Rule of Civil Procedure 11, by signing below, I certify to the best of my

knowledge, information, and belief that this complaint: (1) is not being presented for an

improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the

cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for

extending, modifying, or reversing existing law; (3) the factual contentions have

evidentiary support or, if specifically so identified, will likely have evidentiary support

after a, reasonable opportunity for further investigation or discovery; and (4) the complaint

otherwise complies with the requirements of Rule 11.

Dated: June 18, 2024                                    Respectfully Submitted,

*Olachi-J. Mezu-Ndubuisi*

Dr. Olachi Mezu-Ndubuisi
1021 Pittsford Victor Rd
Pittsford, NY 14534

I agree to provide the Clerk's Office with any changes to my address where case-related

papers may be served. I understand that my failure to keep a current address on file with

the Clerk's Office may result in the dismissal of my case.

Dated: June 18, 2024                                    Respectfully Submitted,

Dr. Olachi Mezu-Ndubuisi
1021 Pittsford Victor Rd
Pittsford, NY 14534

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Buffalo Local Office**
300 Pearl St, Suite 450
Buffalo, NY 14202
(716) 431-5007
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B) Issued On: 04/03/2024

**To:** Dr. Olachi J. Mezu-Ndubuisi
1021 Pittsford Victor Rd
Pittsford, NY 14534

Charge No: 525-2024-00562

EEOC Representative and email:    Julie George
Equal Opportunity Investigator
julie.george@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 525-2024-00562.

On behalf of the Commission,

_____

Maureen Kielt
Local Office Director

**Cc:**
Katherine S McClung
Bond Schoeneck & King
350 Linden Oaks, 3rd Floor
Rochester, NY 14625


Michelle Johnson
University of Rochester
263 Wallis Hall PO Box 270040
Rochester, NY 14627


Chinyere Ibe
Law Offices of C. Valerie Ibe
7220 Owensmouth Avenue Ste 220
Canoga Park, CA 91303


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 525-2024-00562 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Yaw Gyebi, Jr., 33 Whitehall St 5th Floor, New York, NY 10004.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 525-2024-00562 to the District Director at Yaw Gyebi, Jr., 33 Whitehall St 5th Floor, New York, NY 10004.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

I, Olachi J. Mezu-Ndubuisi, am an Associate Professor with tenure at the University of Rochester and the only Black neonatologist. On my first day, July 1, 2023, leadership told me of a culture of microaggressions by staff. Since hire, I have experienced racial discrimination by some staff and leadership, and assigned clinical mentors with less experience, without justification. Leadership retaliated against me for raising patient safety concerns about existing clinical practices that may contribute to morbidity of preterm infants, despite adopting my suggested modifications. I provided care to Hispanic twins on 9/11/23 (A) and 10/5/23 (B) 2023, who improved under my care, but false reports were made, and their care was escalated aggressively by other staff, and led to demise of Twin A on 9/25/23. Neonatology Leadership in retaliation mandated me on 11/22/23 to undergo communication coaching and have a clinical mentor without justification or investigation of the false reports.

1. I, Olachi J. Mezu-Ndubuisi, state that I am an Associate Professor with tenure at the University of Rochester (UR) and the only neonatology faculty of American-American origin and Nigerian heritage in the Division of Neonatology, University of Rochester, New York. On my first day of hire, July 1, 2023, I was informed by Neonatology Leadership that there was a culture of microaggressions and unkind behaviors by staff in the NICU. Since hire, I have experienced acts of racial discrimination, microaggressions, and bias in treatment by some staff, and the leadership of the UR Division of Neonatology. Since my hire, I have been assigned clinical mentors of the same rank, who have less years of clinical experience, without any justification given.

2. I faced retaliation from leadership of the Division of Neonatology when I raised concerns about patient safety regarding existing clinical consensus practice, guidelines, and protocols that may contribute to increased clinical morbidity of preterm infants, particularly minority infants. NICU Leadership welcomed these suggestions and encouraged me to share the evidence-based literature for my perspectives, which I did in several lectures. False reports were encouraged to sabotage these efforts at collaborative modification. The patients involved in these reports did clinically well under my care. The staff would agree with my clinical decisions to wean infants on the ventilator and the infants continued to do well. However, after my shift ends, staff would escalate care of the same infants with more aggressive practices without any justification given in the medical records, leading to their clinical deterioration, and mortality in some cases. NICU Leadership neglected to investigate these false reports and would seem to stop investigation when non-Black faculty were involved.

3. UR Neonatology Leadership has adopted my suggested modifications to existing clinical practice, while still retaliating against me for suggesting these same modifications to optimize patient care.

4. On September 11, 2023, I provided clinical care to minority twins of Hispanic origin. Even though the patients improved under my care requiring weaning on their ventilators, false reports were made about my care. At the end of my shift on September 11 (Twin A) and around October 5th (Twin B) the care of these infants were escalated aggressively despite clinical evidence of their improvement. This led to demise of Twin A on September 25, 2023 under the care of other staff. UR Leadership stated after review of these cases that the clinical care I provided was appropriate.

5. In an apparent retaliation for my raising concerns of patient safety, the NICU Leadership has mandated in an email on November 22nd, 2023 that I undergo communication coaching and have assigned a clinical mentor without justification or any reason, and without any investigation of the patient safety concerns I had raised or the false reports made by some staff. On December 8, 2023, I sent an email to the Neonatology Leadership, copied to UR Leadership, drawing attention to my concerns of racism and retaliation and the mandate to undergo communication coaching and the imposition of a clinical mentor. Other non-Black neonatologists and Associate Professors at UR are not treated in this manner. Hence this complaint to the EEOC.