**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| OLACHI MEZU-NDUBUISI, an Individual | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 24-cv-06387 |
| vs. | ) | |
| | ) | |
| UNIVERSITY OF ROCHESTER, et.al. | ) | |
| | ) | **DECLARATION OF DR. OLACHI** |
| | ) | **MEZU-NDUBUISI** |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S DECLARATION IN SUPPORT OF PLAINTIFF'S MEMORANDUM IN**

**SUPPORT OF RENEWED MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

a.  INTRODUCTION

b.  ACADEMIC BACKGROUND

c.  REASON FOR RENEWED PRELIMINARY INJUNCTION

d.  TIMELINE AND SUMMARY OF CRTICIAL EVENTS IN CASE

e.  COURT PROCEEDINGS IN THE WESTERN DISTRICT

f.  DUE PROCESS VIOLATIONS AND SHAM FAIR HEARING PROCEEDINGS

g.  IRREPARABLE DAMAGE

**A.  INTRODUCTION**

I, Olachi Mezu-Ndubuisi, am the plaintiff in this matter, and I declare the following in support of my

motion for preliminary injunction against the defendants:

1. I am a resident of the City of Rochester, in the State of New York.  I have been a New York

resident for about two and half years.

2. I have personal knowledge of the facts stated herein and I am competent to testify to their truth and accuracy.

3. I have been subjected to racial discrimination since before hire on July 1, 2022 by University of Rochester (UR).

4. I have been treated inhumanely and as a second-class citizen, and unfairly discriminated against as a physician-scientist, just because of the color of my skin and my background as a Black woman of African heritage.

## B. ACADEMIC BACKGROUND

5. I was born and raised a twin in the tropical rain forest region of Imo State, South-East Nigeria in a family of ten children (7 girls and 3 boys) by parents with doctorate degrees, who believed in education and humanitarian service. All my siblings have master's and doctorate degrees ( An attorney/CPA, 2 Pharmacists, 1 Optometrist/public health specialist, 3 physicians, 2 Engineers, 1 IT Specialist/Security systems expert).  I began college at age 15 (a year and half ahead of my peers) and graduated summa cum laude/university valedictorian with a Doctor of Optometry degree (O.D) in 1998 (at age 22), and a Doctor of Medicine degree (M.D) in 2003. I am a naturalized US citizen since 2002. I completed a fellowship in General Pediatrics at Louisiana State University, Shreveport in 2006. I completed neonatal-perinatal medicine fellowship at University of Maryland (2006-2008) and University of Illinois (2011-2013). I was an Assistant Professor and Clinician-Scientist at University of Wisconsin from Nov 1, 2013 to June 30, 2022.

6. I was hired at the University of Rochester as a clinician-scientist on July 1, 2022, to perform clinical care of premature infants in the neonatal intensive care unit (NICU), and conduct clinical, laboratory, translational, and global health research.

7.  I am a well-qualified Physician-scientist and neonatologist and granted tenure upon hire at University of Rochester as an Associate Professor with joint appointments in the Department of Pediatrics and Department of Ophthalmology. I am the only Black faculty in the Department of Pediatrics at the University of Rochester. I am the only Black neonatologist in the Golisano Children's Hospital (GCH) of the University of Rochester, and the only Black faculty on staff in the NICU. I am one of less than 2% of tenured black faculty (medical and non-medical professionals) in the entire nation. **See Exhibit B - D. Mezu-Ndubuisi's Curriculum Vitae (CV) - ECF Doc. No. 60-5, filed Sept 3, 2024 –Plaintiff's Memorandum in opposition to motion to dismiss)**

8.  I continually strive to be an excellent and compassionate clinician and teacher. I am nationally and internationally renowned physician-scientist. I have authored over 25 peer-reviewed medical journal publications, four book chapters, recently published a textbook in 2023 titled, Fluids, Oxygen, Calories, Inflammation/Infection – a physiology-based guide to optimize neonatal care. I have given over 150 presentations nationally and internationally on various topics relating to my expertise in caring for premature infants and my research on the role of oxidative stress on developing organs of premature infants. My publications have been cited over 680 times in literature, and some of my original papers are ranked 97th percentile of all published articles worldwide.  olachi mezu-ndubuisi - Google Scholar

9.  I conduct laboratory research in a designated laboratory space in addition to clinical duties. My laboratory received a 5-year funding for over $1.2 million to conduct research on retinopathy of prematurity (ROP), an eye disease that causes blindness in premature babies exposed to excess oxygen in the NICU at birth. My lab is currently studying the mechanisms of angiogenesis and inflammation in retina and lung diseases in premature babies using a novel neonatal mouse model I

3

developed in 2011 that enables visualization of retinal blood vessels without sacrificing the mice. I also study the damaging effects of high oxygen on the lungs, kidneys, and brain of these mice to understand what happens in organs of premature infants exposed to prolonged high oxygen levels in the first few weeks after birth. My lab is currently producing nanoparticles, a breakthrough in drug delivery that will enable safer delivery of drugs to babies' eyes and bodies without systemic toxicity. Mezu-Ndubuisi Lab - Research - Department of Pediatrics - Rochester NY - University of Rochester Medical Center

10. I have mentored over 60 high school, undergraduate, graduate, and post-graduate trainees. My laboratory at the University of Rochester currently sports over 8 staff that I supervise. My colleagues and trainees in letters of support state that I am kind, supportive, compassionate, an excellent teacher, excellent physician, collaborative, meticulous, and bring out the best in others. **See Exhibit G -  Letters of Recommendation and Evaluation – Clinical and Research.** *(ECF Doc. No. 60-7, filed Sept 3, 2024 –Plaintiff's Memorandum in opposition to motion to dismiss)*

11. In addition to my clinical and laboratory work, I have mentored over 20 students in global health research. I am currently supervising five students in global health research (two high school students, a graduate student at SUNY college of optometry, a University of Rochester medical student, and a UR undergraduate student. I believe that research is meaningful when it has a humanistic goal of helping us better understand disease mechanisms and develop safe and effective treatment and clinical care strategies to improve human health and lives, not just in our local communities, but global communities, particularly underserved regions. For the past 11 years, I have led an annual medical mission trip to Nigeria as the medical mission coordinator. I supervise over 70 medical and non-medical volunteers to provide free medical and eye care to over 2,500 men, women, and children in South-East Nigeria, through the humanitarian activities of a non-

profit organization founded by my parents, Mezu International Foundation (MIF),

www.mezufoundation.org.

12. Over the years, I have established collaborations with local institutions in Nigeria and my prior

institution, University of Wisconsin, and now with University of Rochester, where students under

my mentorship work collaboratively during the medical mission to provide clinical care and

conduct research with students in medical and optometry schools in South-East Nigeria,

particularly Federal University of Technology Owerri and Abia State University Uturu, where we

obtain institutional review board (IRB) approval for the research conducted. I provide education

and skills training for students and local medical staff during these humanitarian missions. I just

returned in early August 2024 from a three-week medical mission trip where University of

Rochester students conducted global health research, presented their work in a poster session in

October 2024 at UR and submitted abstracts to national conferences. They are currently working

on turning their projects into peer-reviewed manuscripts under my supervision. Our global health

research provides education and sustainable solutions to the indigenes in order to improve health

outcomes in the Nigerian community that MIF serves.

13. My passion for neonatology and my compassion for the families of babies I care for in the NICU,

is driven from my family upbringing and also from my personal experience as a mother of

premature one pound birth weight twins. I experienced the loss of my twin son 17 years ago in the

NICU after a week of birth from lung disease of prematurity, following prolonged administration

of maximal oxygen levels on the ventilator and excess fluid administration in the first week of life,

the existing standard of clinical practice at that time in 2007. Decades of research have informed

current practice to evolve to allow more judicious use of oxygen and conservative administration

of fluids in premature infants in the first four weeks of life. ObiolaRose Twin Angels Foundation –

ObiolaRose Twin Angels Foundation offers support to parents of premature and sick infants through their babies' care in the neonatal intensive care unit My surviving twin daughter, OlaRose Ndubuisi, who weighed 1 pound at birth (470g) and spent 89 days in the NICU,  is now a 17-year-old senior in high school with a GPA of over 4.47, who is a published author of 6 books of poetry/children's stories, and the 2024-2025 New York State Youth Poet Laureate and a strong advocate for scoliosis nationally and internationally. OlaRose Ndubuisi (@olaroseofficial) • Instagram photos and videos

14. I published in December 2023, a textbook titled, Fluids, Oxygen, Calories, Infection/Inflammation (FOCI) - a physiology-based guide to optimize neonatal care. This contains evidence based literature from hundreds of studies reviewing evidence for and against clinical decisions regarding neonatal care, with a blueprint step-by-step guide to provide safe care, inspired by my 13 years of clinical practice as a neonatologist/physician-scientist and 21 years of medical practice providing neonatal care. https://www.amazon.com/FOCI-Calories-Inflammation-physiology-optimize/dp/0878311297

15. I have been called as an expert to provide clinical and research expertise on podcasts, newspaper interviews, and respected by colleagues across medical disciplines. I serve on the advisory board as ROP expert on National Center for Children's Vision and Eye Health (NCCVEH) at Prevent Blindness. I serve as a reviewer for the National Eye Institute on multi-million-dollar grant applications from researchers across disciplines, including being invited to chair some applications, and I am an expert reviewer for several academic journals. Link to invited Podcast interview for my expertise as neonatologist and scientist and ROP expert: NICU Heroes Episode 24: Retinopathy of Prematurity (ROP), Causes, Treatment & Research - Hand to Hold

### C. **REASON FOR RENEWED PRELIMINARY INJUNCTION**

16. On my first day of hire, July 1, 2022, in a welcome meeting, Dr. Carl D'Angio, my direct

    supervisor, informed me that the NICU had for several years a culture of microaggressions,

    rumors, unkind communication, disrespectful behaviors, and that they were trying to work on it.

    Yet, no diversity or implicit bias training was provided to the staff, even as I was hired as the only

    Black neonatologist/faculty.

17.  Despite having academic tenure, which is unprecedented for a new faculty and minority Black

    Faculty at University of Rochester, and my dedicated service to University of Rochester as a

    neonatologist and scientist, I have faced, since hire, a consistent pattern of racial discrimination,

    false reports from some NICU staff , and retaliation from the Department of Pediatric leadership and

    some colleagues for advocating for raising safety concerns in the NICU. I advocate for safe care of

    premature babies in the NICU and provide education to nursing staff and medical trainees with

    literature evidence in support. I seek collaborative discussions from staff to enable us to optimize

    the care we provide. All infants under my care have done clinically well or improved following my

    care, yet false reports about my clinical care are made behind my back, with no one informing me

    of any concerns they may have that would have encouraged collaborative academic discussions.

18. Since I was hired, I have not been notified of any complaints or concerns about my clinical care by

    either Dr. D'Angio or NICU Leadership, apart from above Case A, B, and C. In Cases A and B, I

    advocated for ███████████████████████████████████████████████

    ████████████████████████████████████████████████████████

    ██████████████████████████████████████. ████████████████████

    ██████. In Case A and B, ████████████████████████████████████

    ██████████████████████████████████████████████████. Case

A ██████████████████████████████████████████████████

███████████████. I was informed by Dr. D'Angio that he was ███████████████

██████████████████████████████████████████████████

19. ██████████████████████████████████████████████████

██████████████████████████████████████████████████

████ Dr. D'Angio, without verifying or investigating these false reports, called me on the phone at night with this accusation. I investigated and the staff involved all denied making such reports. I reported back to Dr. D'Angio and he said he would investigate, and responded a day later saying he was sorry that I had experienced this, and that he could not find anyone with a first-hand account, and that *"like all rumors, it disappeared into thin air."* He stated that he was in communication with physicians and nursing leadership to be respectful in communication. He stated that he did not wish to discuss this further. Even though Dr. D'Angio agreed that the accusation was false but refused investigation. This error in judgement by Dr. D'Angio as the Division Chief of Neonatology emboldened and empowered some staff to persist in making false reports against me, knowing that their identity would be protected, and they would face no reprimand or consequences for their unprofessionalism

20. Without investigating these false reports, I was mandated to Physician Communication Coaching by Dr. D'Angio, Division of Neonatology Chief on Nov 21, 2023, without evidence why it was needed. I appealed to University leadership on December 8, 2023 with a complaint of racism and retaliation, and my appeal was ignored with continual mandate to comply to the communication coaching with no reasons offered. I filed an Equal Employment Opportunity Commission (EEOC) complaint of racial discrimination and retaliation on December 8, 2023.

21. Eight days after I notified UR leaders of my filed EEOC complaint, I was dramatically removed from clinical work in December 27, 2023 by my new Department Chair, Dr. Jill Halterman, citing "numerous complaints" without informing me what I was accused of. I was further denied due process by University leadership still refusing to state what I am accused of, refusing to investigate the false reports, and insisting on penalties to excessively restrict my clinical activities and monitor/supervise my clinical work. All infants under my care have done clinically well; rather some infants under my colleagues (including NICU leadership) have had adverse outcomes or death from negligent care, and they are not penalized.

22. EEOC issued a right to sue notice in April 2024. My clinical privileges were due to be renewed after two years by June 30, 2024, and the Chief Medical Office, Dr. Apostolakos withheld renewal of my privileges, insisting on a meeting to discuss renewal of my privileges. At the scheduled May 23rd, 2024, meeting he expressed support for renewal of my privileges and shared his belief that I had experienced biased treatment in the NICU. I was invited to another meeting to sit down with Dr. D'Angio and Dr. Halterman to come up with a fair plan to return me to clinical work. In the June 4, 2024, meeting, I was shocked to be given an ultimatum by University of Rochester leaders to agree to a biased re-entry plan by June 21, 2023, which would exacerbate an already toxic work environment, and my requests for fair treatment and a statement of my allegations were ignored.

23. I filed a complaint and preliminary injunction (PI) in the Western District of New York on June 20, 2023. The PI was deemed premature as the university falsely claimed that there were ongoing internal proceedings. The university denied my renewal of privileges without notice and instituted a sham Hearing where I am denied witnesses to allegations against me, and the hearing panel, including a retired Justice serving as presiding officer, were paid without knowledge or consent of me and my counsel. It became clear that there is no hope for a fair or just hearing, and that University

of Rochester wanted to rig the proceedings in order to terminate my clinical privileges and end my medical career.

24. I am renewing my PI appeal, seeking reinstatement of my clinical privileges to prevent irreparable harm to me, my reputation, employment, academic tenure, medical career as a physician, and livelihood,

## D. TIMELINE AND SUMMARY OF CRTICIAL EVENTS IN CASE

25. Since prior to my hire and thereafter, UR and NICU leadership sought to control my lab location and restrict the use of lab equipment necessary for my research, in violation of contractual agreements.

26. On my first day of hire on July 1, 2024, at University of Rochester, Dr. Carl D'Angio, Chief of the Division of Neonatology, informed me and another new hire neonatologist, Dr. Gal Barbut, an Assistant Professor, that we will be required to have a clinical mentor. However, only I was constantly harassed about mentorship, even before I had any contact with patients. This is in violation of UR's policy stating that mentors are optional for Associate Professors but recommended for Assistant Professors. Other Assistant and Associate Professors were no treated in this manner or mandated to mentorship upon hire. **(Exhibit AC - Career Development and Mentoring - Faculty Development - Dept of Medicine).**

27. The racism I was subjected to by NICU leadership was constant, dehumanizing, and toxic. The NICU staff and leadership engaged in and encouraged a culture of gossip and rumors. There are no emails or documents ever sent to me by defendants or NICU Leadership articulating what I am allegedly been accused of till date. I saw the uninvestigated falsehoods, for the first time, in defendants' declarations and email purge of August 7, 2024, more than eight months after I was

dramatically removed from clinical care. Defendants had ignored my repeated requests to share allegations against me.

28. NICU Leadership only notified me of three vague concerns about clinical care raised by unnamed staff, to which I provided detailed responses of true facts (Case A, B, and C). Case C occurred around ███ 2023, Case A around ████ 2023, and Case B around ███ 2023.

29. False allegations are made by clinical staff under my supervision about my care of patients, even though all patients have done clinically well and I exercised my clinical judgement to prevent harm while providing education to staff with academic evidence to support my decisions, and encourage questions and discussions from staff with differing opinions to achieve collaborative consensus. Staff express understanding of discussions, their questions are answered, and they carry out discussed plan with significant improvement in care of the infants. At the end of my shift, I give a detailed sign-out to the attending neonatologist assuming care from me, and they express agreement with plan and note that patient has improved. I ask if there are any questions or concerns and my colleague attendings say there are none. I encourage them to let me know if questions arise. Days to weeks and months after my NICU shift, false rumors about my care and interaction begin and are encouraged by my colleagues, without justification, and without anyone bringing any concerns to my attention. These rumors are not investigated even when they are discovered to be clearly false. Instead, my supervisor, Dr. Carl D'Angio, and my colleagues in NICU Leadership, Dr. Colby Day, Dr. Jeff Myers, Dr. Andrew Dylag, Dr. Julie Riccio, and Dr. Kristen Schieble escalated these concerns to administration without anyone till date informing me of what I am allegedly accused of.

30. My clinical work, every word and action are over-scrutinized unkindly despite my diligence, compassion, and continuously striving for excellence and collaborative care. Nursing staff and

fellows are encouraged by NICU Leadership to decline orders from me, and not to inform me of change in patient's clinical status (as shown in emails filed by defendants in court on August 7, 2024). I was constantly subjected to rude, unkind, and unprofessional behaviors and microaggressions during daytime rounds and overnight calls. False second and third hand unwitnessed reports were solicited in emails, without my knowledge and till date the content of those emails were never disclosed to me, and I saw them for the first time in court documents, with redacted names of the email writers. Defendants have not produced any email as evidence where they have shared these concerns with me, yet they were released in public court documents.

31. Shortly after hire between September 2022 and April 2022, I raised patient safety concerns to NICU leadership about excessive fluid administration (that could worsen lung disease and gut intestinal inflammation, and deterioration of function of organs of premature infants), aggressive ventilator practices (infants not weaned when they have clinical evidence of improved lung function as evidenced in clinical exam, chest x-ray and blood gas values), prolonged use of excessive levels of high oxygen causing toxicity to fragile developing organs, restrictive blood transfusion protocols (delaying and denying critical blood transfusions to premature infants despite critical illness causing deteriorating, perforated intestines, brain bleeding, and worsened lung disease increasing risk of mortality), poor infection control practices (increasing risk for infections in newborn infants). There was an over-reliance of target numbers with no one paying attention to the actual physiological state and clinical needs of the infant in making an informed judgement or clinical decision. The NICU leadership was initially supportive of my recommendations and encouraged me to initiate education with evidence-based review. I conducted regular bedside teaching during day-time clinical rounds and night-time teaching of trainees. I delivered lectures to

the faculty, nursing staff, and trainees in March, April, and May on oxygen saturation goals, fluids, lung disease, and ROP.

32. **Around Sept 2022,** I sent my first email to NICU Leadership raising concerns about unsafe oxygen saturation guidelines. NICU Leadership welcomed my initiatives to lead this change in the guidelines with education and a critical review of the existing evidence-based literature. I sought collaborative discussions with my colleagues and NICU staff so that we could review existing practice and work together to optimize care of the premature infants. The Department of Ophthalmology was supportive of my clinical practice regarding judicious use of oxygen in the first four weeks of life to prevent ROP, and more liberal use after four to six weeks of life, a well-documented mechanism since decades of oxygen use to decrease risk of retinal bleeding and blindness in premature infants. The retinal surgeon would redirect NICU staff to me encouraging them to follow my recommendations and value my expertise on oxygen therapy in newborn. NICU staff sought my recommendations on complex medical cases involving newborns. **(Exhibit Q - ECF Doc. No. 61- Motion to seal certain exhibits to the declaration of the Plaintiff in Support of her Memorandum in opposition to defendants' motion to dismiss her amended complaint).**

33. **Around** ▓▓▓▓▓ **2023,** I was subjected to false rumors initiated by some neonatologists, fellows, and nursing staff in Case C , when staff that I had never seen or spoken to claimed to have heard first-hand statements that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ **(See emails in Exhibit F – Case C –** ▓▓▓▓▓ ▓▓▓▓▓**)** I had presented for my first overnight call following my first two weeks as attending on service since hire. I received sign-out from the two daytime attendings and fellows. After signing out, I went to my call room, and within 40 minutes, the NICU fellow called me to receive a phone call from Dr. D'Angio. Dr. D'Angio proceeded to accuse me of having concerns about ▓▓▓▓▓ ▓▓▓▓▓, and asked if I had questions. I said that I did not have any questions or concerns

about it. After the phone call, I investigated and emailed Dr. D'Angio to inform him that I had not

spoken to any staff since sign-out and had gone straight to my call room, prior to his call. He stated

that he would investigate the rumor and emailed a day later saying *"…I did a little digging, and*

*found that, like many rumors, it disappeared like a mist when I tried to grasp it.  No one whom I*

*could find actually had firsthand knowledge of any conversation.   I'm in contact with leaders of*

*all staff and provider levels about the need for respectful communication. I'm sorry that you*

*experienced this.  I'd be happy to speak with you more about it either by phone or in person."* Dr.

D'Angio never discussed this incident further with me, apparently stopping the investigation.

(Exhibit F – Emails of Case C)

34. **On March 29, 2023,** I presented a lecture on Pulmonary Mechanics in Respiratory Distress

    Syndrome ad Bronchopulmonary Dysplasia to the Division of Neonatology staff, nurses, and

    trainees.

35. **On March 31, 2023,** I received an email from a senior level nurse leader in the NICU formally

    inviting me to give a lecture as a guest speaker to nursing staff during the Harriet Davis Teaching

    Day in September, saying, *"We know that your passion and research is dedicated to ROP, and I am*

    *hopeful you would consider speaking on that topic. We are looking to educate to educate on the*

    *fundamentals of ROP, staging, and even treatments…"* I was happy to deliver this lecture on

    September 21, 2023, titled, "Retinopathy of Prematurity as a biomarker for oxygen toxicity from

    bench to bedside".

36. **April 20, 2023:** I delivered a research seminar on Retinopathy of Prematurity with a focus on my

    bench and translational research to the Department of Pediatrics and Department of

    Ophthalmology

37. **May 10, 2023:** I presented a lecture on oxygen saturation guidelines with a critical review of evidence to the Department of Pediatrics and Dept of Ophthalmology.

38. **May 31, 2023:** I delivered lecture on ROP and Neonatal Ocular Disorders – pearls for the neonatologist on invitation by the neonatology fellows.

39. **June – July 2023**: Dr. Jeff Myers, NICU Medical Director, demanded that I hand over her oxygen saturation protocol, without an invitation to be part of the workgroup reviewing this protocol to implement it. I was concerned about the safe implementation of her recommendations.

40. While applauding my clinical expertise, dedication to teaching, meticulous and compassionate clinical care, GCH NICU leadership sought to discredit me, defame me, and erode the confidence of bedside staff and trainees under my supervision, creating a toxic work environment where staff are encouraged to be rude, disruptive during rounds and bedside care, jeopardizing safe patient care. These behaviors were in retaliation for me gently and respectfully alerting them to unsafe clinical practices in the NICU, including a strict adherence to protocols and guidelines regardless of the baby's clinical state causing adverse outcomes.

41. **July 14, 2023:** Despite receiving these false reports, Dr. D'Angio gave me an excellent evaluation during my annual evaluation meeting with him on July 14, 2023. He did not bring up any concerns or allegations to my attention. I instead discussed that I was facing microaggressions in the NICU but chose to focus on dedicated care to my patients and modeling compassionate and collaborative care with the NICU staff. I asked him if there was any feedback from him or staff, or suggestions of areas of my NICU practice I could improve in. He responded that he had only received overwhelmingly positive reports of my excellence in teaching and clinical care from all staff: physicians, nursing, and trainees. He stated that staff share that I am kind, supportive, knowledgeable, an excellent teacher and meticulous clinician. Dr. D'Angio stated, "Dr. D'Angio:

People enjoyed working with you. Supportive, kind, calm, knowledgeable, approachable, thorough." **Exhibit AP – Certified Audio Transcript. Page 10. Line 20-21.**

42. He also indicated that he had done clinical service after me and was impressed by my meticulous care of patients and detailed notes. He stated that staff enjoyed and appreciated my teaching both at the bedside and during night calls. He then indicated that the only report was that my rounds were considered long due to her passion for teaching but advised her not to change the duration of rounds because excellent teaching was "a good reputation to have". **(Exhibit V -Audio recording of July 14, 2023, meeting – See Notice of manual filing -audio recordings – exhibits to her declaration and memorandum in opposition to defendants' motion to dismiss, filed on 9/3/24).**

43. Dr. D'Angio then added that there were a couple reports that my daytime patient rounds tend to run longer than other attendings due to teaching at the bedside. I acknowledged this and shared that I was working on focused teaching on critically ill patients and specific cases of interest, and also I had begun sharing literature with the team and assigning reading so that trainees, nurse practitioners, nurses  and ancillary staff could participate in leading teaching at the bedside. Dr. D'Angio responded, *"My advice to you is go for the great teacher but rounds are a little bit long as opposed to the doesn't teach us. So you know, if you have to err on the side of teaching continue to do it."* **Exhibit AP – Certified Audio Transcript. Page 14-16.** He added that I had the reputation of being a good teacher in Wisconsin, and that I have it at UR too, and it is a good reputation to have; and advised me to not shorten my rounds but continue teaching as usual.

44. **Exhibit AP – Certified Audio Transcript of July 14, 2024 meeting. Page 14- line 4-21.**

*Dr. D'Angio: But both the resident and the fellow comments are very positive about your 4 teaching. 5*

*Dr. O.J. Mezu-Ndubuisi: Thank you. Any feedback or any learning ... 6*
*Dr. D'Angio: The only learning thing I saw is rounds could be a little bit faster which is 7 probably the response that we get for about half of the faculty. 8*
*Dr. O.J. Mezu-Ndubuisi: Yeah. I guess with a bedside teach no specific cases related like 9 physiology related to certain things. Yeah. I try to vary it up and not do it on every patient. Only 10 the like really relevant patients and try to incorporate them teaching as well like have them look 11 up a journal and share. So maybe that day I don't do much teaching so he doesn't like so they can 12 participate as well. Yeah. So I'll work on speeding it up. 13*
*Dr. D'Angio: My advice to you is go for the great teacher but rounds are a little bit long as 14 opposed to the doesn't teach us. So you know, if you have to air on the side of teaching continue 15 to do it. 16*
*Dr. O.J. Mezu-Ndubuisi: Okay. I love it and I think it's helpful. 17*
*Dr. D'Angio: Yeah. Because as you, as you know, from the references I got and that sort of 18 thing, that's the reputation you had in Wisconsin. You want to keep that and you have it. So that's 19 great. 20*
*Dr. O.J. Mezu-Ndubuisi: Thank you.*

45. Dr. D'Angio after this meeting submitted a written evaluation of my excellence in teaching, clinical work professionalism, and outstanding research activities. He stated my contributions to building a positive and compassionate academic environment in my clinical and research work. **See Exhibit G - Letters of Recommendation and Evaluation – Clinical and Research. (ECF Doc. No. 60-7, filed Sept 3, 2024 –Plaintiff's Memorandum in opposition to motion to dismiss)**

46. ███████, **2023:** I received a vague email from Dr. D'Angio asking to meet via his secretary. I emailed him asking for the agenda for the meeting to enable a meaningful discussion. He responded that it was about Case A and would not state any direct complaint except that staff felt that my practice was "different from what they were used to". I responded via email and gave my account of this case where ████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████ I left detailed, minute-by-minute, notes in the medical records. Without stating what I had done wrong and without reviewing the medical records, Dr. D'Angio informed me that he had initiated an investigation of my care. **(See Exhibit C: Case A – Confidential; Exhibits to declaration and memorandum in opposition to defendants' motion to dismiss, filed on 9/3/24)** I encouraged him to review my detailed notes in the medical records. He returned a couple days later that he had reviewed it. I asked what part of my care he had concerns with, as ██████████████████████████████. He would not respond, but scheduled an in person meeting to follow up.

47. **October 3, 2023:** I met with Dr. D'Angio to discuss Case A. He stated that ███████████ ████████████████████████ He admitted that the investigations had found that I had

████████████████████████. **See audio recordings – (Exhibit W – Notice of manual filing -audio recordings – Exhibits to declaration and memorandum in opposition to defendants' motion to dismiss, filed on 9/3/24).** I reminded him that ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ See emails about Case A **(Exhibit C - ECF Doc. No. 61- Motion to seal certain exhibits to the declaration of the Plaintiff in Support of her Memorandum in opposition to defendants' motion to dismiss her amended complaint).** Dr. D'Angio stated that it was "axiomatic" that my ideas and practice would be of benefit to the group. **(Exhibit W - Audio recording of meeting; Exhibit** AQ certified transcript of audio).

48. In Case B, Dr. Julie Riccio and Dr. Colby Day approached me, when Dr. D'Angio was out of town, with concerns that bedside staff did not feel heard. When I asked for more specific details of the concern, they reported that ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

49. ████████████████████████████████████████████████

████████████████████████████ Drs. Richardson and Riccio expressed their apologies to me for the

inaccurate report about my care and agreed that I had provided appropriate clinical care within standards of practice. I followed up in an email to inform them that the false report had not come from any bedside staff following my own investigation and copied Dr. D'Angio. I requested that NICU leadership should encourage staff to seek clarifications if questions arise during clinical care, and avoid making anonymous complaints days or weeks later, as it posed a threat to patient safety. Dr. Riccio responded that she would encourage staff to communicate more effectively and bring their concerns in real time. See emails about Case B **(Exhibit D - ECF Doc. No. 61- Motion to seal certain exhibits to the declaration of the Plaintiff in Support of her Memorandum in opposition to defendants' motion to dismiss her amended complaint).**

50. **Nov 21, 2023:** I was tricked into a meeting with a false agenda on November 21 by Dr. D'Angio. Dr. D'Angio claimed he wanted to close the loop about clinical mentorship, but in the meeting, he mandated me to do Physician Coaching without justification or offering a reason. I asked why it was needed, what patient brought that concern, as all patients under my care had done clinically well. I asked why I was being singled out in a biased way, since communication involved more than one person. I reminded him that I was the only black faculty in a NICU that had a history of rumors and microaggressions, and this should be considered when unsubstantiated reports arise. I reminded him that I had been clear in my communication about my clinical care and documentation, rather those complaining days and weeks later behind my back without asking me questions directly were the ones not communicating well. He would not give a reason for the mandate saying. He informed me that he had already escalated this to the Chief Medical Officer, Dr. Apostolakos, because he knew that I may refuse. **(See audio recording – Exhibit X - See Notice of manual filing -audio recordings – exhibits to my declaration and memorandum in opposition to defendants' motion to dismiss, filed on 9/3/24)**

51. **Certified Audio Transcript of entire November 21, 2024 Meeting with D'Angio. Pg 1-14**

*[audio starts 00:00:00] 1*

*Dr. O.J. Mezu-Ndubuisi: I'm sorry. I'm at the airport.*

*Dr. D'Angio: Oh, no.*

*Dr. O.J. Mezu-Ndubuisi: That's okay. That's okay.*

*Dr. D'Angio: You going someplace good?*

*Dr. O.J. Mezu-Ndubuisi: Well, Thanksgiving with family, since I'm working Christmas, so I thought it would be good for my daughter to see family before the end of the year.*

*Dr. D'Angio: Okay. Okay. Oh, that's great. I'm glad you're gonna be able to go.*

*Dr. O.J. Mezu-Ndubuisi: I'll do that, yeah.*

*Dr. D'Angio: Okay. And I think that, and I'm concern that you can get into a cycle that's not going to be helpful for anyone. And what I want to do is try to focus on ways to try to repair relationships in the unit so that we don't see the kind of trouble that you and I both experienced. I've talked to many leaders in the unit about my concern about [indistinct 00:01:07] and reminded people that done what I can do to try to remind people that we need to be accepting of different ideas. Not that we're always going to do what anybody tells us to do, but that we need to be more open to different ideas and people with different approaches. So I've tried to work on that end and on your end, we've talked about clinical mentorship. I've talked to Patty Chess, who's willing to act in the clinical mentor role, and I would emphasize that her role is to support you in navigating the unit questions about how do you, know, how do you do things here and why do you do it that way and that sort of thing. Her role would not be in any way supervisory. You're obviously well beyond that in your career, but rather as a resource, resource to you, Pat an advocate for you. So Pat is willing to do that, and she was actually available this afternoon, but you are going to be on Thanksgiving vacation, so I'll have her catch up with you.*

*Dr. O.J. Mezu-Ndubuisi: She came by, actually, she came by last week.*

*Dr. D'Angio: Oh, she did.*

*Dr. O.J. Mezu-Ndubuisi: To my office. So we did catch up, and I took her on tour of my lab 3 and [indistinct 00:02:46]*

*Dr. D'Angio: Oh great.*

*Dr. O.J. Mezu-Ndubuisi: Yeah, so we did catch up. She didn't mention being the mentor, but it was very lovely to see her. And she just stopped by, said she wanted to say hello, so. I like that.*

*Dr. D'Angio: Oh, nice. Oh, that's nice. I'm glad she did. She and I had final hadn't finalized things at that point. Good, I'm glad she did. And I think you'll find her to be, I mean, she's obviously quite knowledgeable about [indistinct 00:03:11] since she's been here even longer than I have, and she's, and I think she would be a good support for you. The other thing that I think would be very useful is the physician communication coaching program that the university has. The specific goal is to help is to help physicians clinicians in their communication not only with patients but with others. We have many people who have taken advantage of it or are going to or are taking advantage of it. I've done this and found it to be very helpful in getting insights into my*

*communication style and trying to improve. Particularly for me, it was around leadership in the division but I found it to be very helpful. There are several other people who have either done it or are currently engaged with one of the countries. These are senior people, it's a mix of people with psychology training and medical training but who have expertise across those two fields to observe and help people with interactions. And I actually learned one of my other I learned yesterday, the day before one of my other faculty members is taking advantage of a similar program hadn't even told me. So it's a I think many people find that kind of having a touchstone to help them develop communication strategies, particularly for difficult situations, would be helpful. The coaching is confidential, so the content is confidential. I know that somebody's in the program that they finish whatever, but the content is confidential. It's for you, not for me. And I think that that would be a very good thing to do. I could put you in touch to do that.*

*Dr. O.J. Mezu-Ndubuisi: Can I say something with that regard?*
*Dr. D'Angio: Sure.*
*Dr. O.J. Mezu-Ndubuisi: I appreciate what you said and I do agree with the meaning of it and how helpful it could be. And I do know that because I have taken the communication programs, I've taken the leadership course that you aware of. It was a six month leadership course and that involved a lot about leadership styles, communicating with mentors and mentees and interacting with colleagues, peers and people under you as well. And I have taken a lot of those leadership and personality courses while at my last institution. So I don't know that taking another one is going to be any additional benefit. **So sort of recommending it is fine but mandating it for me right now feels punitive when there's not been a reason while I'm being told to do it or mandated to do it at this point I feel communication is two ways. It's both on me and the staff I'm communicating with. So why am I being required to do it?** And those staff who clearly did not communicate their  concerns to me, even when I encouraged it, was open about it, did not communicate or responded positively when they meant to, when they were thinking negatively. So I think they're the ones  that need that communication program. So at this point, unless it's been mandated and I would like to understand why. I feel it's punitive and I've done this before.*

*Dr. D'Angio: Did you have direct, did you have the opportunity to have somebody directly observe you in a clinical setting and give you feedback in that setting?*
*Dr. O.J. Mezu-Ndubuisi: Yeah, we randomly did that in my last program. Yes, I had my chief do that a couple times. I had my chair of pediatrics do that when I started.*
*Dr. D'Angio: Okay.*
*Dr. O.J. Mezu-Ndubuisi: And I got very positive feedback. They enjoyed the round, they  enjoyed the teaching, they enjoy my interaction. So I see that a lot of when concerns do come out or come up, some of those being taking up the chains of leadership are concerns started by people who were not even part of the interaction they're complaining about or who came into it after the fact and influenced whoever was part of the interaction. And these are trusted people. **So I always  like to emphasize that staff are, you know them, you've known them longer than me, they're well**

22

*trusted individuals who have their heart in the right place. But as individuals we all have individual biases which you don't have a control over. So you may know someone, but you may not know what their biases are and you cannot vouch 100% for what their intentions are. So that's why everyone should be responsible for their own should be responsible of their communication with others and being a well-respected colleague and being biased is not mutually exclusive. We all have personal biases. But when you act on them to treat someone else unfairly without giving the person the benefit of the doubt or a chance to explain themselves or even have that collegial 14 dialogue, then that's a problem.* I have communicated with you on several times even when you bring these concerns to me and I do believe that I have tried to be open and clear both in writing 16 and in person. What I said, what was said back, what my intentions are. So right now I do think 17 having the benefit of all these communication courses over the years has been helpful to me. I 18 don't need a refresher at this point unless there's a specific reason that there's a punitive aspect to 19 it which you have not indicated what I've done wrong specifically or what I need to go learn 20 different. So it seems one sided in communication when one person is being penalized and the other person who was a party to the misunderstanding because they didn't voice the intent or they misrepresented what they were really trying to say, agree with me when you don't agree and 1 verbalizing that you agree with me when you don't agree. How can I correct that impression.

Dr. D'Angio: I have several responses to that. **The first is there are things happening in the unit to try to help people improve their communication. You know, as I do, that that's a big problem in our unit. And I also know that some of your concerns have been addressed with people. So and I'm not going further than that [indistinct 00:10:24] Second is the goal of this, the goal of this recommendation is not punitive, it is to help you in that situation find ways because we are only, we can only be responsible for our own communication, to find ways that may be more productive for you. And it is not a mandate. It's not a mandate, but it's a very strong recommendation. I think that it would be helpful.**

Dr. O.J. Mezu-Ndubuisi: Sorry, I'm trying to. Sorry, I'm trying to no, I hear you. And like I said, I do agree that it will be helpful, but again, I just don't feel I need it right now. **And unless, like I said, it appears to be punitive, if you're strongly recommending it without a justification given to me, why, the instances you've brought up about misunderstandings, what I've done wrong or what I need to correct, that has not been communicated to me. So strongly recommending me to go improve my communication since punitive.** I'm happy to have Dr. Chaz as a mentor and, and you know, I think it's fair to have that for a little bit and get a feedback from her about our interactions. But, like, based on the issues that have been raised so far, I do not see why I'm being strongly recommended to have that.

Dr. D'Angio: All right, if I were having the same sorts of difficulties with interactions that you were having, I would seek ways to attempt to see what I could do to make my communication more effective so that I didn't find myself in the situation.

*Dr. O.J. Mezu-Ndubuisi: And how do you know I'm not doing that? How do you know I'm 1 not doing that? I am doing that. And I try to be kinder, try to listen more, give people benefit of 2 the doubt and sort of model the behavior I would like people to reciprocate to me. **And each time I come into the unit, I'm more aware of what's not being said, knowing that people are not communicating how they feel, truly encouraging that and sort of letting it go. Like letting people do things their way without even offering a different opinion. I'm trying those things and I'm trying strategies that I have learned about coping over the years. But I'm still going to make you aware that this may be a cultural thing, it may not be a communication issue. It may have to do with my background as a black woman. I didn't get here without having these sort of issues come up ever in my career. They have come up throughout my career and they're not unique to me. They're unique to all black people. So coming to a predominantly white hospital with white NICU staff, I'm aware of that coming in.** And I honestly, with my interaction with people, I'm very sensitive to the awareness that they may not be used to interacting with a black neonatologist. So I am not incinerating anything here. It's something that it is just a fact of the nature of what we do and is an experience that's shared by other minorities, not just me. **So making it, singling me out as need and communication intervention I don't think is the right way to approach these things. First we need to see is there a systemic issue here, a cultural issue here, diversity training that is needed in the staff. So making the person that is a victim of this, the person that needs to just do the soul changing. And I don't think that's the way to go. And that's my opinion. Where I've seen these things work themselves out is when it's a collective effort, we need to be more aware, we need to be more diverse and we need to start thinking diversity, inclusion, with every interaction, am I being inclusive? Am I being open to this person's thought?** And I've seen those work out really great for the well-being of the entire unit. So where people have been singled out, whether it's a trainee, a resident, a student or a staff, there's a minority that's having issues fitting in a program 1 as you need to change the way you speak. **What part of my speech is not clear when I'm communicating to you? It's the same way that I try to compassionately communicate to someone else, anyone else, especially with the experiences I have as a mother of a NICU baby, as a black scientist who has gotten here by being compassionate, by being open, by being collaborative. I have mentees under me. Even right now I have four lab students, two undergrad, two graduate students and I make them feel valued, I make them feel welcome, and they're from different ethnicities. So if there's someone who is not performing at the level they should be, and I know they're well trained, I'm not going to focus on that. I'm going to wonder, is there an environment in the lab that could we could improve on to make them feel more comfortable, to bring out the best in them. I wouldn't single them out to. You need to change this so you can fit into what we already have that works for us. I don't believe respectfully, that's the way to go about it. Thank you for listening.***

*Dr. D'Angio: Let me address those comments first and then we can circle back to the coaching. **You have stated that you feel that you are subject to discrimination as a result of your race. I'm as I'm sure you know, the policy against discrimination and harassment at the university***

*requires that I report that to the Office of Equity and Inclusion and I would do that. That will result in investigation that I hope will address some of your concerns.* The other thing that I'll add, and I'm sorry that you missed our last faculty meeting, one of the things that I've thought about is trying to improve our equity inclusion in the division. And I've been thinking about whether we need a more formal process program within our division. And I'd encourage you to think about whether you'd like to partake in that if we decide to take that route. *Because I, because you, I understand and agree with you points and I can't stand and I can't state that strongly enough that I understand and agree with you with the points that you're making. Going back to the coaching. I've had the opportunity to talk with Mike Apostolakis, who's the chief medical officer of the hospital, and he agreed that it was reasonable to recommend the coaching to you. He also felt that if you did not feel that that would be useful, that he'd like to speak to you about it* in square for you to speak with him.

Dr. O.J. Mezu-Ndubuisi: *Who, speak with who again?*

Dr. D'Angio: *Mike Apostolakis is the chief medical officer of the medical center.*

Dr. O.J. Mezu-Ndubuisi: *If that's your recommendation ...*

Dr. D'Angio: *I'm sorry I didn't hit it.*

Dr. O.J. Mezu-Ndubuisi: *If that's what you've decided, that's what you decided.*

Dr. D'Angio: *That's why I, when I spoke with him, he thought it was reasonable to recommend it and he thought that if you did not ...*

**Dr. O.J. Mezu-Ndubuisi: So what was the need to escalate to speaking with him before you even let me know that there was a concern?**

**Dr. D'Angio: You know, you have known, we've had discussions about concerns and I have sought help to try to find ways to help you as much as I could.**

**Dr. O.J. Mezu-Ndubuisi: But you've never clearly elucidated to me what my fault has been in each of those clinical cases, what I did wrong, whether clinically or in communication. So why escalate something, you've got a report you didn't witness firsthand.** *You talked to whoever you investigated and then you spoke to me and sometimes when you were away in Italy***, I believe I got a meeting from Colby and Julie and they communicated something to me. But it turns out they didn't even investigate it. They took the report from a third person who heard from someone who heard from, they didn't even know who said it. And the person they told me who said it, I went straight to her and she denied ever saying that she was confused and shocked.** *The bedside nurse, they said, so these things are being translated to different people on the side who are not even firsthand witnesses to those encounters. They're generalized statements that are made, including everyone on the team, which is not fair. So at least they should be investigating thoroughly. And I feedback to them, this is the result of my investigation.* **I didn't get a feedback, so I don't feel it is fair to you communicated with me, I communicated with you and then you don't tell me what I've done wrong and why you feel it was wrong, that that would warrant the next step, which is punitive. Strongly recommending, which sounds like mandating me to a**

*course on communication. Just me, nobody else that was involved in this communication and then when you're saying you just recommended and I say I don't feel I need to, because I've done it recently and in the past. Now having me to speak to the CEO who more or less would mandate that I do it because he's going to trust your judgment. He's never going to take my word for it against you because you're the chief. So when you escalate something like that, you've done a vote of no confidence of me.* You've passed a judgment of me that is unfair without justification and I feel **I'm communicating my concerns clearly. So I don't understand why I'm the one being mandated or communication class when I've been clear on all levels what's going on, what I feel and what my role in the matter has been. No one even tells me I don't need to know who made these reports but there's not even a clear feedback of what they said. They're just everything is just vague, vague. So it looks like I'm supposed to just change who I am, just cease to be for anyone to be happy, just cease to communicate for anyone to fit in. That's just not fair in any human being.**

**Dr. D'Angio: I'm sorry that you feel that way, my intention in all of my communications that I have told you that as a result of earlier interactions and I'm not, and, and I'm, you are right, I wasn't there for those interactions. As a result of early interactions, I, my feeling is that the relationships in our unit with you are not optimal. I am doing what I can on my end to try to 1 change interactions that people have with you.**

Dr. O.J. Mezu-Ndubuisi: Yeah, but the question is, **why am I the only one? Even if I went to this course and nobody else did, nothing would change. Because you're laying the burden of change solely on me for a system that hasn't gotten diversity training for its staff. Most hospitals at this point have**. My prior institution, you know, the past couple years, instituted it widely because there were issues on every level in every department. So it's not unique to who you are. **And acknowledging that there is a problem, it's not admitting that a failure of leadership, it's just a climate in a country. It's just what is humanly natural. So people are just being more aware that they need to be more culturally aware and inclusive and open, especially if they've not had the experience of enough diversity in staff within a unit. So laying that burden on one person, whether it's me or another fellow like I saw with Antoinette or someone else, I don't think is the way to go. It's a systemic issue.**

Dr. D'Angio: If you were the only person who has had difficulty communicating in our unit whom I have recommended this coaching for, you would have, you would be correct in your contention. You are not the only person. I have recommended for people who are not underrepresented in medicine and I, and I think it is very helpful. I have told you that I've had people who have spontaneously sought similar things. I've told you that I have done it. **This is about things that I think will help you because you, because you, because you can help us change other people. But only you have the opportunity to see what you can do.**

**Dr. O.J. Mezu-Ndubuisi: Why can't the others join in the communication? Why can't it be.**

**Dr. D'Angio: This is, this is, this is one on one, Olachi, this is one on one coaching in the 1 clinical setting for you to try to help you out of, out of what I see as a very difficult situation for 2 you. 3**

Dr. O.J. Mezu-Ndubuisi: Why? Like the …

**Dr. D'Angio: You are afraid to refuse this, but when you do, when you do that, you need to refuse it to Mike Apostolakis. He was very sympathetic to all of the things that you are saying that I brought to him, but he felt strongly enough that this might be useful, that he wanted to talk to you before you refused it, and I will refer you to him.**

Dr. O.J. Mezu-Ndubuisi: I'm still gonna share that. That is punitive. I just got here. I've barely been here a year. And my time in the NICU is, you know, reduced like other research staff. So I don't even feel like it's being given a chance. **I've been to the NICU in the past couple months. I've had great experiences there. The staff are getting to know me and getting used to me. I've gone above and beyond in trying to be collaborative, collegial and I don't hear their gorgeous. I don't even think I know someone that said something, I make them feel welcome. I am very complimentary with people and very warm and friendly, especially if I know that you don't know me or you misunderstood me at some point. So I don't even feel that this has even been given a chance to play itself out, knowing that I am trying on my part and hoping that, you know, you've also talked to the other staff to give it a time. So just escalating something at this point, I feel it's 18 a little bit premature and punitive.**

Dr. D'Angio: And I feel that having dealt in the past with similar things, that if we don't address things early, that there's the potential for things to worsen rather than get better.

**Dr. O.J. Mezu-Ndubuisi: But you're addressing it by penalizing me. That's what I'm trying to make clear.**

**Dr. D'Angio: I'm not penalizing you. I'm suggesting things that will help you.**

**Dr. O.J. Mezu-Ndubuisi: Only me. I'm the one with the problem with communication, with, I'm being clear and open in my communication. And the people talking behind my back, making assumptions and exaggeration without having the facts, they're the ones that are better at communicating than me. So only me needs to learn and change. That's what I'm hearing.**

Dr. D'Angio: That is untrue. I have told you that is untrue. If you were the only person that I had to have difficult conversations with, it would be, I would have far fewer difficult conversations. **I am sorry that you feel that this is tainted. I think that these things would be helpful. I, Patty Chess, will be your clinical mentor. I will let you talk with Dr. Apostolakis about the coaching program. I will report your concern about discrimination and harassment to OEI, which is my responsibility as a supervisor. I am offering you the opportunity to participate in improving the diversity and inclusion culture in our division** [indistinct 00:28:32] and would appreciate it if you were willing to do that, I will ask that you continue to come to our, to the clinical meetings that we discussed. I know that it's difficult for you to attend in person, but I think that's another way that we all can get to know one another. And I expect that of all of my clinical staff. So I'd appreciate if

27

*you do that. And what I'd like to do is I'd like to arrange to get back together in a couple months and see how things are going with the same with the things that I asked of you, and I'm asking the other people.*

*Dr. O.J. Mezu-Ndubuisi: all right, thank you.*

**Dr. D'Angio: All right. You have a great vacation? I'm sorry that this is coming right on the outset of that, but I hope you believe me when I say that the reason that I recommend things that I am is because I want you to thrive in our setting. And I can do what I can do with the other people, but I'm hoping [indistinct 00:29:52] they will help you specifically.**

**Dr. O.J. Mezu-Ndubuisi: No, this hurts me, actually. I'm being honest with you. It doesn't 1 help me. It hurts me. It hurts me by singling me out. It's not helping me feel valued or included or part of the team is singling me out as the problem. And that is not true. That is not fair. I work with my 100% my heart in teaching, in clinical work, in trying to be collaborative. I'm being held to a stand that nobody else is being held to. Everybody's allowed to, you know, do what they want because you know them more than me. But I'm now the problem, and I need to go the extra mile 6 to change when I just got here. I respect your leadership, but I'm just going to respectfully disagree 7 with the conclusions you've made today.**

*Dr. D'Angio: I'm sorry. I'm sorry that you feel that way. I try to do the best by my faculty and help people the best that I can to be as successful as they can. I'm sorry that you don't feel that this is part of my attempt to do that. You have a good vacation.*

*Dr. O.J. Mezu-Ndubuisi: Thank you, you too.*

*Dr. D'Angio: Okay, bye.*

**Certified Audio Transcript of entire November 21, 2024 Meeting with D'Angio. Pg 1-14**

52. **December 8, 2023:** I sought help and protection from University officials in an email addressed to Dr. Carl D'Angio and copied University of Rochester leadership (including Dr. Apostolakos, Dr. Halterman, Office of Equity, and UR President Mangelsdorf) alleging racial discrimination and retaliation against me for raising patient safety concerns about aggressive ventilator practices, excessive fluid administration, restrictive transfusion policies, and excessive oxygen use in the NICU. **See email of December 8, 2023 (Exhibit I, ECF Doc. No. 61- Motion to seal certain exhibits to the declaration of the Plaintiff in Support of her Memorandum in opposition to defendants' motion to dismiss her amended complaint).** UR ignored my concerns and the leadership continued to mandate Physician Coaching without justification.

53. **On December 19, 2023,** I filed a complaint of racism and retaliation with EEOC and notified all UR officials copied in the Dec 8 email **(Exhibit A -EEOC Complaint and Right to Sue)**

54. **On Dec 23, 2023,** I began two weeks of NICU attending service. I was unduly scrutinized and monitored and faced numerous acts of microaggressions, rudeness and unprofessional behaviors by some NICU staff.

55. **On December 27, 2023,** Dr. D'Angio sought me out in the middle of patient care asking to speak briefly with me, but instead tricked me into an unscheduled meeting under duress. He marched me without my consent to another building, to the office of the newly appointed Chair of Pediatrics, Dr. Halterman, who had never met me before. There had been no invitation to a meeting, prior notice or agenda.  Dr. Halterman informed me that there were numerous complaints and sought to penalize me. I asked for the details of the complaints, but she shared that she had not seen, read, or investigated them. I felt uncomfortable, bullied, harassed, and dehumanized at the tricked closed-door meeting. I respectfully asked her that concerns or allegations about my clinical care should be communicated in writing via email with details, dates of occurrence, what I had allegedly done wrong, what I should have done differently, and on what baby, to enable me respond.  Feeling bullied and academically lynched, I hurriedly left the room in fear and tears, respectfully expressing my apologies. **See audio recording of the December 27, 2023 meeting (Exhibit Y – Notice of manual filing of audio recordings on 9/3/24 ).** In retaliation, Dr. Halterman immediately sent an email within minutes of the meeting removing me from clinical work, without stating the allegations against me.

56. Excerpts from the audio transcript of the meeting  **Exhibit AS : Page 3 line 19 – Page 5, line 10**

*"Dr. Halterman: [indistinct 00:03:46]… I'm sorry that we haven't met before. I feel badly about that.*
*Dr. O.J. Mezu-Ndubuisi: That's okay.*

*Dr. Halterman: But we wanted to meet with you today because over the past week there have been a number of concerns that were brought to our attention around communication in the NICU and some clinical concerns, particularly around ventilating, ventilator status and some other things. And so Carl and I needed to meet with you to talk about a plan so we can best support you and support the teams in the NICU and make sure that there's safety for the patients there. And so this is a hard conversation to have, especially just meeting with you for the first time. So I wanted to ask if you were aware of the concerns and to present to you a couple of ideas for a plan.*

**Dr. O.J. Mezu-Ndubuisi: First, I don't know what to say. Guess he took me by surprise – Dr. D'Angio. Respectfully, I feel if there's any patient concerns, I would like to receive it by email with the patient's name, what the actual concern is, that I can address it. But just vaguely saying there are concerns…**

**Dr. Halterman: Yeah, I actually appreciate that. And what we were planning to do is to do a full review of the concerns because we need to make sure that we understand fully what has been happening. And so you will get all of that information. You absolutely deserve to get that information. So we will make sure there's a formal review.**

**Dr. O.J. Mezu-Ndubuisi: So how do you call me up to speak about a plan to reduce these concerns according to your patient safety without you even first investigating what these concerns are?**

*Dr. Halterman: Well, that's a very good question. And I think that it's my job as the new chair of the department where when safety concerns are brought to me, I need to act on them right away.*

*Dr. O.J. Mezu-Ndubuisi: So what do you mean by safety concerns?*

*Dr. Halterman: Concerns from multiple people within the NICU team about safety of the patients.*

**Dr. O.J. Mezu-Ndubuisi: What safety in particular? What is it that I did that makes you concerned?**

**Dr. Halterman: So that's where, as I said, we need to do a formal review to find out all of the details, but whenever there are concerns, we need to act on them.**

**Dr. O.J. Mezu-Ndubuisi: But this is just vague. What concerns are you talking about? Why have they not been brought to my attention?**

**Dr. Halterman: No, we are bringing them to your attention and we will make sure that you have all the information.**

**Dr. O.J. Mezu-Ndubuisi: I appreciate you bringing it to my attention, but one, you haven't told me what concern it is, how it affected patient safety and what patient we are talking about. I've been on service since Saturday. I have cared for my babies like every other person.**

**Dr. Halterman: Yeah, I understand.**

**Page 6, line 4 to Page 9, line 3:**

*Dr. O.J. Mezu-Ndubuisi: So I do a lot of teaching and I do not implement anything until there's a consensus. So if the same, if the person tells me they understand where I'm coming from and I agree with the plan and we implement it and then they go behind my back and say their concerns, I think the communication problem comes from them.*

*Dr. Halterman: So that's, but that's exactly why we have to look into this. But we're hearing concerns from a number of different people. So it's our job to make sure that everything is going okay. And we want to support you and help you to make sure you can be successful.*

*Dr. O.J. Mezu-Ndubuisi: Thank you so much, I appreciate this meeting, but I am not comfortable continuing this conversation. I would appreciate if you could send me an email saying exactly what you told me, that there are concerns, and you can either outline the concerns or let me know. Like you said, you have options to reduce those concerns. And this is before investigating. So that's concerning to me as biased and rushing to a judgment without even telling me is this case, you did this when people had these concerns. Did they share these concerns with you? You haven't even asked me what did you say in response and what came out of this? So you haven't investigated. It's not a firsthand or even secondhand account.*

*Dr. Halterman: We're going to investigate all of this. But what I can tell you is that because there were concerns from a number of different people, we felt we needed to put a plan in place while we sort everything out to make sure that we can support you as best as we can.*

*Dr. O.J. Mezu-Ndubuisi: So what babies are you talking about? Because these babies are doing better clinically.*

*Dr. Halterman: I don't have the details of all of the babies, but what I can tell you is that the plan that we have is really meant to be supportive of you. So can I explain to you what we have in mind?*

*Dr. O.J. Mezu-Ndubuisi: No. I would, sorry, with all due respect, this sounds very biased and retaliation because you do know I have written you a couple weeks ago copy response to Dr. D'Angio and copy to you as the new chair of the department.*

*Dr. Halterman: Yeah, I saw that.*

*Dr. O.J. Mezu-Ndubuisi: That I have been subjected to microaggressions, bias treatment and retaliation for raising patient safety concerns. You have not acknowledged that email or even my position as the only African American faculty in pediatrics of neonatology and coming into a NICU that has a history of microaggressions. Clearly if Dr. D'Angio informed me on my first day of work and I have seen the efforts trying to reduce and I've been early on a victim of it where rumors were starting about me, completely false. He's aware of it.*

*Dr. Halterman: So this is ...*

*Dr. O.J. Mezu-Ndubuisi: So how do you know?*

*Dr. Halterman: Separate from that investigation. But I do acknowledge that that is happening 16 and we aren't able to respond to you until that investigation is complete. So I appreciate you reaching out and that will be proceeding forward completely separate from this discussion today.*

*Dr. O.J. Mezu-Ndubuisi: I feel this is retaliation and I'm obliged to share my opinion that this  is retaliation.*

*Dr. Halterman: [overlap]*

*Dr. O.J. Mezu-Ndubuisi: One as chair, you have never met me. You don't know me.*

*Dr. Halterman: I know.*

*Dr. O.J. Mezu-Ndubuisi: You've never seen me work. You've never asked me how I'm settling in. And the first you call me to your office is to tell me you're investigating me and you're  going to penalize me with options, and you're accusing me of patient safety concerns.*

*Dr. Halterman: May I clarify a little bit, though? We're going to be investigating the  situations that happened. We're not investigating you. And what we're proposing is a supportive plan to make sure that you can be successful in the NICU. May I? May I?*

*Dr. O.J. Mezu-Ndubuisi: I'm sorry. I feel, I feel targeted and tricked into this meeting.*

*Dr. Halterman: I understand.*

*Dr. O.J. Mezu-Ndubuisi: If you wanted to meet me.*

*Dr. Halterman: That wasn't our intention at all ...*

*Dr. O.J. Mezu-Ndubuisi: Well, if you wanted to meet me as chair, you could send me an 11 email, an invitation to a meeting. If he wanted to talk to me, he could have told me. He just said, 12 do you have a minute? And as we stepped into the hallway, he says, we're going up to Dr. 13 Halterman's office. And I was taken aback and I said ...*

*Dr. Halterman: I understand.*

*Dr. O.J. Mezu-Ndubuisi: Then he says, she would like to meet you. And I said nothing and I came up here and this is a conversation as serious as it is, it shouldn't be so informal.*

*Dr. Halterman: I understand, and this is not how I wanted our first meeting to be. But I will tell you that the concerns that were raised.*

*Dr. O.J. Mezu-Ndubuisi: I'm sorry, I cannot. If they're significant enough, that should warrant  a formal email to me in writing. That should warrant the name of the baby, medical record number, what day, what time, what I did, what was wrong, what should have been done different? I look forward to expecting that at this point, I'm sorry, but I will have to leave. [background chatter]*

*Sorry, I really feel cornered and this is wrong. I feel attacked right now. I'm sorry. I feel really uncomfortable. With all due respect, I'm really sorry. I'm afraid, I'm actually afraid right now. I'm sorry. I'm sorry. "* **(Exhibit Y -Audio recording of meeting; Exhibit AS – certified transcript)**

57. **Jan 2024:** Dr. Halterman emailed asking to meet with me to discuss options or restrictions to practice needed to return me to clinical work, stating that an "unnamed" faculty would be present. I responded to respectfully inquiry about why I was removed from work, with no statement of the allegations against me and no opportunity to respond to them. I recounted for her all my clinical activities in December prior to my unjust removal from clinical work following the unscheduled forced meeting. I explained that all the clinical plans I had made were discussed with the prior attending neonatologist Dr. Joe Bliss, who agreed with them and had instituted similar plans following our discussion. I also reported that a nurse practitioner, Chelse Gill ( a recent graduate) had falsely recorded low vitals for two babies in her notes in the medical records that did not match the oxygen saturation values automatically pulled in from the ventilator to the Epic medical records in real time from the JET and Draeger on these patients. My removal from clinical work was based primarily on this false report. This staff was not reprimanded or penalized for this patient safety violation. S**ee Account of Reassignment of Clinical Duties in Response to January email to Dr. Halterman (Exhibit L -  ECF Doc. No. 61).**

58. **Jan 11, 2024**: I signed attestation for reappointment of clinical privileges, as the two year term would expire on June 30, 2024.

59. **Feb 8, 2024:** I was informed that a Focused Professional Practice Evaluation (FPPE) had been conducted and invited to meeting with an unnamed staff. I stated that I did not want to disrupt the ongoing EEOC investigation. **(Exhibit K-  ECF Doc. No. 61)**

60. **April 2024:** Dr. Apostolakos intercepted my completed reappointment application and insist on a meeting prior to renewal of privileges. I requested to attend meeting with my sister as a support person. Dr. Apostolakos agreed.

61. **May 23, 2024:** During meeting, Dr. Apostolakos showed me, to my shock, the results of an FPPE that had been conducted. Discussion of an FPPE was never disclosed as part of the meeting agenda. There was no notice given prior to the FPPE audit and no notice that it would be presented during the May 23, 2024, meeting. Dr. Apostolakos in the audio recordings stated that I was the first and only neonatologist who had been subjected to an FPPE in the Department of Pediatrics at the University of Rochester. Without any credible evidence for removing me from clinical work, university leaders went on a fishing expedition to review every baby I had ever cared for since hire and wrote a detailed report on 22 of those charts that were critically ill premature infants. The FPPE alleged 18% deviation from clinical practice, while stating that I had documented my rationale for every clinical decision in the charts and that no patient had any adverse outcome or death.    I explained that I followed standards of care, including making clinical decisions to save patients' life, such as giving a blood transfusion for severe anemia in infants on high oxygen on the ventilator and with signs of feeding intolerance due to reduced gut perfusion and concern for necrotizing enterocolitis, being conservative with fluid administration in the first week of life that allowed physiologic resorption of lung fluid and improved respiratory function or on babies with significant pulmonary edema from chronically excess fluid administration, and weaning the ventilator when patients improved to avoid lung damage. The FPPE also stated that all patients did clinically well, and no patients have had any adverse outcomes or death under my care. Yet, the FPPE falsely claimed an 18% deviation from NICU standard of practice, even though the reasons for clinical decisions were clearly documented based on my clinical judgement and had prevented

harm.  Dr. Apostolakos expressed uplifted by meeting me and my sister. He expressed understanding of my respiratory care and admiration for my knowledge of physiology, as he was a critical care physician, and he supported my return to clinical work. He shared that he had witnessed biased treatment of a minority adult medical staff who nursing staff sought to have penalized for clinical actions he (Dr. Apostolakos) had done previously, and the same staff had not expressed concerns. He agreed to return me to unsupervised clinical work, and initiate communication training and implicit bias training for the entire NICU staff. He further agreed that he would observe Dr. Mezu and other neonatologists at rounds (not just Dr. Mezu) and would ensure implicit bias training for all NICU staff. He invited me to meet with NICU leadership and I agreed. As revealed later in defendant's August 7 filings, the biased FPPE was conducted by Dr. Jeff Myers. **(Exhibit Z - Audio recording of meeting; Exhibit AT – certified audio transcript).**

62. **Excerpts from Exhibit AT - Certified audio transcript from meeting with Dr. Apostolakos**

**Page 10, line 21 to Pg. 12, line 17:**

*Dr. Apostolakos: And so if you want to take a minute to read through it or however long it  takes you, it's two pages with a summary.*
*Dr. U Mezu-Chukwa: And who's involved in this [indistinct 00:18:47]*
*Dr. Apostolakos: This is a peer quality.*
*Dr. U Mezu-Chukwu: Okay. So nurses doctors ...*
*Dr. Apostolakos: No, it's one, it's a senior physician.*
*Dr. U Mezu-Chukwu: **Just one doctor. [indistinct 00:19:43] in the NICU. Is that something [indistinct 00:19:52] Only when a complaint is raised.***
***Dr. Apostolakos: Only when complaints are raised, it's done routinely throughout the institution. I've been here for seven years, we haven't had a review like this in neonatal ICU, but we've had a number of these in other areas.***
*Dr. U Mezu-Chukwu: But it would be nice to know what the, you know, getting a result and n of one kind of ...*
*Dr. Apostolakos: No, I agree.*
*Dr. U Mezu-Chukwu: So if we had like randomly, in the space of a year, or maybe everybody gets a chance to, because it's important to make sure that everybody and then you can understand where people fall. The saying that's outside of standards, 15 to 20%, what does that mean? If I hold all the NICU positions in the NICU and at one point in the last two years, I'm able to see what the*

*deviation or perceived deviation is, I think that would give me more clarity as to how to interpret. But having an N of 1, you know, this is okay. You know, there's a lot of provider variability. We all train very differently, she's coming from an outside institution, she wasn't trained here. She practices in a different way. So I think if you're also going to hire people from outside, you have to make accommodations that they're bringing new ideas, different ways of managing patients, and also allow them to feel comfortable. So I'm not really sure how to interpret this 15 to 20%. To me it seems fine, it's not 50, it's not 60%. But I think if I had a brother, if I had a way of looking at it, that that would make more sense, so I'm just not sure how to interpret this.*

*Dr. Apostolakos; I agree with you, but I do think so this is why, you know, I'm supportive of Olachi's [indistinct 00:21:39] Okay, that's my support. Is that not reappointed to get her re-credentials. The concerns had been raised to me have been about communication. Now, Olachi, I'm not saying it's all on Olachi, I'm not saying it's all on the team but I, I believe from what I've heard from both sides, the communication hasn't been great.*

**Dr. U Mezu-Chukwa: Have you actually talked to [indistinct 00:22:12]? Because I don't know if you've ever heard of [indistinct 00:22:16] When she does well, she teaches, [indistinct 7 00:22:22] is drawing all kinds of things. She's energizing the team, she's explaining down to the pathophysiology but that's the kind of training she has. Everything she does has justification. If she's managing fluids or changing the fluids, she is telling you the rationale, the reasoning and experience. And it seems from what she, she told me the team, so have you actually interviewed the members of the team, the fellows, the residents, the particular nurses who were involved?**

**Dr. Apostolakos: I haven't. The quality team has, I haven't.**

*Dr. U Mezu-Chukwa: Because it's, it's, so communication again. I have my masters in business and communication as well and like I said, I'm even branching out to open my own company  and communication is a two way street. She can communicate all day long, get team agreement, but it's a two way street.*

**Page 41, line 11 – Page 42, line 10:**

*Dr. Apostolakos: This is the other thing that's true. This is the other thing that's true. Because there is implicit bias and, you know, I've seen it with women. I've seen it with people of color.  I've seen it with people of Middle Eastern descent. And I can tell you, you know, I've, you know, this is years ago. I said something that was, you know, I knew the nurse, it probably was something  I shouldn't say, but we were such good friends.*

*Dr. U Mezu-Chukwu: He didn't say it with any malice **intended.***

**Dr. Apostolakos: That's right and they laughed. You know, we hugged each other. And this  is where I learned how to grow, because I believe the fellow was there and about two weeks later, a nurse came and complained to me about he was a Middle Eastern fellow, and the bias was that  he doesn't appreciate women. So she reported to me something he did that I had done pretty similarly two weeks before.**

**Dr. U Mezu-Chukwu: And no one said anything.**

*Dr. Apostolakos: Well, and it's and it's, I don't know whether it's trust or they, they know me. 1 And I think part of the issue is, Olachi, as you said, you're new, so they don't know you. It's different. And, you know, I don't know implicit bias very well may be playing a role. I haven't lived your experience or your experience. I know Judy's talked to me about imagine she was like the only orthopedic surgeon.*

*Dr. U Mezu-Chukwu: I'm sure she's ...*

*Dr. Apostolakos: No, and **I've just seen it in general, nurses treat female physicians differently than they do males. And I don't know if it's a jealousy thing or what exactly it is, but I've seen them be mean to and I've never seen them be mean to a male physician.** But in any event, so there's plenty of bias. I wrote down what you asked me about implicit bias training…*

**Certified audio transcript Pg 46, line 16 to Pg 48, line 21**

*Dr. Apostolakos; **After meeting you Olachi, I don't understand why. The reason, I don't know that it's the people that you're rounding with that have done the reports. Because it seems to me. I mean, I don't know, but I think I'd be comfortable giving you feedback that you want to hear because you don't seem like you need a ...***

*Dr. O.J. Mezu-Ndubuisi: I encourage it.*

*Dr. Apostolakos; So that's why I'm wondering if it's something that you've done that they see as not being part of the current standard and you explain why.*

*Dr. O.J. Mezu-Ndubuisi; And I explained this particular one.*

*Dr. Apostolakos; But the next person doesn't.*

*Dr. O.J. Mezu-Ndubuisi; So because he told me when the case of maybe they escalated and he died, he told, when I told him to read my note, he told him that people that I worked with have a different perspective of what happened. So that made me confused, but they agreed with me. Then they need the communication training. If they cannot tell me they disagree. I asked them several times if they agree. I assure them I wouldn't do anything if they don't agree to avoid it. I don't go 15 years in my career doing things without getting consensus. That's why rounds take long.*

*Dr. Apostolakos: **And Coaching training is a strong word. This is an observation. And so generally they call and tell you what they're going to do, then they come and follow you around,  speak with the team.***

*Dr. O.J. Mezu-Ndubuisi: **I need to have that.***

*Dr. Apostolakos; **And to have that it was on rounds. Yeah. No ...***

*Dr. O.J. Mezu-Ndubuisi; **But I want it done to other people.***

*Dr. Apostolakos; **Yeah, understood.***

*Dr. O.J. Mezu-Ndubuisi: So I don't feel targeted.*

*Dr. Apostolakos; Yeah.*

*Dr. O.J. Mezu-Ndubuisi; And then people perceive that I've done something wrong, so I'm being punished. That's what they're going to see. If only I get a coach, only I get followed on joint*

*rounds and the other team, the whole week nobody's there following them. So you can follow me today, follow the other person the next day. So it's a joint effort.*

*Dr. Apostolakos; Well, the coach I'm thinking of has been doing work in the NICU. As you know the NICU is a, can I tell you, of all my training, that's the one place that I could not…*

*Dr. Apostolakos: Yeah. Now, it's especially in what I've seen with both pediatric nurses and neonatal ICU nurses is they are, you know, like I've had a nurse tell me in the NICU, you know, we're talking about something and I'm trying to explain why I'm doing it this way. The nurse, like, do it that way. And they'd say, what gets me going is when they say I'm just advocating for the patient. Like, [overlap] That's what I'm thinking. Like you're protecting them from who? Me? I mean …*

*Dr. O.J. Mezu-Ndubuisi: Exactly how I feel today.*

63. Following the May 23rd, 2024, meeting I wrote a Response to the biased FPPE **(Exhibit M – ECF Doc No. 61).** I stated that I did not deviate from clinical guidelines and provided standard of care in all cases. Rather, I explained that I used my clinical judgement, when needed, to prevent harm in patients as mandated by her Hippocratic oath "To Do No Harm." My patients improved and did clinically well, and no patient has died under my care, as state din the FPPE. In my response, I outlined other cases where other non-minority neonatologists had made decisions following guidelines that resulted in adverse outcomes or patient death, and cases where they deviated from guidelines, but a little too late to prevent an adverse outcome. I called for an unbiased evaluation of all cases in the NICU in Morbidity & Mortality conferences instead of targeting me, the only black neonatologist, with an FPPE. See Response to FPPE **(Exhibit M – ECF Doc. No. 61)**

64. **June 4, 2024:** In the follow-up on June 4, 2024, meeting, my sister and I were shocked and disappointed to see a flip-flop in Dr. Apostolakos views from the prior May 23rd 2024 meeting. Dr. Apostolakos, Dr. Baumhauer, Dr. D'Angio and Dr. Halterman, presented me with a 5- page re-entry plan, without stating why it was needed or evidence supporting its need. The re-entry plan was never disclosed as the agenda of the meeting or presented to me prior to the meeting. At the beginning, Dr. Apostolakos stated that the 18% deviation necessitated the re-entry plan. Yet, this

FPPE alleged 18% deviation is not cited in the MEC adverse action or hearing panel mandate in September 2024. The re-entry plan mandated excessive daily and weekly monitoring of my clinical activities, and restriction of my practice, including running every ventilator change and clinical decision by a mentor, who would not be physically in the building. **(Exhibit AA - Audio recording of meeting; Exhibit AU – certified transcript)**.

65. In the reentry plan, I would be subjected to daily monitoring of my clinical activities and would not be allowed to make any independent decision on ventilators, fluids, or nutrition on any babies, that even medical students are able to independently make. I would be required to seek permission from a clinical mentor who would not be in the building for routine clinical decisions on feeding infants, making ventilator changes, etc.. I pointed out that it would be unsafe for patients if their treatment were decided by people who had neither seen nor examined them. The reentry plan restricted my clinical care to feeders and growers and prohibited her from night calls indefinitely. I stated that it was unsafe for a clinical mentor to make ventilator and clinical decisions without seeing the patient or being at the bedside. I stated that the re-entry plan was biased and unacceptable and would create a more hostile and toxic work environment for me. I was informed that the re-entry plan would be revised.

66. They stated that it was clear that I was knowledgeable and care about my patients, and that the monitoring would allow others to understand my clinical practice ideas so it can be adopted by the NICU. I do not have a different style of clinical practice. I practice standard of medical care, which is using my clinical judgment guided by existing practice to optimize care and prevent harm for the baby. The reentry plan stated that I would be summarily terminated if there was any complaint against me, with no verification for truth or falsity. I repeatedly asked what I had done wrong, and why the restrictions were being implemented if all the cases brought to my attention

were deemed to have had favorable outcomes, and I had provided standard of care. None of the leadership present responded to my inquiry. They simply stated that agreeing to the plan was the only condition on which the university would allow me to return to clinical practice. See audio recording of June 4th, 2024 meeting – **Exhibit AA – Notice of manual filing of audio recording filed on 9/3/24**)

67. Following the June 4, 2024, meeting, on the same day, I responded to the re-entry plan, expressing my objections again, repeating my request for the evidence justifying such intense restrictions to my practice, and informing leadership that the re-entry was biased and would worsen an already toxic work environment as the only black neonatologist in the NICU. See response to re-entry plan **(Exhibit N - ECF Doc No. 61).**

68. **June 10, 2024:** Dr. Apostolakos presented via email a modified re-entry plan that was 1.5 pages but contained all the elements of the 5-page re-entry plan. I was given an ultimatum to accept the plan by June 21, 2024, or the University would assume I declined the plan. That would mean non-renewal of my clinical privileges at the end of June, which would warrant mandatory reporting to the National Practitioner Databank, a death knell to my medical career.

69. **June 14, 2024:** I responded rejecting the re-entry plan. I shared with them a retreat document form the neonatology faculty anonymous survey where it was stated that there was constant rumors and unprofessional and rude behaviors from NICU staff at all levels, and this was concerning and affecting patient care. This anonymous survey was completed by neonatologists while I had not worked clinically for six months. I called Dr. Apostolakos' attention to the root cause of the communication issue sin the NICU as a toxic culture and unhealthy work environment, and I should not be singularly punished for being a victim of this toxic culture and raising patient safety concerns, particularly being the only black faculty in the NICU. **(Exhibit N – Response to re-**

**entry plan).** Dr. Apostolakos responded with an ultimatum stating that I had until June 21, 2024, to accept the terms of the re-entry or else the university would take it that I declined it.

70. **On June 20, 2024,** I filed pro se, a preliminary injunction and complaint in the United States District Court for the Western District of New York alleging racial discrimination and retaliation.

### E. COURT PROCEEDINGS IN THE WESTERN DISTRICT

71. **On June 27, 2024,** following my filing a legal complaint and preliminary injunction in the United States District Court for the Western District, the University in panic renewed my clinical privileges for two years.

72. **July 3, 2024:** University of Rochester emailed a new document claiming that the two year renewal was in error, and sent a letter renewing my clinical privileges for 59 days ending August 29, 2024. **(Exhibit AE – 59 day renewal letter).**

73. On August 5, 2024, I received a notice to sign an attestation that I had previously signed on January 21, 2023, for an unnamed "committee" meeting on August 6, 2024. I ignored the request. The medical staff office tried to trick me into signing this attestation twice. (Exhibit AB – August 5, 2024 Attestation email from Medical Staff Office). This was to support their false claim in their August 7, 2024, filings that I had a pending application for renewal of privileges.

74. On August 6, 2024, the Credentialing Committee met illegally, without any prior request for reapplication for clinical privileges, and falsely claimed that I had reapplied for reappointment. This is not true, as I had only applied once in January 2023 for which it was renewed on June 27, 2024. The Credentialing Committee denied my clinical privileges in an illegally convened meeting, without any notice to me prior or after the meeting. This is the basis of the MEC adverse decision and the sham Fair hearing proceedings.

75. On August 7, 2024, University of Rochester through counsel filed volumes of documents in amendments to their response to my complaint and motion for preliminary injunction, including false affidavits from Drs. Apostolakos, D'Angio, and Halterman regarding their meetings with me. The University claimed that it had initiated internal administrative proceedings and that I would have an opportunity to appeal the non-renewal of my clinical privileges. In the same filing, the University provided false witnesses and volumes of solicited emails from staff with uninvestigated complaints against me. These exhibits were filed by defendants on August 7, 2024, had redacted names and emails but discussed in publicly filed affidavits and memorandum with falsehoods directly contradicted by emails and audio tape evidence. These false witnesses and reports had never been brought to my attention by my supervisors or university leaders in any email or at any meetings held before they were submitted to this Court. The emails appear to be solicited by NICU Leadership from bedside staff (nurses and trainees) under my supervision. These emails or their contents were never shared with me, and showed staff's lack of understanding of basic ventilator management and its clinical correlation to patient care, and they were seeking help from NICU leadership in balancing the mandate to adhere to rigid protocols to my hands-on bedside approach of tailoring ventilator management and protocols to real-time clinical care needs of the patient with teaching and collaborative discussions. NICU leadership let their staff down in their self-serving motives of preserving their ego by with-holding these concerns from me and missed opportunities to encourage real time teaching for these staff with those specific patients and allow evidence-based academic discourse in the best interest of the patient, as is expected of physicians and an academic institution.

76. **On August 11, 2024,** I filed through my counsel, responses to these false affidavits and provided audio tape recordings of the meetings with Dr. D'Angio, Dr. Halterman, and Dr. Apostolakos as

proof. The audio recordings show that these false reports were not investigated and instead NICU leaders sought to penalize me by mandating clinical mentoring and physician communication coaching without stating why this was needed. The audio recordings and my exhibits A-AE conclusively prove that I was highly regarded in the Division of Neonatology as an excellent clinician and teacher, and that I performed my clinical duties collaboratively with my colleagues, practiced evidence-based medicine and followed all set NICU protocols, and exercised my clinical judgement when required to prevent harm to infants in the NICU with meticulous documentation in the medical records. The audio recordings show that some nursing staff and medical trainees under my supervision who have participated in collaborative care and expressed agreement with clinical plans that helped infants improve made false reports or were encouraged by defendants to make negative reports about clinical care that I provided to infants.

77. **On August 14, 2024,** the oral arguments for the Preliminary Injunction (PI) were held. Chief Judge Wolford deemed that the preliminary injunction was premature as the internal administrative hearings and process were ongoing. She, however, cautioned UR counsel to inform their clients to ensure that internal proceedings were fair and fulsome and allowed me to address all the matters I had raised in the PI motion, including my summary removal from clinical practice on December 27, 2023.

78. At the Preliminary injunction hearing of August 14, 2024, the defendants' attorney falsely claimed that my application for privileges was pending. This is not true. The application for privileges was submitted and signed in an attestation in January 2024. The August 28, 2024, Notice of Adverse Action letter from the MEC was the first and only alert to me by the University of Rochester that her clinical privileges were denied. There was no prior notice sent to me electronically or by mail

for the August 6, 2024, Credentialling Committee denial of my privileges or the August 21, 2024

meeting of the Medical Executive Committee (MEC) upholding this decision.

79. The Chief Judge cautioned University of Rochester through their lawyers to ensure that my current

employment  status does not change on August 29, 2024, as the administrative proceedings are

ongoing. **(Exhibit AV August 14, 2024 preliminary Injunction hearing transcript).**

**The August 14, 2024 PI transcript (pp.52-53):**

MR. FEIN: "*I would ask the Court to consider, even if it's not entered as an order, stating for the record that you would expect, based upon all of the representations today, that our client would be permitted to raise the December 27th suspension issue in the larger [internal UR] proceeding that has been described.*

THE COURT:  *"I'll state that for the record. I expect the Plaintiff to be able to raise the issues she has raised in front of me at this hearing. I mean, you know, part and parcel of this is whether or not she has been treated fairly. Is she being discriminated against? Is she being targeted or are these legitimate decisions that are being made on the part of the Defendants? I mean, I would hope that Mr. D'Antonio and Ms. Wells would be advising their clients that they should be as fulsome as possible in any internal review of this."(*See Exhibit AV - August 14, 2024 **preliminary Injunction hearing transcript).**

## F.  DUE PROCESS VIOLATIONS AND SHAM FAIR HEARING PROCEEDINGS

80. University of Rochester leaders have in clandestine, irregular procedures violated their own By

Laws by instituting sham due process proceeding where they have denied renewing my clinical

privileges on August 6th, 2024, without informing me, and held a secret MEC meeting on August

21, 2024, without notice to me upholding this denial. They finally wrote a letter to me, which I

received on September 3, 2024, without certified signature receipt, casually seeing mail in my

mailbox, to inform me of the adverse decision not to renew my privileges citing that I was

removed form clinical work for concerning communication and violating NICU practices,

without citing one evidence, patient name or date of alleged event, or even stating the protocol

allegedly violated. They falsely stated that I refused to discuss a re-entry plan with University

leaders, when the fact is that university leaders presented a re-entry plan to me mandating I agree to it and refusing to state what I am accused of, the evidence supporting it, and why a re-entry plan is needed. I responded through my lawyer challenging their unjust decision and lack of evidence and provided all the exhibits we had submitted in court including their recently uncovered false email reports. We also provided audio tape recordings of key meetings with NICU and University leaders, showing that I had not violated any protocols and reports against me were false. Notably, all infants had done clinically well under my care, and there was no deaths. Rather, numerous deaths had occurred under the care of other neonatologists, including the same colleague NICU leadership promoting the unjust penalties against me. Up till September 3, 2024, I had not been informed that any committees were meeting or taking action.

81. There has been a change in my status, in violation of the judge's order, as I was removed from the email list serve for all communication from the Division of Neonatology and Department of Pediatrics since June 26, 2024. I no longer received any emails meant for the email groups: NICU-all, Pediatric Neo All Staff, Pediatric Neo Staff, Pediatric Neo All Faculty." In effect, it is as though I am no longer a faculty in the Division of Neonatology. This is a change in status that is unjustified, as no one till date had informed me of what I am allegedly accused of. My counsel notified UR counsel to have my email reinstated in the general lists. After several attempts that remained unacknowledged, I was restored to all lists except NICU-all. **We notified Mr. D'Antonio several times in October and November to reinstate me to NICU-all, and our requests were ignored. Since July 26, 2024, till date, I have not receiveed any emails addressed to NICU-all.**

82. On September 3, 2024. I received in my mailbox (not by certified signature-required mail delivery), a letter dated August 28, 2024, from Kathleen Parrinello RN, PhD, President and Chief

Executive Officer, Strong Memorial Hospital, communicating the Medical Executive

Committee's recommendation to deny application for my reappointment. **Exhibit AF**

83. The letter alerted me that I could seek a fair hearing before the University of Rochester Medical

Center (URMC). Page 2 of the letter sets forth the complete reasoning of the Medical Executive

Committee (MEC) recommendation as follows: "The Medical Executive Committee's

recommendation to deny your application for reappointment was due to the fact that there is no

plan for your return to the clinical schedule and no expectation that such a plan will be

developed."

84. I, through my attorneys in a letter dated September 14, 2024, **Exhibit AG**, notified Dr. Parrinello

that a fair hearing was requested.  It stated, "Among other things, the recommendation rested on

the demonstrably false assertion that Dr. Mezu refused to discuss a reentry plan after her

arbitrary, fact-free, suspension of clinical privileges on December 27, 2023…It is not possible to

be mandating a re-entry or remediation plan if no one has stated and will state what I am accused

of or why remediation is needed."

85.  The letter further elaborated that:

"Dr. Mezu-Ndubuisi was presented with an ultimatum: *accept the fact-free reentry plan without*

*question or be denied clinical privileges*. Discussion requires at least two participants. However,

URMC personnel refused to discuss with Dr. Mezu regarding alleged or rumored deficiencies in

her clinical performance that served as postulates for Dr. Mezu being mandated to Physician

Communication Coaching by Dr. Carl D'Angio, Chief of Neonatology (November 21, 2023

meeting – audio recording **Exhibit X**),  being suspended from clinical work by Dr. Jill

Halterman, Chair of Pediatrics and Dr. D'Angio (December 27, 2023 – audio recording **Exhibit**

**Y** ), being presented with a biased Focused Professional Practice Evaluation (FPPE) by Dr.

Michael Apostolakos, Chief Medical Officer (CMO) and Dr. Judy Baumhauer (May 23rd, 2024 – audio recording **Exhibit Z**), and being mandated to agree to a biased and toxic reentry plan (June 4, 2024 – audio recording **Exhibit AA**). All audio recordings were previously filed. ***(filed Sept 3, 2024 –Notice of manual filing for Plaintiff's Memorandum in opposition to motion to dismiss)***

Section 2 (A) of the Fair Hearing Plan instructs practitioner Dr. Mezu-Ndubuisi "to set forth the basis upon which the practitioner seeks to contest the adverse…recommendation." A Memorandum was submitted in compliance with that Fair Hearing Plan instruction. Dr. Mezu-Ndubuisi listed the names and email contacts of witnesses expected to be available for questioning during the Fair Hearing procedures."

86. We submitted to the MEC, via Dr. Parrinello, and copied to Drs. David Linehan (Senior Vice President for Health Services), Apostolakos, Halterman, and D'Angio evidence and exhibits listed hereafter, and a web link to six (6) audio recordings of my meetings with Drs. D'Angio, Halterman, and Apostolakos between July 2023 and June 2024, as well as mailed a flash drive copy of these audio recordings. Exhibits A to AE were provided electronically and via certified mail. Certified legal transcripts of the six audio tape recordings are additionally provided as new exhibits:

  i.   **Exhibit AP -** July 14, 2023 audio transcript - annual evaluation meeting with Dr. D'Angio
  ii.  **Exhibit AQ** October 3, 2023 audio transcript - Meeting with Dr. D'Angio
  iii. **Exhibit AR** November 21, 2023 audio transcript - Meeting with Dr. D'Angio
  iv.  **Exhibit AS** December 27, 2023 audio transcript - Meeting with Drs.  D'Angio and Halterman
  v.   **Exhibit AT** May 23, 2024, audio transcript - meeting with Drs. Apostolakos and Baumhauer
  vi.  **Exhibit AU** June 4, 2024, audio transcript - meeting with Drs. Apostolakos, Baumhauer, D'Angio, and Halterman.

87. My response to the MEC through my counsel dated September 14, 2024, included summary of the facts of Case A, B, and C, and my meetings with University leadership throughout the

proceedings. We requested staff witnesses to Case A, B, C , and other allegations submitted

in emails by defendants to the court on August 7, 2024, to be present for the hearing to prove

that their allegations were false and solicited. **Exhibit AG.** These email complaints were

publicly filed in court without verification or investigation by the University and without

notice to me or an opportunity to respond. Based on these uninvestigated, false "numerous"

complaints from unnamed faceless staff, I was removed from clinical duties, and mandated to

sign on to a re-entry plan, and denied clinical privileges when she refused to agree to the plan

anchored to false allegations.

88. Our letter dated September 14, 2024, through my counsel, in response to Dr. Parrinello's

notice of adverse decision by MEC, re-states the timeline of events and explained the need

for witnesses:

- *"There are newly manufactured false allegations by the MEC.  The second paragraph of your letter falsely asserts, "[Y]ou [Dr. Mezu] were removed from the clinical service schedule for the neonatal intensive care unit (NICU) …because of concerns that had been identified with respect to certain clinical practices you engaged in in treating NICU patients that are inconsistent with the NICU standards, and deficiencies in your collaboration with other providers and staff in the NICU." On the contrary, meetings between Dr. Mezu and NICU leadership revealed agreement that the concerns about her were misplaced and had never been investigated. To this day—nine months later—the concerns remain uninvestigated.  Repetition of a falsehood ad infinitum is not proof.*
- *Dr. Mezu-Ndubuisi has only been notified by Dr. D'Angio or NICU Leadership of clinical concerns made by staff under her supervision regarding Case A ( A –* ██████████*l, 2023 – Exhibit C), Case B (B -* ████████*, 2023 – Exhibit D), and Case C (C –* ████████ *2023 – Exhibit F). (All of these were filed under seal on Sept 3, 2024 –ECF Doc. No. 61- Motion to seal certain exhibits to the declaration of the Plaintiff in Support of her Memorandum in opposition to defendants' motion to dismiss her amended complaint). Examination of Cases A, B, and C concluded with NICU leadership agreeing that Dr. Mezu's care was within standard NICU practice."*

89. The university responded on September 23rd, 2024, contradicting their prior letter, and only stated

that my clinical privileges were denied only because there was no plan in place to return me to

work. They no longer cited concerning clinical care or communications, or violation of protocols.

The lack of integrity and moral courage evident in the leadership where truth is jettisoned, and the truth bearer is victimized and destroyed, without care for the well-being of staff under their care or the welfare of the vulnerable patients is disappointing. The University leaders stated in their response that Mr. D'Antonio would be representing the university going forward, and that a hearing panel would be formed since I have appealed the MEC adverse decision, stating that hearing must be concluded between October 17 and November 16, 2024.

90. From September through November, my counsel began communicating with opposing counsel.

**Exhibit AI – Email Correspondence between Counsel from September to November 2024.**

We asked to know if the hearing panel had been appointed and who was the Chair or presiding officer, expecting that there would be witness testimony under supervision of physicians without conflict in the case. Mr. D'Antonio proceeded to deny that witnesses would be allowed stating it was not necessary, while still falsely stating, without evidence, that I violated protocols, and there were numerous complaints about my clinical care. We disagreed with him reminding him that Chief Judge Wolford had made it clear to him to advise his clients to ensure that any hearing was "fulsome" and would allow me to question adverse decisions made such as removal from clinical work, mandate to physician communication coaching, and false allegations of concerning patient care. Mr. D'Antonio ignored this directive.

91. I was copied on most emails between counsel. My counsel and I were informed by Mr. D'Antonio that a hearing panel had been formed and a presiding judge appointed, a retired Justice. My counsel sought to determine the scope of hearing from the presiding Judge. Counsel agreed to subject two-page summaries of their respective arguments which differed on scope of hearing, witness testimony, and duration/time of hearing. Mr. D'Antonio wanted a sham hearing with no witnesses, held at night after a long day of work (4pm to 8pm).

92. On November 8, 2024, both counsel sent their two-page summaries of their respective positions to Judge Frazee. The summaries by counsel differed. Mr. Fein again restated the facts that the re-entry plan was based on false predicates and uninvestigated allegations disproven by audio tapes of meetings between me and University leaders, and re-stated Chief Judge Wolford's directive that administrative proceedings by the University be fair and allow me to question the factual foundations for adverse actions including removal from clinical duties. **Exhibit AN – November 8 Letter from Fein to Judge Frazee.** Mr. D'Antonio in his summary stated that my request for witnesses to verify Cases A, B, C were frivolous and unnecessary as the re-entry plan was not determined based on them. But he repeated that numerous (uninvestigated) complaints had been made about my clinical care, communications and violating NICU protocols, which would have been superfluous if these factors had no influence on the development of a reentry plan. Mr. D'Antonio stated,

*"It is also apparent that Dr. Mezu-Ndubuisi wishes at the hearing to ascribe the determination to require that reentry plan and/or communications coaching to racism." He adds that the Office of Equity at University of Rochester is investigating these allegations. It is notable that Dr. Mezu-Ndubuisi has not been contacted by the Office of Equity since her email alleging racism and retaliation to University leadership on December 8, 2023, 11 months later. The Office of Equity notably shares the same cozy, administrative space with Dr. Apostolakos, CMO. University Leadership fails to recognize that demanding communication coaching of the only black faculty in a division/department is racism. Dr. Mezu-Ndubuisi has been described as eloquent and clear in her communication, and detailed, thoughtful and direct in her oral and written communication, as evidenced in emails with University Leaders, audio tapes, and letters of evaluation form staff and trainees. It is the University leaders who have remained vague, clandestine, taciturn, unclear, contradictory and evasive in their communication. Mr. D'Antonio concludes his letter as follows, "Simply stated, the MEC accepted-and had the right to accept-the determinations of Hospital leadership that communications coaching was appropriate, and that a reentry plan was required before Dr. Mezu-Ndubuisi could continue her clinical activity."* **Exhibit AO – November 8, 2024 Letter D'Antonio to Judge Frazee.**

93.  It is startling that the University suggests that its hospital leaders are infallible or beyond reproach, even if their decisions are erroneous and may cause harm to the well-being of staff and patients. Mr. D'Antonio does not state one protocol that I am alleged to have violated, as audio tapes on October 3, 2023, from Dr. D'Angio clearly state that I practiced within NICU standards. In fact, the audio tapes show that NICU Leadership did not know that the nursing staff were following a ten-year-old oxygen saturation protocol, different from what they had been

promoting, yet I was falsely accuse of changing oxygen saturation parameters. I brought this to

his attention during this meeting. In November 2023, the oxygen saturation protocol was changed

to reflect the NICU leadership's preference. (**Exhibit E – ECF No. 60-6 – filed on 9/3/24**).

94. The presiding judge wanted to clarify that there was no objection to her selection as judge prior to

making her decision, as she noted a letter from Mr. Fein to Mr. D'Antonio inquiring about how

the hearing panel was selected, and that no ex parte communications had occurred between Mr

D'Antonio and the hearing panel/presiding judge. Mr Fein sought clarification from Mr.

D'Antonio, who denied any ex parte communication but cited discussions about scheduling and

invoicing. Mr. D'Antonio suggested both parties split the fee for the presiding judge's payment,

for the first time confirming that there was a financial conflict and without disclosing what the

amount of payment was. Mr. Fein asked clarification of what invoicing meant, and if the

presiding Judge received payment from defendants or counsel, which would disqualify her and

question her ability to remain impartial. The presiding judge wrote back confirming that she had

discussions with Mr. Antonio to be paid $450 per hour for non-hearing times and $550 per hour

for hearing times. Mr. Fein reiterated that payment of a presiding officer without disclosure to

concerned parties was a conflict and valid grounds for disqualification and repeated a request for

the presiding judge to be disqualified. Mr. D'Antonio justified that the hearing panel should be

paid for their time. He disregarded that a disinterested neutral party could have initiated the Fair

Hearing panel selection and engagement, and that the plaintiff and counsel should have been

informed in full disclosure of these proceedings. On November 18, 2024, the presiding officer

stood her ground and refused our request to recuse herself from the fair hearing proceedings.

95.  University of Rochester engages in unfair and biased hearings that are a sham. **There is no expectation that a fair hearing is remotely possible as the culture of the university appears to be to conduct biased hearings,** if at all.

96. **As a physician, I participate is several administrative and academic committees within the university and nationally. These are considered service and an expectation for academic career development and are not paid or compensated. Some of these committees require significant time commitment weekly, monthly, and throughout the years, during work daytime and after work hours. My colleagues and I have never been paid to participate in university committees.** It is irregular and biased for the Fair Hearing Committee to be paid to participate in hearing for a few hours lasting merely days, which could determine the fate of another physician colleague's clinical privileges, employment, career, and livelihood. This erodes confidence in the impartiality of the decision of panel members.

### G.  IRREPARABLE DAMAGE

97. I would suffer irreparable damage if my clinical privileges were not renewed in a finalized decision by the University of Rochester. Non-renewal of my clinical privileges is mandates reporting to the National Practitioner Data Bank (NPDB). The NPDB does not investigate or litigate veracity of negative reporting by academic institutions or hospitals, and with their known history of accepting good faith reports from institutions, I would be unable to remove such a negative report, clear my name, reputation or salvage my medical career.

98.  My research lab is currently involved in novel and ground-breaking research, including studies of the effect of oxygen damage to fragile organs of premature infants using mouse models, the development of unique and novel transgenic mice, development of nanoparticles and microparticles

for advanced drug delivery to provide safer, more effective therapies for lung disease, retinal disease, and other systemic diseases in infants and adults. All these would be lost to generations and humanity if I lose my clinical privileges and employment with Defendants.

99.  The irreparable damage I have suffered emotionally from being forcibly removed from clinical work since December under false allegations, and denying me due process for the past 11 months, and with no hope of an unbiased fair hearing with witnesses, and no statement articulating in writing in any email or document what I am allegedly accused and the unending anxiety this indefinite limbo has caused me, cannot be remedied by monetary compensation.

100. It is notable that since I have provided audio tapes recordings of every meeting with the defendants since my hire, on August 12, 2024, they have avoided referring to it, as it contradicts the false statements made by them and their counsel, particularly Dr. Apostolakos, Dr. Halterman, and Dr. D'Angio on August 7, 2024 (prior to their being aware of audio recordings) where they perjured themselves on multiple counts.

101. Contrary to Defendant's insinuations, if I am returned to clinical work, I would be able to resume collaborative teamwork and relationships with the NICU staff. The new policies in place would reduce or eliminate the toxic culture of gossiping and micro aggressions and rumors that have been rampant at the University of Rochester for years.  Defendants routinely permit physicians on maternity leave or sabbatical to return to work immediately with no reentry programs.

102. I have reflected for over a year now on these issues, with shock and sadness that one could have such a negative experience in a job one embraced with such enthusiasm and joy and receive such unkind treatment from colleagues I have only treated with respect and compassion. After months of prayer and self-reflection, I have gone through the stages of grief in this very traumatizing ordeal and have reached a calm place of acceptance and trust in God's will. I have chosen to show

empathy and understanding for those who have had misperceptions of me, and maligned my character unjustly. Their actions are not a reflection of me, but rather a reflection of the state of their souls and the inner struggle within. They may truly believe that they are well-meaning, seeking in their own minds "the best interest of the patient" by sharing their wrong opinions and misperceptions.

103. Dr. D'Angio, Dr. Halterman, and Dr. Apostolakos' conduct in this case have helped me understand how important and powerful words are. These three leaders have not worked directly with me, and have relied on the account or words from so-called witnesses. When coming from one so trusted, respected and well-meaning, words could influence other staff, leadership, and a whole institution leading to judgements that may deny others equity and justice, albeit unintentionally. The account of the unnamed accusers and so-called witnesses were immediately taken as gospel because it came from staff who are trusted and respected, or known longer than me, or their friends. You cannot vouch for the contents of one's mind and soul. Being biased and well-meaning or respected are not mutually exclusive.

104. That University leaders chose to believe, without any questioning, false accounts from non-minority staff and refuse to ask my side of events or even give me the benefit of the doubt, speaks heavily of racial bias, which is unfortunate. Even condemned criminals are treated with more respect by being told clearly what their charges are, presumed innocent until proven guilty with irrefutable evidence, and allowed to vigorously defend themselves and question witnesses. University of Rochester seeks to be accuser, judge, jury, and executioner with no witness testimony and not one single allegation stated verbally or in writing.

105. Bringing prompt and respectful attention to differences in clinical opinion when conflicts arise would easily clarify misunderstandings and help us all provide safe, efficient care, and avoid

months of speculation. Expecting people to be mind-readers and to know we disapprove of a clinical decision, despite our positive statements, smiles and nods, seems unfair.  These issues have been escalated frivolously under false guise of patient safety, instead of being viewed with a Diversity, Equity, and Inclusion lens to determine if there is an honest miscommunication that could be improved by both parties (not just one party), a true patient safety concern (unlikely if all patients did clinically well and improved) or a racial targeting or bias (more likely as in my case where other non-minorities performing similar actions, using their clinical judgement, are not penalized).

106. **I believe that true leadership is not just authority, but compassionate service of those under one's care, by one's own example – *servant leadership*.** Servant leaders show courage and honesty in acknowledging when an error has been made, and strive to correct that error, without ego. Servant leaders believe that everyone is capable of greatness, and seek to nurture and bring out the best in those they serve. The success and productivity of an institution depends on the strength of its diversity and the way its members are valued and treated. When minority staff feel valued, safe, and at home in the workplace, they undoubtedly excel. I truly hope we can all heal from this with a renewed commitment to compassionately serve our patients, their families, and one another. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: November 24, 2024

*O. J. Mezu-Ndubuisi*

_____

Olachi Mezu-Ndubuisi, Plaintiff