UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

OLACHI MEZU-NDUBUISI, an individual,

                        Plaintiff,

      v.

UNIVERSITY OF ROCHESTER, GOLISANO
CHILDREN'S HOSPITAL, DR. MICHAEL
APOSTOLAKOS, in his personal capacity
and as Chief Medical Officer of University
of Rochester, DR. JILL HALTERMAN, in
her personal capacity and as Chair of the
Department of Pediatrics, University of
Rochester, and DR. CARL D'ANGIO, in his
personal capacity and as Chair of the Division
of Neonatology, Department of Pediatrics,
University of Rochester,

                   Defendants.

_____

**DECISION AND ORDER**

6:24-CV-06387 EAW

## **INTRODUCTION**

Olachi Mezu-Ndubuisi ("Dr. Mezu-Ndubuisi" or "Plaintiff") sued the University of

Rochester ("University"), Golisano Children's Hospital ("Hospital"), Dr. Michael

Apostolakos, Dr. Jill Halterman, and Dr. Carl D'Angio (together, "Defendants")[1] alleging

---

[1]     In the original complaint, filed *pro se*, Plaintiff named as a defendant "Golisano Children's Hospital, University of Rochester Medical Center." (Dkt. 49 at 1). But in her amended complaint, filed by counsel, Plaintiff names that same defendant just as "Golisano Children's Hospital" and does not independently identify the University of Rochester Medical Center ("URMC") as a separate defendant in the caption. (Dkt. 57 at 1). While the body of the amended complaint continues to refer to URMC as a separate defendant, the failure to include this entity as a separate defendant in the caption of the amended complaint leads the Court to conclude that URMC is not a separately-identified defendant. Nonetheless, because of the lack of clarity on this issue and because of the inclusion of URMC

she was not reappointed to the Hospital's clinical staff as a result of discrimination, retaliation, and harassment.[2]  (Dkt. 57).  Pending before the Court is Defendants' motion to dismiss the amended complaint[3] (Dkt. 38); Plaintiff's motion for a preliminary injunction (Dkt. 70); and Plaintiff's motion for a temporary restraining order (Dkt. 74).  For the following reasons, the Court denies the motions for a preliminary injunction and a temporary restraining order and stays the remainder of the litigation pending further order of the Court.

## FACTUAL BACKGROUND

The following facts are taken from Plaintiff's amended complaint (Dkt. 57), Plaintiff's Declaration in Support of Plaintiff's Memorandum in Support of Renewed Motion for a Preliminary Injunction (Dkt. 95), the Declaration of Stephen P. Burke (Dkt. 75-1), the Declaration of Thomas S. D'Antonio (Dkt. 75-4), the Declaration of Dr. Michael Apostolakos (Dkt. 27-3), as well as the exhibits submitted by the parties.  As required on

---

as a separate defendant does not impact resolution of the pending motions, the Court has not directed to the Clerk of Court at this time to terminate the URMC as a defendant.

[2]     The Court allowed the sealing of certain documents and information that consists of confidential information of both the parties and non-party individuals.  (Dkt. 41; Dkt. 65; Dkt. 92).  Consistent with those rulings, certain portions of the memoranda submitted by the parties in connection with their motions, certain portions of other documents, and certain exhibits have been filed under seal.  Because the information filed under seal does not need to be referenced in connection with resolution of the pending motions, the Court has referred herein to the unsealed, redacted papers filed in connection with the pending motions.

[3]     Defendants also moved to strike certain portions of the amended complaint.  (Dkt. 38).  The Court has already addressed that aspect of the pending motion in a separate Decision and Order.  (Dkt. 105).

a motion to dismiss, the well-pleaded allegations set forth in Dr. Mezu-Ndubuisi's amended complaint are treated as true.

Dr. Mezu-Ndubuisi is a physician and neonatologist hired at the University of Rochester in July 2022. (Dkt. 57 at ¶ 21). She is "the only Black faculty and neonatologist in the Division of Neonatology of Nigerian national origin, and the only [B]lack tenured faculty in the Department of Pediatrics at the University of Rochester." (*Id.*). She "was hired as a clinician-scientist to conduct laboratory, clinical, global health and translational research, including bench to bedside applications of research knowledge, as well as care for newborns and critically ill premature infants in the neonatal intensive care unit (NICU)." (*Id.*).

Dr. Mezu-Ndubuisi "has faced a pattern of discrimination, false reports, and retaliation from the department leadership and colleagues." (*Id.*). She was subjected to "extreme microaggressions" and "rumors about her clinical care," and "NICU [l]eadership refused to investigate these false reports, and instead encouraged these behaviors." (*Id.* at ¶ 29). NICU leadership ignored her interest in developing a diversity, equity and inclusion training program for the NICU. (*Id.* at ¶¶ 32-33).

Dr. Mezu-Ndubuisi was involuntarily "assigned several clinical mentors to [her] in succession, without seeking her input or giving her a reason why a clinical mentor was needed," even though "[n]o other Associate Professor has been forced to have a clinical mentor." (*Id.* at ¶ 35). "[A]ssignment of a clinical mentor was a practice initiated when she was hired in July 1, 2022, as the only Black faculty in neonatology," and the purpose of a "clinical mentor was to monitor [her]." (*Id.* at ¶¶ 36, 39, 40).

NICU leadership "instituted unfair monitoring and over-scrutiny of Dr. Mezu-Ndubuisi" from the time she was hired. (*Id.* at ¶ 43). Such scrutiny included urging her to attend conferences and meetings in person, when others attended via video. (*Id.* at ¶¶ 43-45). When she made suggestions to improve the NICU's protocols, NICU leadership forced her out of those discussions. (*Id.* at ¶¶ 46-49). She was unnecessarily recommended for "mandated Physician Communication Coaching, Forced Clinical Mentoring, and monitoring of her clinical practice, without any just cause [which] continu[ed] to foster a hostile work environment, discrimination and retaliation." (*Id.* at ¶ 50).

"Early in her first weeks as attending on service Dr. Mezu-Ndubuisi became the victim of the unhealthy, rumor-rife environment in the NICU. She was subjected to false patient safety reporting and inaccurate rumors. . . ." (*Id.* at ¶ 52). NICU leadership "accept[ed] rumors and personal biased opinions of staff regarding Dr. Mezu-Ndubuisi's clinical care of patients without properly investigating them." (*Id.* at ¶ 51). Instead, "Defendants stop the investigations when there is evidence that these staff were untruthful about their complaints against Dr. Mezu-Ndubuisi . . . , or that harm was caused by these staff to the patient while under their care." (*Id.*). In addition, "[s]ome specific staff, particularly those making these complaints, are consistently rude, threatening and unprofessional towards Dr. Mezu-Ndubuisi . . . , and this has continued undeterred because Defendants' NICU leadership appears to be protecting those making false complaints." (*Id.* at ¶ 53).

Dr. Mezu-Ndubuisi was falsely accused "of changing oxygen saturation parameters in the NICU when she had been instructed not to do so." (*Id.* at ¶ 62). "[She] has been

denied this autonomy of practice to make a clinical decision that deviates from a protocol or consensus guideline in the best interest of patient safety, if she has determined and has shown that following that protocol or guideline would be harmful to the patient," while "[s]ome non-minority neonatologists who do not follow the consensus guidelines . . . are not penalized and there are no complaints made about them by bedside staff." (*Id.* at ¶¶ 63-65). Even though "all babies under her care have done clinically well," she was restricted from clinical practice, while the cases "harmed under the care of non-Black neonatologists" were not investigated, and the clinicians involved in those cases were not penalized. (*Id.* at ¶¶ 74-86).

Dr. Mezu-Ndubuisi filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on December 19, 2023, alleging she was discriminated against on the basis of her race. (*Id.* at ¶ 98). In retaliation, "her every action, movement, and word during patient care has been over-scrutinized, over-analyzed, and monitored." (*Id.* at ¶¶ 103, 104). On December 27, 2023, "barely eight days" after her EEOC filing, she was pulled out of the NICU and into a meeting where she was "intimidated, harassed, and attempts made to coerce her to agree to penalties restricting and monitoring her practice in the NICU because they received anonymous patient safety reports against her in the defendants' continuing pattern of discrimination and retaliation against Dr. Mezu-Ndubuisi which they intensified after she filed a complaint against them with the EEOC." (*Id.* at ¶ 106). She was removed from clinical duties that same day. (*Id.* at ¶ 107).

In late May 2024, Dr. Mezu-Ndubuisi met with Dr. Michael Apostolakos, the chief medical officer, to discuss a plan for her to return to clinical practice. (*Id.* at ¶¶ 127, 128).

Dr. Mezu-Ndubuisi declined to agree to either the terms of the initial plan, or to a revised plan. (*Id.* at ¶¶ 127-156). She told Dr. Apostolakos that the plan "was discriminatory and excessive monitoring, without just cause." (*Id.* at ¶ 165). Dr. Apostolakos replied that the plan as presented on June 12, 2024, "offered an outline of the terms and conditions under which the University would support your return to clinical practice," and that if Dr. Mezu-Ndubuisi did not accept the plan by June 21, 2024, the University "will consider you to have declined." (*Id.* at ¶ 170). She declined to sign, stating that "[t]he re-entry plan is filled with falsehoods, inaccurate statements" (*id.* at ¶¶ 171, 172) and that "[a]greeing to sign such a document is career suicide," that would subject her "to bullying, harassment, clinical monitoring with no clear end and continued racial discrimination" (*id.* at ¶ 173).

By email dated January 4, 2024, Dr. Mezu-Ndubuisi was invited to a meeting to discuss the conditions under which she would be permitted to return to clinical duties. (*Id.* at ¶ 112). On January 10, 2024, Dr. Mezu-Ndubuisi was notified that her clinical privileges needed to be renewed, and she should start the process. (*Id.* at ¶ 119). "On February 12, 2024, Dr. Michael Apostolakos, the C[hief ]M[edical ]O[fficer] of the University of Rochester Strong Memorial Hospital wrote to Dr. Mezu-Ndubuisi informing her that he had received a Focused Professional Practice Evaluation (FPPE) from the NICU regarding her clinical care and he would like to meet to review and discuss. . . ." (*Id.* at ¶ 115). In response to each, Dr. Mezu-Ndubuisi noted that she had filed an EEOC complaint, and declined to meet. (*Id.* at ¶¶ 114, 115).

On April 15, 2024, Dr. Apostolakos informed her that if she wanted to return to clinical practice, she would need to meet with him first and agree to a re-entry plan. (*Id.*

at ¶ 123).  That meeting took place on May 23, 2024, but ended without agreement on a plan.  (*Id.* at ¶¶ 127-136).  A follow-up meeting on June 4, 2024, also ended without a plan for Dr. Mezu-Ndubuisi to return to clinical service.  (*Id.* at ¶¶ 147-152).  The University unilaterally presented Dr. Mezu-Ndubuisi with a re-entry plan on June 12, 2024; and followed up with an email on June 14, 2024, stating that if she failed to agree to the plan by the end of the day on June 21, 2024, the University would "consider you to have declined."  (*Id.* at ¶ 170).  Dr. Mezu-Ndubuisi did not agree to the plan, as "[a]greeing to sign such a document is career suicide."  (*Id.* at ¶¶ 171-174, 187).

Dr. Mezu-Ndubuisi received a right-to-sue letter from the EEOC on June 20, 2024.  (*Id.* at ¶ 118).  She filed the complaint in the instant action on that same day, initially proceeding *pro se*.  (Dkt. 1).  At the same time Dr. Mezu-Ndubuisi moved for a preliminary injunction reinstating her clinical privileges.  (*Id.* at ¶ 209).  On June 27, 2024, she was notified that her clinical privileges were being renewed for a two-year period from July 1, 2024, to June 30, 2026.  (*Id.* at ¶ 210).  On July 3, 2024, she received another letter, superseding the one issued June 27, that restored her clinical privileges for a 59-day period from July 1, 2024, to August 29, 2024.  (*Id.* at ¶ 211).  As discussed in further detail below, on August 14, 2024, the Court issued an Order memorializing its oral rulings the day before, wherein it denied Dr. Mezu-Ndubuisi's motion for a preliminary injunction without prejudice.  (Dkt. 41).

On August 28, 2024, Dr. Mezu-Ndubuisi was informed that the Hospital's Medical Executive Committee ("MEC") recommended denying her application for reappointment.  (Dkt. 70-5 at 1).  The letter states:

As you know, you were removed from the clinical service schedule for the neonatal intensive care unit (NICU) at Golisano Children's Hospital (part of Strong Memorial Hospital) because of concerns that had been identified with respect to certain clinical practices you engaged in in treating NICU patients that are inconsistent with the NICU's standards, and deficiencies in your collaboration with other providers and staff in the NICU.

(*Id.*).  The letter also states that because Dr. Mezu-Ndubuisi "expressly declined to engage in any further discussion toward developing and finalizing" a plan for her return to service in the NICU, "no plan was agreed to prior to the consideration of your application for reappointment."  (*Id.*).  The MEC's "recommendation to deny your application for reappointment was due to the fact that there is no plan for your return to the clinical schedule, and no expectation that such a plan will be developed."  (*Id.* at 2).  The letter advised Dr. Mezu-Ndubisi that she was "entitled to request a fair hearing before" the MEC's recommendation was presented to the University's Medical Center board.  (*Id.*).

Dr. Mezu-Ndubuisi requested a fair hearing.  (Dkt. 70-1 at 8).  She sought an evidentiary hearing, and proposed submitting audio recordings, audio transcripts, and calling numerous witnesses to testify.  (*Id.* at 9-13).  On September 23, 2024, Kathleen Parrinello, the Hospital's president and chief executive officer, sent a letter acknowledging Dr. Mezu-Ndubuisi's request for a fair hearing, to be scheduled between October 16 and November 16, 2024, in accordance with the fair hearing plan set forth in the Hospital's bylaws.  (Dkt. 70-6).  On October 8, 2024, counsel for Defendants, Thomas D'Antonio ("D'Antonio"), wrote to Dr. Mezu-Ndubuisi's counsel, Bruce Fein ("Fein"), objecting to the scope of the evidence she was proposing to put before the fair hearing panel.  (Dkt. 96).  On October 14, 2024, Fein responded that the scope was appropriate given that "[t]he MEC

never considered whether the factual predicates for Dr. Mezu-Ndubuisi['s] reentry plan were false." (Dkt. 70-9 at 1).

D'Antonio replied on October 28, 2024, stating: (1) the scope of the hearing was limited given that "in this case the MEC assessed whether Dr. Mezu-Ndubuisi had exhibited a willingness to commit to a plan, acceptable to the Hospital's clinical leadership, that would allow her to resume clinical activity"; (2) that Dr. Mezu-Ndubuisi "filed a bias/hostile environment complaint with the University's Office of Equity and Inclusion, which is handling that complaint directly," a process the MEC plays no role in; and (3) identified the members of the hearing panel, including the presider, Hon. Evelyn Frazee, retired New York Supreme Court Justice. (Dkt. 70-10 at 1-3). Fein replied on October 30, 2024, again disagreeing with D'Antonio's proposed scope for the hearing, and also asking how the panel and presider were chosen. (Dkt. 97).

On November 8, 2024, both counsel sent two-page summaries of their respective positions as to what the scope of the hearing should entail. (Dkt. 70-12; Dkt. 70-13). Justice Frazee wrote the parties on November 12, 2024, stating that (1) she would address the issues regarding the scope of the hearing, and (2) asking if the parties had agreed to waive the fair hearing plan's requirements for the timing of the hearing, "as it is clear that a November 18 date for accomplishing the hearing is unlikely." (Dkt. 70-7 at 15). She wrote counsel again on November 13, 2024, referring to Fein's letter of October 30, 2024, that asked how the panel and presider were chosen. (*Id.* at 11). Justice Frazee wrote:

> Before I commence writing my decision regarding the issue of the scope of the hearing, I want assurances from Mr. Fein on behalf of Dr. Meza-Mdbuisi [sic] that there will be not be a challenge to my selection as the Chair of the

> Hearing Committee/Presiding Officer in this matter. Similarly, I need assurances that there will not be a challenge to any members of the Hearing Committee. Once I begin working on the substantive issues, I do not want procedural delays. If there is going to be a problem in this regard, it needs to be addressed upfront. Please advise by noon on Friday, November 15, 2024.

(*Id.*). Fein wrote to D'Antonio asking if D'Antonio had engaged in *ex parte* communications with Justice Frazee, or the hearing committee, or if D'Antonio had, or planned to, offer legal advice, to the panel or Justice Frazee. (Dkt. 75-16). D'Antonio responded:

> As you know from our discussion of November 4, I confirmed for you then that neither I, nor anyone from my firm, have provided or would be providing counsel to Justice Frazee, or any of the hearing panel members. Similarly, beyond discussion of her general availability and willingness to preside over the hearing, and related non-substantive administrative matters (scheduling, invoicing), I have had no *ex parte* contacts with Justice Frazee, or any substantive communications regarding the matters in dispute, and I have had no contact whatsoever with the hearing panel members.

(Dkt. 75-17 at 2). Fein responded:

> Based on your email and verbal assurances, our only concern is your reference to discussing "invoicing" with Justice Frazee. Please clarify. Will UR directly or indirectly be paying Justice Frazee professional fees or out-of-pocket expenses for her service as Presiding Officer? If the answer is 'no,' then we have no problem with Justice Frazee serving in her appointed role. If the answer is 'yes,' then we would move for her disqualification because one party in an adversary proceeding should not be financing a neutral presiding officer. Without impugning Justice Frazee's integrity, persons are not likely to bite the hand that feeds them.
>
> These answers are necessary because we all agree that justice must be above suspicion.

(Dkt. 75-18 at 2). D'Antonio replied:

> Bruce—we have never discussed the issue of compensation for the Presiding Officer, but I have no problem with the parties dividing the cost of the

Presiding Officer in this case 50/50. I will say that in other medical staff matters in which I have been involved, the hospital typically compensates external hearing panel members, and the parties have never had (nor have I heard of) any concern about that arrangement. In addition, in this instance the Presiding Officer is a non-voting panel member.

But in all events a 50/50 split presumably will alleviate the concern you posit. Please let me know if you want to discuss any of this further.

(Dkt. 75-19 at 2). Fein then wrote to Justice Frazee asking that she disqualify herself as

presider:

We request your disqualification as the Fair Hearing Presiding Officer. The information provided from Mr. D'Antonio indicates he spoke to you ex parte about the University of Rochester, a party to the Fair Hearing, agreeing to pay your fees, to which you apparently agreed. That financial conflict of interest was concealed from Dr. Olachi Mezu-Ndubuisi, as was the amount of compensation you were to receive from UR. This concealment is more than ample to establish that your impartiality in the matter might reasonably be questioned.

Mr. D'Antonio's suggestion that the parties each pay one-half your compensation is a nonstarter. It does nothing to cure the bias shown by your initial secret agreement to be paid by UR alone in an unknown amount. Further, nothing in the Bylaws requires an appellant from the MEC adverse action to pay for an appeal to a Fair Hearing Panel. Mr. D'Antonio's proposal would change the rules in midstream, which is unacceptable.

(Dkt. 70-7 at 6). Fein stated that if Justice Frazee did not disqualify herself, Dr. Mezu-

Ndubuisi would seek a temporary restraining order and preliminary injunction to enjoin

the hearing. (*Id.*).

Justice Frazee responded:

My communication with Mr. D'Antonio was with regard to my hourly rate ($450/hour for time expended outside the hearing and $550/hr for presiding at the hearing). I was also advised as to the nature of the role of the Presiding Officer to oversee the procedural aspects of the hearing, but that the decision-making aspect was within the province of the physicians composing the hearing panel. I was also advised that any procedural questions of a legal

> nature which the physicians might have could also be posed to me.  That was
> the extent of my communication with Mr. D'Antonio.

(*Id.* at 4).  She asked that the parties participate in a conference with her.  (*Id.* at 5).  Fein responded by declining to participate in a conference, and to continue to request Justice Frazee recuse herself.  (*Id.* at 3).  Justice Frazee declined to recuse herself on November 18, 2024.  (*Id.* at 1).  On November 25, 2024, Justice Frazee issued a decision delineating the scope of the hearing.  (Dkt. 75-6).

A notice of hearing issued on December 6, 2024, setting the hearing for December 16 and 17.  (Dkt 75-23 at 2-3).  On the morning of December 16, Justice Frazee wrote to both attorneys:

> As you know, I sent a Notice of Hearing scheduling this matter to be heard this afternoon and tomorrow.  I then sent an email requesting counsel to advise me of your availability for a virtual conference.  While Mr[.] D'Antonio provided several dates when he was available neither Mr. Fein nor Ms. Ibe replied.  I'm not quite sure how to interpret this lack of the courtesy of a response.
> There are numerous issues which need to be discussed, especially given the pending motion before Judge Wolford.  I will be attempting to again schedule a virtual conference. In the meantime, however, the dates for the hearing are suspended at this time.

(Dkt. 84-9 at 1).

## PROCEDURAL BACKGROUND

Proceeding *pro se*, Dr. Mezu-Ndubuisi filed her initial complaint on June 20, 2024. (Dkt. 1).  On the same day, she also moved for a preliminary injunction seeking reinstatement of her clinical duties, and an order mandating that the University renew her medical staff appointment, and to avoid being forced to agree to a remediation plan.  (Dkt.

2).  On July 11, 2024, Defendants moved to dismiss the complaint and to strike certain allegations in the complaint.  (Dkt. 13).

On July 22, 2024, now represented by counsel, Dr. Mezu-Ndubuisi filed an amended motion for a preliminary injunction.  (Dkt. 17; Dkt. 18).  She filed an amended complaint on July 29, 2024.  (Dkt. 19).  Defendants moved to dismiss the amended complaint, and to strike certain allegations contained therein, on August 12, 2024.  (Dkt. 38).

The Court held oral argument on August 14, 2024.  (Dkt. 39).  In relevant part, the Court denied Defendants' original motion to dismiss (Dkt. 13) as moot given the filing of the amended complaint and denied without prejudice Plaintiff's motions for a hearing (Dkt. 35) and for a preliminary injunction (Dkt. 2).  (Dkt. 41).

On September 3, 2024, Dr. Mezu-Ndubuisi filed opposition to the motion to dismiss the amended complaint (Dkt. 60; Dkt. 62).[4]  Defendants filed reply papers on September 13, 2024.  (Dkt. 64).  On November 24, 2024, after Justice Frazee declined to recuse herself, Dr. Mezu-Ndubuisi filed another motion for a preliminary injunction seeking reinstatement of her clinical duties and an order mandating that the University renew her medical staff appointment, and to avoid being forced to agree to a remediation plan.  (Dkt. 70).  Defendants filed papers in opposition on December 9, 2024.  (Dkt. 75).  Dr. Mezu-Ndubuisi filed reply papers on December 16, 2024.  (Dkt. 82).

---

[4]    In her opposition papers, Dr. Mezu-Ndubuisi agreed to dismiss her Title VII claims as against the individual defendants, her due process claims, and her breach of contract claims.  (Dkt. 60 at 13, 21).  Those claims are therefore dismissed.

On December 8, 2024, while the preliminary injunction was being briefed, Dr. Mezu-Ndubuisi moved for a temporary restraining order enjoining the fair hearing until December 23, 2024. (Dkt. 74). Defendants filed opposition papers on December 18, 2024. (Dkt. 84).

## DISCUSSION

### I.    Legal Standards

#### A.    Temporary Restraining Order/Preliminary Injunction

"Temporary restraining orders and preliminary injunctions are extraordinary and drastic remedies, which are 'never awarded as of right,' or 'as a routine matter.'" *See Rush v. Hillside Buffalo, LLC*, 314 F. Supp. 3d 477, 483-84 (W.D.N.Y. 2018) (quoting *Whitfield v. Lopez*, No. 15-CV-4827 (DLI) (LB), 2015 WL 6128866, at *2 (E.D.N.Y. Oct. 16, 2015) (citations omitted)). "'[A] temporary restraining order . . . serves a purpose different from that of a preliminary injunction,' in that '[t]he purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction.'" *Martin v. Warren*, 482 F. Supp. 3d 51, 67 (W.D.N.Y. 2020) (alterations in original) (quoting *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009)).

"In the Second Circuit, the standard for issuance of a temporary restraining order . . . is the same as for a preliminary injunction." *Id.* at 68 (quoting *Fairfield Cnty. Med. Ass'n v. United Healthcare of New England*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013)). A plaintiff seeking a temporary restraining order or preliminary injunction must demonstrate that: (1) there is a likelihood of success on the merits; (2) she will suffer irreparable injury

if relief is not granted; (3) balancing of the equities tips in favor of the moving party; and (4) entry of relief would serve the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the moving party is unable to demonstrate a likelihood of success on the merits, a court may still issue a preliminary injunction if the moving party demonstrates "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)); *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 113-14 (2d Cir. 2006) ("To obtain a preliminary injunction, plaintiff must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor."). But where, as here, a plaintiff seeks a preliminary injunction that will alter the status quo, she must make a "clear showing" that she is entitled to the relief requested "or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011); *see N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (to alter status quo, moving party must "demonstrate a 'substantial' likelihood of success on the merits" (citation omitted)). A district court "has wide discretion in determining whether to grant a preliminary injunction[.]" *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 511 (2d Cir. 2005).

B.    Rule 12(b)(1)

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.á.r.l*, 790 F.3d 411, 416-17 (2d Cir. 2015) (quotation and citation omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "When considering a motion to dismiss for lack of subject matter jurisdiction . . . , a court must accept as true all material factual allegations in the complaint." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998). In addition, a court is not limited to the allegations in the complaint and can "refer to evidence outside the pleadings," *Luckett v. Bure*, 290 F.3d 493, 496-97 (2d Cir. 2002), but it "may not rely on conclusory or hearsay statements contained in the affidavits," *J.S. v. Attica Cent. Schools*, 386 F.3d 107, 110 (2d Cir. 2004). "Indeed, a challenge to the jurisdictional elements of a plaintiff's claim allows the Court to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Celestine v. Mt. Vernon Neighborhood Health Ctr.*, 289 F. Supp. 2d 392, 399 (S.D.N.Y. 2003) (quotation omitted). Whether a complaint should be dismissed for lack of subject matter jurisdiction is a threshold issue. *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990).

### C.    Rule 12(b)(6)

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted).  "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).  "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion

- 17 -

couched as a factual allegation.'" *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation omitted).

## II.    Preliminary Injunction

### A. Ripeness

Dr. Mezu-Ndubuisi's motion for a preliminary injunction is not ripe for adjudication, and the Court denies it without prejudice to renewal if the Hospital finalizes her loss of clinical privileges <u>and</u> she pursues a complaint with the New York State Public Health and Health Planning Council ("PHHPC")[5] that is unsuccessful.

"Ripeness is a constitutional prerequisite to exercise of jurisdiction by federal courts." *Nutritional Health All. v. Shalala*, 144 F.3d 220, 225 (2d Cir. 1998).  To be justiciable, a cause of action "must present a real, substantial controversy, not a mere hypothetical question. . . .  A claim is not ripe if it depends upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (internal quotation marks and citations omitted).  "The doctrine's major purpose is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Id.* (internal quotation marks and citation omitted).

---

[5]    The PHHPC was previously known as the Public Health Council ("PHC").  *See* N.Y. Pub. Health Law § 2801(6).

"The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation marks omitted). "Thus, the doctrine implicates two distinct conceptual jurisdictional criteria." *Nat'l Org. for Marriage*, 714 F.3d at 687. The first, constitutional ripeness, may be considered "as a specific application of the actual injury aspect of Article III standing." *Id.* at 688. "The irreducible constitutional minimum of standing contains three elements: (1) the plaintiff must have suffered an injury in fact, i.e., an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks omitted). "Constitutional ripeness, in other words, is really just about the first [] factor—to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not actual or imminent, but instead conjectural or hypothetical." *Id.* (internal quotation marks omitted).

Dr. Mezu-Ndubuisi's claim is constitutionally unripe. While the amended complaint alleges that Dr. Mezu-Ndubuisi's privileges will not be renewed (Dkt. 57 at ¶¶ 210, 211), the decision regarding her reappointment is not yet final. When the University declines to reappoint a physician, that process requires that:

- the Hospital's Credentials and Privileges Review Committee ("CPRC") reviews and makes a recommendation regarding the physician's application (Dkt. 19-7 at 60; Dkt. 27-3 at ¶ 55);

- if the CPRC recommends denying reappointment, the MEC reviews that recommendation and makes a recommendation regarding whether the application should be denied (Dkt. 19-7 at 61-62; Dkt. 27-3 at ¶ 56);

- the physician can then request a fair hearing (Dkt. 19-7 at 65; Dkt. 27-3 at ¶ 59);

- if a hearing is requested, an ad hoc hearing panel then considers whether to uphold the MEC's negative recommendation (Dkt. 19-7 at 65-68; Dkt. 27-3 at ¶ 60(a)-(b));

- the hearing panel's report is then sent to the MEC, which may make a further recommendation to the Hospital's Board (Dkt. 19-7 at 68; Dkt. 27-3 at ¶ 60(c));

- the Hospital's Board then considers whether to accept the hearing panel's recommendation to deny reappointment (Dkt. 19-7 at 68; Dkt. 27-3 at ¶ 60(d));

- the physician may then request appellate review (Dkt. 19-7 at 69; Dkt. 27-3 at ¶ 60(d));

- if appellate review is requested, an appellate review body reviews the hearing panel's recommendation (Dkt. 19-7 at 69-70; Dkt. 27-3 at ¶ 60(e)); and

- as a final step, the Hospital's Board of Governors votes on whether to grant or deny reappointment (Dkt. 19-7 at 70; Dkt. 27-3 at ¶ 60(f)).

Here, the decision whether to reappoint Dr. Mezu-Ndubuisi has progressed to the fair hearing stage, with numerous steps still to follow before any final decision is made concerning her privileges. And as discussed further below, PHHPC review is appropriate before the Court would consider issuing an injunction to reinstate Dr. Mezu-Ndubuisi's privileges.

Further, allegations "of [] bias or prejudgment based on ex parte communications are insufficient for injunctive relief and cannot be reviewed until . . . [there is] an adverse

determination and an appeal has been taken raising these claims on the record as a whole." *Touche Ross & Co. v. S.E.C.*, 609 F.2d 570, 575 (2d Cir. 1979). "Requiring exhaustion before the allegedly biased tribunal not only will give the tribunal the opportunity to purge itself of bias, if any, but also will provide a foundation for further review of the dispute either with respect to the alleged bias or on its merits." *MFS Sec. Corp. v. SEC*, 380 F.3d 611, 623 (2d Cir. 2004).

Indeed, to the extent that Dr. Mezu-Ndubuisi seeks a preliminary injunction to challenge the way in which the Hospital is conducting its proceedings against her—as opposed to any ultimate decision to terminate her privileges—she must do so via an Article 78 proceeding after exhausting the administrative remedies provided by the Hospital. "[A] university faculty member's 'claims based upon the rights or procedures found in college manuals, bylaws and handbooks may only be reviewed by way of a special proceeding under Article 78.'" *Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (*quoting Bickerstaff v. Vassar Coll.*, 354 F. Supp. 2d 276, 283 (S.D.N.Y. 2004)); *Koul v. Univ. of Rochester*, 285 F. Supp. 3d 595, 601 (W.D.N.Y. 2018) (same) (collecting cases). An Article 78 proceeding allows a plaintiff to challenge whether the presiding officer "was biased and prejudged the outcome, [and] that the determination was slanted by the adjudicator's refusal to recuse herself, or that ex parte communications . . . may have infected the [presiding officer]'s ruling." *Locurto v. Safir*, 264 F.3d 154, 174-75 (2d Cir. 2001) (internal citations omitted). "An Article 78 proceeding therefore constitutes a wholly adequate post-deprivation hearing for due process purposes." *Id.* at 175.

At bottom, Dr. Mezu-Ndubuisi's motion for a preliminary injunction reinstating her clinical privileges is not ripe for adjudication.

### B. Merits

Even if Dr. Mezu-Ndubuisi's motion for a preliminary injunction were ripe, the Court would deny the motion on the merits at this stage of the litigation. As a threshold matter, Defendants argue that Dr. Mezu-Ndubuisi is seeking a mandatory injunction, rather than a prohibitory injunction, and must therefore satisfy a heightened standard to obtain relief.

As noted above, "[t]he Second Circuit has . . . differentiated between injunctions that propose to alter the status quo (mandatory injunctions) and those that merely seek to maintain it (prohibitory injunctions)." *XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*, 874 F. Supp. 2d 263, 271 (S.D.N.Y. 2012). A mandatory injunction may "issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011). "By contrast, a prohibitory injunction may be granted on a showing of '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *XL Specialty Ins. Co.*, 874 F. Supp. 2d at 271 (quoting *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)). "The heightened standard should only apply 'if a preliminary injunction would make it difficult or impossible to render a meaningful remedy to a

defendant who prevails on the merits at trial.'" *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 463 (S.D.N.Y. 2005) (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 35 (2d Cir. 1995)).

Because Dr. Mezu-Ndubuisi seeks to alter the status quo by asking the Court to reinstate her medical privileges, she is seeking a mandatory injunction. *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018) ("Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it."); *Lerario v. N.Y.-Presbyterian/Queens*, No. 20-cv-6295 (JGK), 2023 WL 4847141, at *4-5 (S.D.N.Y. July 28, 2023) (physician seeking preliminary injunction reappointing him to clinical practice subject to the heightened review standard). Under either standard, however, Dr. Mezu-Ndubuisi cannot, at this stage, make the necessary showing to obtain the relief she seeks.

First, and most critically, she cannot establish irreparable harm. A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "The irreparable harm requirement . . . must therefore be satisfied before the other requirements for an injunction can be considered." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (internal quotations and citations omitted). The moving party "must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (quoting

*Faiveley*, 559 F.3d at 118).  Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).  If "there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005).  "[T]he law is clear that a discharge from employment and the injuries that may flow therefrom (*e.g.*, lost income, damage to reputation, and difficulty finding future employment) do not constitute the irreparable harm necessary to obtain a preliminary injunction." *Peck v. Montefiore Med. Ctr.*, 987 F. Supp. 2d 405, 412 (S.D.N.Y. 2013) (collecting cases).

Here, the Court denied the first motion for a preliminary injunction:

I think that it's premature at this point. . . . [T]he Plaintiff agreed and stipulated today that based on the representations by the defense that nothing will be changed from the status quo while she litigates these issues before the hearing committee at the hospital [and therefore] . . . there really isn't any irreparable harm at this point with respect to the decision not to renew the staff privileges.

(Dkt. 59 at 57:3-13).  Plaintiff identifies nothing that has changed since the August hearing to call the Court's previous analysis into question, other than her removal from an email list that includes only clinicians actively working in the NICU.  (Dkt. 95 at ¶ 81).  That de minimis shift in the status quo does not alter the Court's previous analysis.

Moreover, Dr. Mezu-Ndubuisi has failed to demonstrate that money damages will not adequately compensate for any harm.  She argues:

> Irreparable harm would result from non-renewal of Dr. Mezu-Ndubuisi's clinical privileges, as that would warrant a mandated reporting to the National Practitioner Databank which is career-ending for a physician, as she would not be hired by another institution and unable to obtain malpractice insurance.  Her employment at UR would be jeopardized as it is contingent on maintaining clinical privileges.  Dr. Mezu-Ndubuisi would be ineligible for NIH funding with a negative report to the National Practitioner Databank.

(Dkt. 70-1 at 26).  But as Defendants point out, none of that will occur until she "completes the fair hearing process, subsequently appeals any decision resulting from the fair hearing process, fails to prevail at that stage, fails at the University Board level, and fails before the [PHHPC]."  (Dkt. 75 at 14).  As aptly put in *Lerario*, "[t]hese alleged harms, though serious, do not show -- let alone make a strong showing -- that Dr. [Mezu-Ndubuisi] is likely to suffer irreparable harm absent immediate reinstatement."  2023 WL 4847141, at *5.  Even assuming money damages "will be difficult to ascertain," "reinstatement remains available as a remedy following a trial.  If reinstatement is not feasible . . . the Court has discretion to order front pay, *Bergerson v. N.Y. State Office of Mental Health*, 652 F.3d 277, 286 (2d Cir. 2011), or to fashion 'any other equitable relief as the court deems appropriate,' 42 U.S.C. § 2000e-5(g)(1)."  *Id.* (footnote omitted).

Finally, as noted by the Court during the August hearing, the fact that Dr. Mezu-Ndubuisi was reassigned from clinical practice in December 2023 but did not seek redress from the Court until June 2024 cuts strongly against a finding of irreparable harm.  (*See* Dkt. 59 at 5-10).  "Unreasonable delay may 'preclude the granting of preliminary injunctive relief, because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'"  *Lerario*, 2023 WL 4847141, at *6 (quoting *Tough Traveler, Ltd. v.*

*Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)).  "[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998).

The absence of irreparable harm is fatal to Dr. Mezu-Ndubuisi's request for a preliminary injunction.  Indeed, "if a party fails to show irreparable harm, a court need not even address the remaining elements of the test."  *Saraceni v. M&T Bank Corp.*, No. 19-cv-1152, 2020 WL 435359, at *3 (W.D.N.Y. Jan. 28, 2020).  The Court, in the interest of completeness, briefly touches on the remaining factors.  None favor granting the motion.

Dr. Mezu-Ndubuisi cannot establish a likelihood of prevailing on the merits.  She has not shown a likelihood of success on the merits of her discrimination claims, which the Defendants have moved to dismiss.  The record, as it stands now, is insufficient to allow the Court to find that she is clearly likely, or even simply likely, to prevail on the merits.  Moreover, Dr. Mezu-Ndubuisi's current motion for a preliminary injunction seeks reinstatement not based on her discrimination claims, but on the ground that the fair hearing offered by the Hospital does not comport with due process.  (*See generally* Dkt. 70; Dkt. 82).[6]  She argues that the fact that Justice Frazee will be paid by the hospital for her work as the presider of the fair hearing panel raises an inference of bias requiring Justice Frazee's recusal.  Even if these claims were properly before this Court (as opposed to being pursued in an Article 78 proceeding), the Court disagrees.  Those acting as neutral

---

[6]    As previously noted, Plaintiff has voluntarily discontinued her due process and breach of contract claims.  So to the extent she is seeking preliminary injunctive relief based on dismissed causes of action, this is yet another reason that the motion must be denied.

adjudicators should be paid for their work. *Pompano-Windy City Partners, Ltd. v. Bear, Stearns & Co., Inc.*, 698 F. Supp. 504, 518 (S.D.N.Y. 1988). "The fact that the forum may compensate the arbitrators is not itself sufficient to establish 'evident partiality.'" *Id.* ("The payment fees to arbitrators does not, of course, depend on their disposition of the merits. . . . [T]he typical reality of arbitration of this type involves arbitrators who often accept their appointment as a form of public service, and the fees they might receive do not make up for what they lose by taking time from their regular employment.") (citations omitted)). And Dr. Mezu-Ndubuisi declined a common-sense solution to the issue when she declined to split the fee with the Hospital. (Dkt. 70-7 at 6).

Nor do the communications between D'Antonio and Justice Frazee regarding administrative matters raise an inference of bias. "*Ex parte* communications by [] any one [] with a judicial or quasi-judicial body regarding a pending matter are improper and should be discouraged. On the other hand, the mere existence of such communications hardly requires a court or administrative body to disqualify itself." *Power Auth. of N.Y. v. Fed. Energy Regulatory Comm'n*, 743 F.2d 93, 110 (2d Cir. 1984). "Recusal would be required only if the communications posed a serious likelihood of affecting the agency's ability to act fairly and impartially in the matter before it." *Id.* "In resolving that issue, one must look to the nature of the communications and particularly to whether they contain factual matter or other information outside of the record, which the parties did not have an opportunity to rebut." *Id.* None of those concerns are implicated here.

Finally, Justice Frazee's decision to limit the scope of the hearing does not provide a ground for issuing an injunction reinstating Dr. Mezu-Ndubuisi. The Bylaws vest the

fair hearing presider with the authority to "assure that all participants in the hearing have a reasonable opportunity to present relevant oral and documentary evidence," "determine . . . what evidence will be permitted, and make any other rulings that may be required." (Dkt. 19-7 at 67). In addition, the Bylaws provide that "[t]he Chair shall have final decision making authority on all such issues." *Id.* Given this, it cannot be said that Justice Frazee acted outside the scope of her authority in limiting the scope of the hearing.

"Because pre-deprivation process serves a limited function, the Constitution mandates only that such process include, at a minimum, notice and the opportunity to respond." *Peck*, 987 F. Supp. 2d at 411-12 (citing *O'Connor v. Pierson*, 426 F.3d 187, 197 (2d Cir. 2005)). Both are provided for here. To the extent that Dr. Mezu-Ndubuisi is relying on the Court's comments during the August hearing regarding the scope of the proceedings, the Court simply expressed a view as to how best to proceed, and did not issue an order as to how the Hospital must proceed.

Nor do the equities favor Dr. Mezu-Ndubuisi. She argues that the equities favor her because she is only being offered "a rigged Fair Hearing proceeding that fell miles short of due process," and, overall, treated her with bad faith since she filed her complaint with the EEOC. (Dkt. 70-1 at 27). As set out above, Dr. Mezu-Ndubuisi has remedies should the process provided by the Hospital prove inadequate. Requiring the Hospital to reinstate her appointment without permitting the process to be completed, however, would impose hardship on Defendants, potentially interfering with their obligations to their patients and the public. As explained by the court in *Peck*:

> If the Court were to deny [the physician's] motion for a preliminary injunction, [the physician] will merely be obliged to follow the procedure that [the hospital] has set for challenging a prospective termination of employment. . . . [The physician] cannot fairly claim hardship from having to participate in this established process, which applies to all [physicians] whose performance [the hospital] might claim was sufficiently wanting to justify discharge. . . . [I]f the Court were to grant the preliminary injunction, the effect of such an injunction would likely be to shut down altogether the process by which [the hospital] is presently considering whether to terminate [the physician]. . . .  To pretermit this process would saddle [the hospital] with having to retain a [physician] whom it claims is deficient in a variety of ways, while depriving the hospital of the opportunity to demonstrate these deficiencies . . . [and] would therefore cause a substantial hardship.

*Id.*  The Court agrees, and finds the balance of equities here favors Defendants.

Finally, granting Dr. Mezu-Ndubuisi an injunction is contrary to the public interest. New York created PHHPC review to serve the public's interest. *See Gelbard v. Genesee Hosp.*, 211 A.D.2d 159, 161 (4th Dept. 1995) ("The public has an overriding interest where questions of a physician's competency and/or ethics are involved in determining whether that physician should be permitted to practice in a hospital.  The [PHHPC] is best qualified to pass initially on those matters."), *aff'd*, 87 N.Y.2d 691 (1996); *Mason v. Cent. Suffolk Hosp.*, 3 N.Y.3d 343, 348 (2004) ("It is not just in a hospital's interest, but in the public interest, that no doctor whose skill and judgment are substandard be allowed to treat or operate on patients.").  It is in the public interest here to require Dr. Mezu-Ndubuisi, if necessary, to bring her claim to the PHHPC before the Court considers whether to issue an injunction requiring the Hospital to reinstate her.

## III.  Temporary Restraining Order

"In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction." *Donlon v. City of Hornell*, No. 23-

CV-6096-FPG, 2023 WL 1784669, at *1 (W.D.N.Y. Feb. 6, 2023) (quoting *Antonyuk v. Hochul*, No. 22-CV-986, 2022 WL 5239895, at *3 (N.D.N.Y. Oct. 6, 2022)).  For the reasons given above as to why her motion for a preliminary injunction would fail on the merits, Dr. Mezu-Ndubuisi's motion for a temporary restraining order is denied. Additionally, because the hearing did not go forward as scheduled on December 16 and 17, and that was the relief sought by Dr. Mezu-Ndubuisi with the temporary restraining order motion, it is also denied as moot.

## IV.    Primary Jurisdiction Doctrine

### A.    New York Public Health Law § 2801-b

When physicians challenge a determination to suspend or diminish that physician's professional privileges in a hospital, Public Health Law § 2801-b(2) "provides the allegedly aggrieved physician with a procedural avenue through which he [or she] can present his [or her] claim of a wrongful denial of professional privileges to the Public Health Council." *Guibor v. Manhattan Eye, Ear & Throat Hosp., Inc.*, 46 N.Y.2d 736, 737 (1978).  Section § 2801-b provides that:

> It shall be an improper practice for the governing body of a hospital to refuse to act upon an application for staff membership or professional privileges or to deny or withhold from a physician . . .  membership or professional privileges in a hospital, or to exclude or expel a physician . . . from staff membership in a hospital or curtail, terminate or diminish in any way a physician's . . . professional privileges in a hospital, without stating the reasons therefor, or if the reasons stated are unrelated to standards of patient care, patient welfare, the objectives of the institution or the character or competency of the applicant.

N.Y. Pub. Health Law § 2801-b (McKinney 2008).

Section 2801-b further provides an administrative review mechanism for physicians' claims relating to the denial of professional privileges:

> Any person claiming to be aggrieved by an improper practice as defined in this section may, by himself or his attorney, make, sign and file with the public health council a verified complaint in writing which shall state the name and address of the hospital whose governing body is alleged to have committed the improper practice complained of and which shall set forth the particulars thereof and contain such other information as may be required by the council.

N.Y. Pub. Health Law § 2801-b(2).

The statute thus creates "a two-step grievance process by which a physician may obtain injunctive relief requiring the hospital to restore wrongfully terminated staff privileges." *Gelbard v. Genesee Hosp.*, 87 N.Y.2d 691, 696 (1996). "First, the physician must submit a complaint to the [PHHPC]." *Id.* "After investigating the physician's complaint, the [PHHPC] will either direct the hospital to reconsider its decision or inform the parties of its determination that the complaint lacks merit." *Id.* "Only upon completion of the [PHHPC] review may the physician proceed to the second step, which is to commence an action under section 2801-c to enjoin the hospital from improperly denying or terminating staff privileges." *Id.* As the New York State Court of Appeals explained almost 30 years ago:

> A hospital's decision to grant or deny staff privileges is based on specialized medical considerations involving notions of patient care, physician competence, and institutional welfare. Unlike the courts, which are generally untrained and inexperienced in these matters, the [PHHPC] is a body of medical experts dedicated to the review of complex medical care issues, including issues related to the grant or denial of hospital staff privileges. The requirement of threshold [PHHPC] review thus ensures that before a court orders the restoration of a physician's staff privileges, the [PHHPC] has been afforded an opportunity to apply its special expertise to the issues involved.

- 31 -

> This process assists judicial decision making in a subsequent court action because the [PHHPC]'s findings are entitled to prima facie effect.

*Id.* (citations omitted).

"The requirement of threshold [PHHPC] review serves the dual purpose of allowing an expert body to initially review the physician's complaint and of promoting prelitigation resolution." *Id.* As a result, "in view of the statutory scheme and principles of exhaustion of administrative remedies, that both of these undeniably salutary purposes are advanced by interpreting ***the statute as mandating threshold [PHHPC] review in all cases in which a physician seeks injunctive relief to compel the restoration of staff privileges***." *Id.* (emphasis added); *see also Cohoes Mem'l Hosp. v. Dep't of Health*, 48 N.Y.2d 583, 588 (1979) ("If the parties, with the assistance of the Public Health Council, are unable to resolve their differences amicably, then, and only then, may the aggrieved physician . . . invoke step two of the statutory procedure by commencing an action pursuant to section 2801-c of the Public Health Law to enjoin the hospital from discriminating against or unjustly denying professional privileges . . .").

In *Gelbard*, the New York Court of Appeals established a brightline rule that a physician seeking an order restoring staff privileges must first present his claims to the PHHPC and the physician could not avoid PHHPC review by "artful pleading." 87 N.Y.2d at 697; *see also Gelbard*, 211 A.D.2d at 164 ("[A] physician cannot avoid review by the Public Health Council in the first instance by cloaking a cause of action in terms of 'breach of contract' when, in effect, he or she is seeking reinstatement of hospital privileges. Thus,

the allegations of a complaint are not controlling; rather, it is the nature of the relief sought that controls.").

## B.    Primary jurisdiction doctrine

Primary jurisdiction is a "relatively narrow" exception to the exercise of federal court jurisdiction. *Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 504 (2d Cir. 2022) (citation omitted).[7] "The doctrine is a prudential one, fashioned by the courts, concerned primarily with promoting relationships between the courts and the administrative agencies charged with particular regulatory duties, and with ensuring the two do not work at cross-purposes." *Id.* (internal quotation marks, citation and brackets omitted). "The doctrine of primary jurisdiction applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of the administrative body." *Id.* (internal quotation marks omitted).

In *Johnson v. Nyack Hosp.*, 964 F.2d 116 (2d Cir. 1992), the Second Circuit found that the doctrine of primary jurisdiction required a physician to exhaust his administrative remedies with the PHHPC before commencing a lawsuit in federal court arising out of the hospital's professional privileges decision. *Id.* at 121-22. There, the physician plaintiff brought a federal antitrust action against a hospital and several members of its medical

---

[7]    "A court's application of the primary jurisdiction doctrine thus 'does not [necessarily] deprive the court of jurisdiction.' Rather, once a court determines that the doctrine applies, it has discretion either: (1) to retain jurisdiction or (2) to dismiss the case without prejudice." *Palmer*, 51 F.4th at 505 (quoting *Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993)).

staff, alleging a conspiracy to revoke plaintiff's surgical privileges so as to eliminate the competition he posed in the thoracic and vascular surgery market.  *Id.* at 120.  The Second Circuit affirmed the district court's holding that because plaintiff's claims were based on actions taken regarding his professional privileges, plaintiff was obligated to exhaust his PHHPC remedy before filing the complaint.  *Id.* at 120-21 ("[A] physician who asserts a damages claim that turns on whether the hospital legitimately terminated his privileges must first file a complaint with the [PHHPC].").  The Second Circuit emphasized:

> The [PHHPC]'s mission is to "consider any matter relating to the preservation and improvement of public health."  N.Y. Pub. Health L. § 225. The [PHHPC] customarily passes on cases where a doctor complains that a hospital unfairly terminated his privileges.  In disposing of these cases, the [PHHPC] draws upon the vast medical knowledge of its members.  Because of the [PHHPC]'s experience and expertise, we agree with the District Court that the [PHHPC] should first determine whether defendants' actions were medically justified.

*Id.* at 121.  The Second Circuit also noted:

> [J]udicial economy will best be served by requiring Johnson to file a complaint with the P[ublic ]H[ealth ]C[ouncil] before seeking judicial relief. The [PHHPC] often avoids the unpleasant task of besmirching a physician's reputation by: using its professional expertise to identify and discourage groundless claims, to mediate and to conciliate disputes between health-care professionals, and to offer the court some aid in resolving such disputes, should the parties fail to come to agreement on their own.  The [PHHPC] may yet propose a solution that will end the current hostilities between Johnson and Nyack without judicial intervention. At the very least, the [PHHPC] should be given a chance to try.

*Id.* at 123 (citation omitted).

The Second Circuit refined its approach in *Tassy v. Brunswick Hosp. Ctr. Inc.*, 296 F.3d 65 (2d Cir. 2002).  There, the plaintiff's privileges were revoked by a hospital following sexual harassment allegations.  *Id.* at 65-66.  Plaintiff "denie[d] the sexual

harassment allegations and assert[ed] that [he was] discriminated against . . . on the basis of his race and national origin." *Id.* at 66. The Second Circuit found the plaintiff was not required to first bring his claim before the PHHPC. *Id.* at 66. It distinguished *Johnson*, finding that the PHHPC's medical knowledge was not required because "[t]he primary factual issue is whether [the doctor] committed the alleged sexual harassment, the resolution of which does not require the [PHHPC's] expertise." *Id.* at 70. The Second Circuit noted that the PHHPC "has no expertise in determining whether a doctor committed sexual harassment or other acts of non-medical misconduct." *Id.* By contrast, in *Johnson*, plaintiff's medical privileges were revoked based on plaintiff's unsatisfactory surgical performance, and so "[t]he medical expertise of the [Council]" was required to determine whether "defendants had a proper medical reason to terminate [the doctor's] privileges." *Id.* (quoting *Johnson*, 964 F.2d at 122).

The district courts in this Circuit take a variety of approaches in reconciling *Johnson* and *Tassy*. "The majority of post-*Tassy* district court decisions interpret *Tassy* and *Johnson* as each providing a distinct exception to the primary jurisdiction principle." *Sabido v. Staten Island Univ. Hosp.*, No. 11 Civ. 4120 (BMC), 2012 WL 13042444, at *3 (S.D.N.Y. Apr. 4, 2012). Those courts read the two cases to find that the primary jurisdiction doctrine does not apply where "the physician's privileges have been terminated for reasons that do not pertain to medical care," or when "(1) the plaintiff seeks damages, but *not* reinstatement; *and* (2) the presence or absence of a proper medical reason for terminating the plaintiff's privileges is *not* dispositive of the plaintiff's claims." *Mahmud v. Bon Secours Charity Health Sys.*, 289 F. Supp. 2d 466, 473 (S.D.N.Y. 2003); *see also Bauman*

*v. Mount Sinai Hosp.*, 452 F. Supp. 2d 490, 500 (S.D.N.Y. 2006) (adopting approach set forth in *Mahmud*); *Deshpande v. Medisys Health Network, Inc.*, No. 07-CV-375 (NGG)(VVP), 2008 WL 2004160, at *2 (E.D.N.Y. May 7, 2008) (same). Other courts read *Tassy* to hold that primary jurisdiction cannot be invoked when the medical-care reasons for not reinstating a physician do not provide a "complete defense" to the physician's Title VII claims. *See, e.g., Chandra v. Beth Israel Med. Ctr.*, No. 09 Civ. 6619(RMB)(GWG), 2011 WL 180801, at *2 (S.D.N.Y. Jan. 19, 2011).

Here, as currently pleaded, this case falls squarely within § 2801-b(2)'s ambit: Dr. Mezu-Ndubuisi is seeking reinstatement of her medical privileges, and "[a] physician who wants his privileges restored must first file a complaint with the [PHHPC] prior to seeking redress in the courts." *Johnson*, 964 F.2d at 121. Moreover, it appears likely that the PHHPC's technical expertise would materially aid the Court in deciding plaintiff's claims, even if the decision would not provide Defendants with a complete defense to those claims. In *Mahmud*, the plaintiff-physician also argued that defendants claimed that her patient care was deficient as a pretext for discrimination. 289 F. Supp. 2d at 475. The court determined that "[t]hese factual allegations, and particularly those concerning deficient patient care, are the very type of medically-based claims that demand initial review by the [PHHPC], which is in a far superior position to assess their merit than this Court." *Id.*

A similar result was reached by the court in *Sabido*:

There is no question here that a decision from the PHHPC on the issue of whether Sabido violated a required standard of care by not responding to a call for a patient with a DNR order will be of assistance to this Court. It goes directly to the second prong of the test under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803-05 (1973), that is, whether SIUH had a *bona fide*

business (*i.e.*, medical) justification for suspending Sabido's privileges. The appropriate response of an on-call physician in this situation is squarely within the ambit of the PHHPC's expertise, and while I, or more likely the jury, could listen to competing experts and decide whether Sabido's failure to respond was appropriate, the primary jurisdiction doctrine does not require an inability to judicially determine an issue; rather, it just requires that an agency's expertise will assist the Court in making that determination.

2012 WL 13042444, at *5.

In *Sohrawardy, D.O. v. Northwell Health, Inc.*, No. 23cv9706 (DLC), 2024 WL 3898307 (S.D.N.Y. Aug. 22, 2024), the plaintiff physician also alleged her firing was due to discrimination, while her employer contended she was fired for deviating from the standards set for patient care. *Id.* at *1. Defendants moved to dismiss her Title VII lawsuit because she failed to first file a complaint with the PHHPC before seeking relief in federal court. *Id.* at *2. The court found that PHHPC review would materially aid it in considering plaintiff's Title VII claims, as the complaint alleged that:

the defendants suspended, investigated, and eventually fired Dr. Sohrawardy purportedly because of concerns about patient safety and quality of care. Dr. Sohrawardy alleges that the incidents that Northwell characterized as deviations from standards of care on her part in fact resulted from understaffing, delays, or other systemic problems in the hospital. Evaluating these claims will benefit from, if not require, 'a skilled evaluation of whether [Dr. Sohrawardy] provided inadequate treatment' to patients.

*Id.* (quoting *Johnson*, 964 F.2d at 122).

Similarly, here Dr. Mezu-Ndubuisi's discrimination claims are inextricably intertwined with issues related to her practices regarding patient care. The gravamen of her complaint is that the Defendants falsely criticized her medical care as a pretext for discrimination. The PHHPC's technical expertise would materially aid the Court in

deciding Plaintiff's claims.  To be clear, the PHHPC will not be evaluating her claims of discrimination.  It would evaluate only issues regarding Dr. Mezu-Ndubisi's patient care.[8]

Also unpersuasive is Dr. Mezu-Ndubisi's argument that Title VII preempts the requirement that she first seek PHHPC review before pursuing reinstatement.  The cases she cites stand for the proposition that in certain situations, a plaintiff need not exhaust state law remedies before pursuing federal claims. (*See* Dkt. 60 at 12 (quoting *Patsy v. Bd. of Regents*, 457 U.S. 497, 516 (1982) (plaintiffs need not exhaust state administrative remedies before initiating § 1983 claims); *Felder v. Casey*, 487 U.S. 131, 139 (1988) (same); *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 458 n.3 (1975) (declining to decide "whether a § 1981 claim of employment discrimination is ever subject to a requirement that administrative remedies be exhausted"); *Buntin v. City of Boston*, 813 F.3d 401, 404-05 (1st Cir. 2015) (§ 1981 claims not subject to Title VII's exhaustion requirements); *Battle v. Nat'l City Bank of Cleveland*, 364 F. Supp. 416, 418 (N.D. Ohio 1973) (same))).

But the primary jurisdiction doctrine does not implicate the exhaustion rule.  *See Johnson*, 964 F.2d at 122 (in deciding whether PHHPC review is required, "the doctrine of

---

[8]    The Court recognizes that the scope of the hearing has been limited to exclude some of the patient care subject matters that Plaintiff wanted to raise.  (*See* Dkt. 75-6).  It is difficult to understand how the fair hearing panel can assess the appropriateness and reasonableness of Plaintiff's reaction to the request to agree to a plan to return to clinical practice without at least some understanding of the facts that led to the suspension from clinical practice in the first place.  But at this stage of the litigation—without any final decision being made as to Plaintiff's staff privileges—it seems reasonable to conclude that medical issues and Plaintiff's provision of patient care will be part of the hearing, and therefore the result will likely implicate the technical expertise of the PHHPC.

primary jurisdiction, which is related to (and commonly confused with) exhaustion, is the applicable principle" for analysis).  Instead, primary jurisdiction asks whether a court will be aided by an agency with expertise in the subject matter underlying the dispute before the court.  *Id.*  ("Primary jurisdiction thus recognizes that even though Congress has not empowered an agency to pass on the *legal* issues presented by a case raising issues of federal law, the agency's expertise may, nevertheless, prove helpful to the court in resolving difficult *factual* issues.").

Nothing in Title VII bars a court from applying the primary jurisdiction doctrine in a Title VII case.  Dr. Mezu-Ndubuisi argues invoking primary jurisdiction conflicts with Congress's intent that Title VII cases be fast-tracked:

> It shall be the duty of the judge designated pursuant to this subsection to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited.  If such judge has not scheduled the case for trial within one hundred and twenty days after issue has been joined, that judge may appoint a master pursuant to rule 53 of the Federal Rules of Civil Procedure.

42 U.S.C. § 2000e-5(f)(5).  But here, Defendants have yet to file an answer and issue has not yet been joined, so that provision is not applicable.

Finally, contrary to Dr. Mezu-Ndubuisi's argument, the recent overruling of *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), by *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) is of no moment to the Court's analysis because *Chevron* deference applied (1) only to legal issues, and (2) only to determinations by federal agencies.  *N.Y. State Dep't of Envtl. Conservation v. Fed. Energy Regul. Conservation*, 884 F.3d 450, 455 (2d Cir. 2018) (*Chevron* deference does not apply to state

agency determination absent "the federal agency charged with administering that statute []

expressly approv[ing] the state's interpretation and implementation.").

Granted, even if the PHHPC agrees with the Hospital, that will not provide a

complete defense to Plaintiff's Title VII claims, because she can still argue the medical

issues are pretextual, and discriminatory or retaliatory motives were the real reason for

Defendants' actions. "But the standard for the applicability of primary jurisdiction is not

whether the agency will address all dispositive questions in a case." *Sohrawardy*, 2024

WL 3898307, at *3. "It is rather 'whether an agency's review of the facts will be a material

aid to the court ultimately charged with applying the facts to the law.'" *Id.* (quoting

*Palmer*, 51 F.4th at 508). Given the nature of Dr. Mezu-Ndubuisi's claims, the Court

concludes PHHPC review would provide material aid to the Court when the time comes to

consider her federal law claims.

### C.    Stay

A court applying the doctrine of primary jurisdiction may either (1) stay the case

"so as to give the plaintiff a reasonable opportunity within which to apply to the [agency]

for a ruling," or (2) dismiss the case without prejudice "if the parties would not be unfairly

disadvantaged." *Palmer*, 51 F.4th at 505. However, "[w]here dismissal would present a

'significant danger of unfair disadvantage' to a plaintiff whose damages claims are subject

to a statute of limitations, a stay is appropriate." *Sohrawardy*, 2024 WL 3898307, at *4

(quoting *Palmer*, 51 F.4th at 505). Dr. Mezu-Ndubuisi would run into a statute of

limitations issue if the Court dismissed because she would be outside the 90-day limit for

filing suit after receiving her right-to-sue letter from the EEOC. 42 U.S.C. § 2000e-5(f)(1).

Rather than dismiss the complaint without prejudice, the Court instead stays the instant litigation.

## **CONCLUSION**

For the reasons set forth above:

(1) Dr. Mezu-Ndubuisi's motion for a preliminary injunction (Dkt. 70) is DENIED as unripe, without prejudice to renewal should it become ripe;

(2) Dr. Mezu-Ndubuisi's motion for a temporary restraining order (Dkt. 74) is DENIED;

(3) Defendants' motion to dismiss the amended complaint (Dkt. 38) is stayed pending further order of the Court, except for her Title VII claims as against the individual defendants, her due process claims, and her breach of contract claims, which are DISMISSED by the consent of the parties.

The parties shall file status letters at the completion of the Hospital's review process, in which the parties may, if necessary, address whether continuing the stay is appropriate.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:    January 6, 2025
          Rochester, New York